# EXHIBIT 2

**WIPO**
WORLD **INTELLECTUAL PROPERTY** ORGANIZATION

# WIPO Arbitration and Mediation Center

## ADMINISTRATIVE PANEL DECISION

## Cerulean Studios, LLC v. Hexuan Cai

## Case No. D2013-0902

### 1. The Parties

The Complainant is Cerulean Studios, LLC of Brookfield, Connecticut, United States of America, represented by Kilpatrick Townsend & Stockton LLP, United States of America.

The Respondent is Hexuan Cai of Xiamen, Fujian, China, represented by Oyen Wiggs Green & Mutala LLP, Canada.

### 2. The Domain Name and Registrar

The disputed domain name <trillian.com> is registered with Network Solutions, LLC (the "Registrar").

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on May 22, 2013. On May 23, 2013, the Center transmitted by email to the Registrar a request for registrar verification in connection with the disputed domain name. On May 23, 2013, the Registrar transmitted by email to the Center its verification response confirming that the Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondent of the Complaint, and the proceedings commenced on May 31, 2013. In accordance with the Rules, paragraph 5(a), the due date for Response was June 20, 2013. The Response was filed with the Center on June 18, 2013.

The Center appointed Richard Tan as the sole panelist in this matter on June 28, 2013. The Panel finds that it was properly constituted. The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

Subsequent to the filing of the Respondent's Response, the Complainant and the Respondent submitted in quick succession unsolicited Supplemental Filings (the Complainant's Supplemental Filing of June 28, 2013; the Respondent's Supplemental Filing of July 10, 2013; the Complainant's Supplemental Filing of July 11, 2013; and the Respondent's Supplemental Filing of July 12, 2013). The Complainant requested permission to submit its Supplemental Filing on the basis that the Respondent's Response contained misleading allegations with regard to its claimed ownership and use of the name "Trillian", which the Complainant could not have reasonably anticipated when it filed the Complaint. After considering the Complainant's reasons for its request, which the Panel considered were justified, the Panel decided in the exercise of its discretion that the aforesaid Supplemental Filings should be admitted and issued Administrative Panel Procedural Order No. 1 on July 15, 2013 allowing the Supplemental Filings of both parties to be admitted and extending time for the rendering of the Panel's Decision. The Panel considered that exceptional circumstances existed which warranted the filing of the Supplemental Filings and that, for procedural fairness, the Respondent should be allowed an opportunity to respond.

Subsequently, the Complainant requested that it be allowed to make a further Supplemental Filing, which it submitted on July 24, 2013, to show that a document that the Respondent submitted in his Supplemental Filing was a false document. After considering that request, the Panel, in the exercise of its discretion, issued Administrative Panel Procedural Order No. 2 on July 25, 2013 in which it admitted the Complainant's Supplemental Filing of July 24, 2013 and allowed the Respondent to file a supplemental filing in response. The Respondent filed a Supplemental Filing on July 31, 2013.

The Panel upon considering the Respondent's Supplemental Filing of July 31, 2013, visited the website of Hextar Holdings Sdn Bhd, the Malaysian company to which the Respondent claimed that certain goods under the Trillian mark had been shipped under the bill of lading that the Complainant contended was a false or fictitious document. The Panel noted that according to information on the aforesaid website, one of the companies listed as part of the Hextar group of companies was Agrinoon Hextar Chemicals Co Ltd (China), which appeared to be linked to the Respondent or his companies.

The Panel then issued Administrative Panel Procedural Order No. 3 on August 14, 2013 to invite the Respondent to submit a supplemental filing to comment on the relationship between Hextar Holdings Sdn Bhd and the Respondent and his companies and the nature of the relationship; whether there was any other corroborative and/or independent evidence of the shipment of 300 cartons of Trillian Lotus Seed that was said to have been shipped on the same vessel and date (September 18, 2012) as referenced by Exhibit P to the Respondent's Supplemental Filing of July 10, 2013) and Exhibit R to the Respondent's Supplemental Filing of July 31, 2013 and whether the packaging of the goods as shipped actually bore the mark Trillian. The Panel also allowed the Complainant to submit a supplemental filing in response if it wished. The Respondent filed a Supplemental Filing on August 21, 2013 and the Complainant filed a Supplemental Filing on August 23, 2013 in response.

The Panel has considered that the foregoing Supplemental Filings constituted exceptional circumstances under Rule 15(b) of the UDRP that required additional time for the Panel to provide its Decision and has extended the time accordingly.

## 4. Factual Background

The Complainant is a software development company founded in 2000. It developed and offers an instant messaging software application under the TRILLIAN mark. Its application allows a user to exchange messages and chat with people who use other instant messaging services or social networks. It owns a trade mark and service mark registration (Reg. No. 4,044,953) in the United States of America for TRILLIAN in Class 9 for "downloadable computer software for accessing, creating and transmission of instant messages and voice over Internet protocol communications; downloadable computer software for accessing and using electronic social networks" and in Class 38 for "instant messaging services". The mark was applied for in March 2011 at the United States Patent and Trademark Office (USPTO) based on a first use in commerce of July 1, 2000 of its downloadable computer software and the mark was registered on October 25, 2011. The Complainant also operates a website at the domain name <trillian.im> which it has used since April 2009 and another website at the domain name <trillianastra.com> which it has used since 2005.

The disputed domain name was acquired by the Respondent in December 2012 at an on-line auction. Prior to that, it was owned by a prior registrant since 1995. On or about November 15, 2012, the registration of the disputed domain name expired and was not renewed by the prior registrant and was put up for auction by NameJet, an aftermarket domain name auction service dealing with the sale of expiring domain names.

## 5. Parties' Contentions

### A. Complainant

The Complainant contends that the disputed domain name is identical to the TRILLIAN trade mark in which it has rights, that the Respondent has no rights or legitimate interests in the disputed domain name and that the Respondent has registered and is using the disputed domain name in bad faith.

In respect of the first contention, the Complainant relies on its trade mark registration of the mark TRILLIAN which it owns and asserts that it has also common law rights in that mark through the extensive and continuous use of the TRILLIAN mark on its software products since July 2000 when it first released a version of its Trillian instant messaging application. Since then, it says that it has released several newer versions of its Trillian software application, which have enjoyed great

success. To date, it says that its Trillian application has been downloaded more than 50 million times through many well-known websites such as those operated by Google, Apple, Cnet and others, making it one of the most popular instant messaging applications. It says that it has also received high praise from the tech media and favorable reviews from the media for its products. As a result of its extensive and long use of the mark TRILLIAN, it asserts that its mark has become well-known within the tech community and amongst consumers.

In respect of the second contention, the Complainant claims that since acquiring the disputed domain name in December 2012, the Respondent has used it as a click-through revenue portal that contains links to tech-related websites, some of which purport to offer products and services by the Complainant's competitors and others which purport to relate to the Complainant. The Complainant's rights predate the Respondent's registration of the disputed domain name. There is no relationship between the Complainant and the Respondent giving rise to any license, permission or other right by which the Respondent could own or use the disputed domain name incorporating the Complainant's mark. The Respondent has not been known by the disputed domain name. The Respondent was also not using the disputed domain name in connection with a *bona fide* offering of goods or services or making a legitimate noncommercial use or fair use of the disputed domain name. The Respondent did not register the disputed domain name for any legitimate purposes.

In respect of the third contention, the Complainant asserts that the Respondent's bad faith registration and use are established by the fact that the disputed domain name is identical to the Complainant's well-known trade mark and the website is being used for a click-through revenue portal for profit. Such registration and use of a well-known mark is in and of itself a form of opportunistic bad faith. Given the commercial content of the Respondent's website, the Respondent has attempted to profit from the web traffic generated by the Complainant's TRILLIAN mark and has thus been acting in bad faith. Further, a simple search for "trillian" on Google before the Respondent acquired the disputed domain name would have revealed the Complainant's rights in the TRILLIAN mark. Moreover, after acquiring the disputed domain name, the Respondent immediately used it for the click-through revenue portal for his own profit.

By its Supplemental Filing of June 28, 2013, the Complainant disputed the Respondent's claims in his Response that it had rights and legitimate interests in the disputed domain name and had used the Trillian mark on its website in connection with the sale of certain goods. The Complainant contended that that the Respondent's claimed use of the Trillian mark occurred only after the Complainant filed the Complaint.

In addition, it asserted that the Respondent falsely alleged that he was not aware of the Complaint until May 31, 2013 as just five days earlier, on May 26, 2013 the Respondent sent an email to the Complainant which contained a veiled offer to sell the disputed domain name. The Complainant characterized the Respondent's assertions and claims as false and an attempt to mislead the Panel.

The Complainant produced printouts from "www.archive.org" to show that on April 25, 2013, prior to the filing of the Complaint, the Respondent's company's website at "www.xu.com" contained no references to "Trillian". The Respondent had added references to "Trillian" on its website only after the proceedings were initiated and also added "Trillian" watermarks to photographs of its goods. The "new" products on the website with the Trillian mark placed on them were actually mere clones of the products previously available on the Respondent's website prior to May 22, 2013, which contained no references to "Trillian" whatsoever. The Complainant produced printouts of the old and "new" products shown on the Respondent's website at different dates to support these assertions.

The Complainant further asserted that while the Respondent claimed that "Trillian" was one of his company's major brands, none of the Respondent's other websites made references to "Trillian".

The Complainant also asserted in its Supplemental Filing of July 11, 2013 that the email address "[…]@gmail.com from which the email dated May 26, 2013 was sent containing the alleged veiled offer to sell the disputed domain name was an address associated with the Respondent and his Agrinoon business based on searches done by the Complainant at WhoIs archive pages, and that the Respondent's assertion in his Supplemental Filing of July 10, 2013 that he had no connection with the person who sent the email was patently false and further proof of the Respondent's attempts to mislead.

In its further Supplemental Filing of July 24, 2013, the Complainant asserted that a shipping document exhibited by the Respondent as Exhibit P to the Respondent's Supplemental Filing of July 10, 2013 (consisting of a copy of a bill of lading purporting to show that certain Trillian goods had been shipped on September 18, 2012 to a company in Malaysia known as Hextar Holdings Sdn Bhd) was a false document. It exhibited a document which it said was a true and correct copy of the

actual bill of lading obtained from the shipping line which showed that the goods shipped were not Trillian goods but some other products. It said that the document provided to the Panel as Exhibit P as evidence of prior or actual use of the Trillian mark on goods for sale and export was fabricated.

In its further Supplemental Filing of August 23, 2013 in response to the Respondent's Supplemental Filing of August 21, 2013, the Complainant contended that the Respondent had made various assertions and claims that were unsupported, false and filled with inconsistencies. It argued that the Respondent failed, as invited by the Panel, to provide any corroborative or independent evidence of the alleged shipment of the goods on September 18, 2012 relating to the bill of lading that the Complainant contended was a fake document. It submitted that the Respondent's new evidence purportedly showing that it had shipped 500 gift boxes of Trillian-marked goods to a company in Malaysia, Lean Teik Soon Sdn Bhd, was suspect, noting that Lean Teik Soon Sdn Bhd was a wholly owned subsidiary of a company whose chairman was also the chairman of Hextar Chemicals, and that there were elements of the photograph of the gift box that were also suspect. It also asserted that even if there was a sale of the goods on November 24, 2012 to Lean Teik Soon Sdn Bhd, as the Respondent had alleged, that transaction postdated the expiry of the registration of the disputed domain name on November 15, 2012, and the Respondent did not make any use of the Trillian mark before that date. The claimed use, if any, only started for the purpose of creating a framework for claiming a legitimate interest in the disputed domain name based on the Complainant's well-known trade mark.

The Complainant also noted that the Respondent's claim of not being connected to the person who sent the email dated May 26, 2013, was highly suspect as the Respondent's company's domain name <laogubo.com> (for its major brand "Laogubo" of products) was registered in the name of that person with an address in Vancouver, and that Vancouver address has also been used by the Respondent to register multiple domain names such as <sexnow.com> and <sexhome.com>.

### B. Respondent

The Respondent contended that the Complainant's trade mark registration at the USPTO in the United States of America was only for downloadable computer software and instant messaging services, which did not preclude others in the United States of America from using the mark in association with other goods and services such as agricultural products which the Respondent's company has been dealing with. Further, such registration had only force in the United States and would not preclude others from using an identical mark in other countries.

The Respondent asserted that he or his company had rights and legitimate interests in the disputed domain name. He asserted that "long before" the Complainant initiated these administrative proceedings the Respondent's company, Agrinoon (Fujian) Ecological Agriculture Company Limited, a company incorporated in China, had used the brand "TRILLIAN +萃莲" to market and sell its local specialty agricultural products such as lotus seeds, edible lilies, wolfberries, fruits, soybeans and others. He claimed that the pronunciation of the Chinese words "萃莲" was the same as the pronunciation of the English word "trillian". In November 2012, his company decided to set up a B2C website at "www.xu.com" to market the Respondent's branded products including the Laogubo and Trillian brands. That company used and/or prepared to use the trade mark and brand Trillian in connection with a *bona fide* offering of goods or services before the Complainant initiated these proceedings. Accordingly, the Respondent asserted that he has rights and legitimate interests in the disputed domain name.

The Respondent asserted he did not register or use the disputed domain name in bad faith. The Respondent acquired the disputed domain name to advance his company's legitimate business interests in agricultural products and has never attempted or intended to sell, rent, or otherwise transfer the disputed domain name to the Complainant or others for monetary gain.

The Respondent claimed that his company considered it very important to secure domain names that corresponded with its two major brands, Laogubo and Trillian. The Respondent said he "was sad to discover" that <trillian.com> was already registered by a third party in 1995. The Respondent claimed that "fortunately", his company discovered that the disputed domain name became available at the end of 2012 at an on-line auction when the original registrant did not renew it, and it then decided to bid for it. It was successful in the auction and paid the sum of USD 7,599.

The Respondent claimed that he and his company had not heard of the Complainant's Trillian instant messaging system or its TRILLIAN trade mark prior to the auction.

After the auction, the disputed domain name was transferred to the Respondent on December 28, 2012. The Respondent did not however change the disputed domain name's DNS until February 14, 2013. On that date, the Respondent had the DNS of the disputed domain name changed to a DNS server provider, but the Respondent claimed that as the person in the Respondent's company who was in charge of managing the disputed domain name was on maternity leave and the period coincided with the Chinese New Year holidays, and as the Respondent's company was "adjusting" the setup of its B2C e-commerce web portal "www.xu.com" which was not fully completed until early May of 2013, the Respondent's company did not direct the website with the disputed domain name to "www.xu.com" until "about the middle" of May 2013. At the current time, the website with the disputed domain name points to the Respondent's company's web portal "www.xu.com".

The Respondent further asserted that during the period between February 14, 2013 and the middle of May 2013, the disputed domain name was parked by the DNS server and the content and keywords on the disputed domain name were automatically generated by the DNS server system, without any instructions or input from the Respondent. The actions of the DNS server resulted in the content parking alleged by the Complainant.

In the latter regard, the Respondent stated that the content parking was due to the Respondent's oversight; the period during which the disputed domain name was parked by the DNS server was fairly brief and the Respondent had re-directed the website with the disputed domain name to the Respondent's company's own B2C e-commerce web portal "www.xu.com" before the Complainant commenced these proceedings.

In the Respondent's Supplemental Filing of July 10, 2013 responding to the Complainant's Supplemental Filing of June 28, 2013, the Respondent claimed that the email dated May 26, 2013 referred to by the Complainant as sent by the Respondent to the Complainant was not sent by or on behalf of the Respondent. It was sent from an email address […]@gmail.com that did not belong to the Respondent. The Respondent claimed that he did not know how that email came to be sent. The Respondent also submitted certain documents including photographs that purported to show the Trillian mark on packages of the Respondent's products as at September 11, 2012 and May 17, 2013.

In the Respondent's Supplemental Filing of July 12, 2013 responding to the Complainant's Supplemental Filing of July 11, 2013 (which stated that the email address […]@gmail.com from which the email dated May 26, 2013 was sent, was an address associated with the Respondent and his Agrinoon business based on searches done by the Complainant at WhoIs archive pages), the Respondent claimed that the person who sent the email was not a staff member of the Respondent's company but was someone who worked for a web construction support and consulting company which provided services to the Respondent's company.

In the Respondent's further Supplemental Filing of July 31, 2013 in response to the Complainant's Supplemental Filing of July 24, 2013 (asserting that a shipping document exhibited as Exhibit P to the Respondent's Supplemental Filing of July 10, 2013 was a false document), the Respondent re-asserted that the shipping information in Exhibit P was indeed true, and exhibited certain other documents purporting to establish the truth of the disputed document.

In response to the Administrative Panel Procedural Order No. 3, the Respondent stated in his Supplemental Filing of August 21, 2013 that the relationship between the Respondent or his company and Hextar Holdings Sdn Bhd was a purely business relationship and was an arm's length one. The latter wanted to use the Respondent's company's name "Agrinoon" for its proposed China office and asked the Respondent's companies for permission, but no office was eventually set up and the company "Agrinoon Hextar Chemicals" named on the website of Hextar Holdings Sdn Bhd was never formed and has "never existed". The Respondent said that he had tried to obtain a certified letter and copy of the bill of lading in dispute from the shipping company but was not able to do so as the shipping company refused his request. He further attached another set of documents purporting to evidence a further sale of 500 boxes of Trillian lotus seeds to another company in Malaysia, Lean Teik Soon Sdn Bhd. It exhibited a copy of a bill of lading dated December 22, 2012 and a purchase order dated November 24, 2012 and a photograph of one of the gift boxes.

## 6. Discussion and Findings

The Complainant has the burden of proving each of the following three elements under paragraph 4(a) of the Policy in order to be entitled to a transfer of the disputed domain name:

(i) that the disputed domain name is identical or confusingly similar to a trade mark or service mark in which the Complainant has rights; and

(ii) that the Respondent has no rights or legitimate interests in respect of the disputed domain name; and

(iii) that the disputed domain name has been registered and is being used in bad faith.

### A. Identical or Confusingly Similar

This element requires the Complainant to establish two matters: first, that it has rights in the TRILLIAN mark, and second, that the disputed domain name is identical or confusingly similar to the said mark.

The Respondent accepts that the Complainant has registered the trade mark in the United States of America in respect of downloadable computer software in Class 9 and instant messaging services in Class 38 but points out that another company has registered an identical TRILLIAN mark in Class 7. The Respondent also argues that the Complainant's trade mark registrations have force only in the United States and does not preclude others from adopting or using the identical mark in countries outside the United States.

As many UDRP panels have found, as long as a party owns a registered trade mark, that would generally satisfy the threshold requirement of having trade mark rights under the Policy, and the location of the trade mark and/or the goods or services for which it is registered are not relevant for the purpose of finding rights in a trade mark under this first element. The Complainant has been using the TRILLIAN mark since July 2000 and owns a United States trade mark registration for the TRILLIAN mark, registered on October 25, 2011. It also operates websites with the domain name <trillian.im> (since 2009) and <trillianastra.com> (since 2005) and has been making its software applications available over the Internet since 2000.

Based on the Complainant's ownership of its trade mark registration of the TRILLIAN mark, this Panel finds that the Complainant has established that it has rights in the said mark.

As to the second matter, the threshold test for identity or confusing similarity under the Policy involves a comparison between the trade mark and the disputed domain name to determine the likelihood of Internet user confusion. In order to satisfy this test, the relevant trade mark would generally need to be recognizable as such within the disputed domain name, with the addition of common, dictionary, descriptive, or negative terms typically being regarded as insufficient to prevent threshold Internet user confusion.

In this Panel's view, this threshold test is satisfied as the disputed domain name reproduces the Complainant's TRILLIAN trade mark in its entirety. Accordingly, the Panel finds that the disputed domain name is identical or confusingly similar to a trade mark or service mark in which the Complainant has rights.

### B. Rights or Legitimate Interests

As several UDRP panels have found, a complainant is only required to make out a *prima facie* case that the respondent lacks rights or legitimate interests in the domain name and once such a *prima facie* case is made, the burden is shifted to the respondent to come forward with appropriate allegations or evidence to demonstrate its rights or legitimate interests in the domain name. If the respondent makes allegations or produces evidence of its rights, the panel's task is to weigh all the evidence with the burden of proof remaining on the complainant. The general standard of proof is that based on a balance of probabilities.

Paragraph 4(c) of the Policy provides a non-exhaustive list of circumstances, if found by the panel to be proved based on its evaluation of all the evidence presented, as to what constitutes rights or legitimate interest by a respondent in a disputed domain name:

"(i) use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a *bona fide* offering of goods or services before any notice of the dispute; or

(ii) that it has been commonly known by the domain name, even if it has acquired no trademark or service mark rights; or

(iii) that it was making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark."

It is evident that there are a number of vigorously contested factual issues relating to the question whether the Respondent had rights or legitimate interests in the disputed domain name.

In this Panel's view it appears that the Respondent is not commonly known by the disputed domain name. Neither is the Respondent using the disputed domain name for noncommercial purposes. The main issue in dispute was whether the Respondent used or made demonstrable preparations to use the mark Trillian in connection with a *bona fide* offering of goods or services before any notice of the dispute.

One key issue to be addressed is the meaning of the phrase "before any notice of the dispute" in relation to the Respondent's use of the mark. Is the relevant date or period to be taken the period before the filing of the Complaint or the commencement of proceedings on May 31, 2013 or some other period? This question was considered in *Leap Real Estate Systems, LLC. v. BytePlay Limited*, WIPO Case No. D2009-1290. The panel in that case found: "It seems to this Panel that it is possible for 'notice of the dispute to occur in ways other than, and thus at times earlier than, the filing of the complainant or the dispatch of a cease-and-desist letter. It seems to this Panel that it should only be said that the respondent has 'notice of the dispute' when, at the very least, the respondent was, or reasonably should have been, aware both of the existence of the complainant's mark and of the other facts that are necessary for a complainant to have reasonable prospects of success in an action under the Policy." This Panel concurs with the above opinion. It seems somewhat artificial and narrow if "notice of the dispute" were to mean only the receipt by the Respondent of the notice of the Complaint or the commencement of proceedings since the Respondent could have been aware of facts that, objectively, could give rise to a dispute even before receiving any formal notice.

The Respondent bid for the disputed domain name through an on-line auction. The Respondent was evidently no stranger to domain names, having registered multiple domain names like <sexnow.com> and <sexhome.com>. Further, based on his own assertions in his Response, he had been on the lookout for the disputed domain name for some time but found that it had already been registered by a third party. The website at the disputed domain name also contained references to the Complainant and its services.

It is difficult to believe given the foregoing that the Respondent was unaware of the Complainant's TRILLIAN mark or goods at the time he decided to bid for the disputed domain name and the real possibility that a dispute would or could arise thereafter. A search on "trillian" on one of the Chinese web search engines as "www.baidu.com" would also show the Complainant's Trillian products and services (Exhibit 16 to the Complainant's Supplemental Filing of August 23, 2013). Accordingly, the Respondent would likely have had notice of the existence of the Complainant's mark and of circumstances that would show that a dispute could arise, at least about the time the Respondent planned to submit a bid for the disputed domain name, which would have been sometime around November 15, 2012 (the date the registration of the disputed domain name expired). If that is right then the Respondent's use of Trillian mark on his website or on goods after November 15, 2012 would not establish any rights or legitimate interests for the purpose of the Policy.

The Respondent's alleged sale of goods bearing the Trillian mark to Lean Teik Soon Sdn Bhd, on which the Respondent relies, however took place on November 24, 2012, *i.e.* after the time the Respondent was likely to have considered acquiring the disputed domain name and aware of the prospects of a dispute arising. Accordingly that sale might also be properly disregarded as would other acts contrived to show that the Respondent used the mark Trillian on his goods after notice of the dispute.

In the nature of UDRP proceedings, there are no discovery procedures or oral hearings which might allow witnesses to be called and cross-examined so that a panel can assess the credibility of witnesses on the allegations they make especially when they are, as in this case, vigorously contested.

The Panel has to determine whether on the evidence before it, the Respondent used or made demonstrable preparations to use, the Trillian name or mark in connection with a *bona fide* offering of goods or services before any notice of the dispute.

The Respondent has claimed to have used the mark Trillian on his company's local specialty products, such as lotus seeds, edible lilies, wolfberries, fruits and soyabean "long before" the Complainant started these proceedings and that "over the years" its brand "Trillian" has achieved excellent reputation. However the Respondent has not provided any reliable or

convincing evidence that he or his company used the mark Trillian or that it has achieved recognition and enjoyed a strong reputation. He has not given evidence of the volume of sales or details of his company's marketing efforts or the period of those sales.

As other panels have said, "unsupported factual allegations, even if not denied, are of no moment, and unsworn statements of counsel as to factual matters easily verifiable with documentary evidence or of which counsel has no personal knowledge are not evidence and carry little or no weight in a Policy proceeding." See *Budge Industries, LLC v. Joe Carrero*, WIPO Case No. D2010-0392, *Align Technology, Inc v. Web Reg/ Rarenames/ Aligntechnology.Com,* WIPO Case No. D2008-0103.

On the contrary, the Complainant has demonstrated, by producing print outs of the website on April 25, 2013, which was before the commencement of these proceedings, that the Respondent's website did not in fact contain any references to the Trillian brand as at that date but were inserted only later.

With regard to the two export sales the Respondent has relied upon, one in relation to a shipment on September 18, 2012 to Hextar Holdings Sdn Bhd, and the other to Lean Teik Soon Sdn Bhd on November 24, 2012, the authenticity of the first transaction has been called into question. The Respondent did not produce any corroborative or independent evidence to verify this transaction. The second transaction was made very likely around the time the Respondent was intending to acquire the disputed domain name. If the Respondent was in truth using the mark Trillian on his or his company's goods in any substantial manner prior to receiving notice of the dispute, whichever date is taken, it should not have been difficult for the Respondent to produce some evidence of other sales. He did not produce any or any compelling evidence of such sales.

The Panel accepts that it is difficult to resolve questions of credibility in proceedings such as these without oral evidence or cross examination of witnesses. However as the Complainant has correctly submitted, in appropriate situations, a panel may be justified in concluding that one party's evidence may have been manufactured and a panel may discount any matters that may have been invented to frustrate the proceedings: see *e.g. Edward* G. *Linskey Jr. v. Brian Valentine,* WIPO Case No. D2006-0706.

There have been several unsatisfactory features of the Respondent's case that suggest that the Respondent has lacked candour in his submissions. For example, the Respondent's statement that the person who sent the email dated May 26, 2013 to the Complainant was not connected to it was clearly suspect given that the email address from which the email was sent was clearly associated with his business.

The Panel finds that more likely than not, the Respondent, after learning that his company was in a position to acquire the disputed domain name through an auction, started to put in place a framework to support a claim that he had rights or legitimate interests in the name "Trillian".

Having regard to all these matters and after evaluating the evidence, the Panel finds that on a balance of probabilities the Respondent has no rights or legitimate interests in the disputed domain name within the meaning of paragraph 4(a) of the Policy.

### C. Registered and Used in Bad Faith

Paragraph 4(b) of the Policy states that any of the following circumstances, in particular but without limitation, shall be considered evidence of the registration and use of a domain name in bad faith:

(i) circumstances indicating that the respondent registered or acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant (the owner of the trade mark or service mark) or to a competitor of that complainant, for valuable consideration in excess of documented out-of-pocket costs directly related to the domain name;

(ii) circumstances indicating that the respondent registered the domain name in order to prevent the owner of the trade mark or service mark from reflecting the mark in a corresponding domain name, provided that the respondent has engaged in a pattern of such conduct;

(iii) circumstances indicating that the respondent registered the domain name primarily for the purpose of disrupting the business of a competitor; or

(iv) circumstances indicating that the respondent intentionally is using the domain name in an attempt to attract, for commercial gain, Internet users to its website or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of the respondent's website or location or of a product or service on its website or location.

The overriding objective of the Policy is to curb the abusive registration of domain names in circumstances where the registrant is seeking to profit from and exploit the trade mark of another: *Match.com, LP v. Bill Zag and NWLAWS.ORG*, WIPO Case No. D2004-0230.

The Complainant principally relies on the Respondent's registration and use of the disputed domain name based on its well-known trade mark, which the Complainant contends is in and of itself a form of opportunistic bad faith. Further, it relies in its Complaint on the fact that the website is being used for a click-through revenue portal for profit.

It is not disputed by the Respondent that at or after the time of the acquisition of the disputed domain name, the website was used as a click-through revenue portal, but the Respondent claimed that at that time the disputed domain name was parked by the DNS server and the content was automatically generated without any instructions from the Respondent. The Respondent further claimed that his intention was to develop the website as an e-commerce portal to market his company's goods, including its Trillian brand agricultural goods, and it was in the course of doing so but the process needed time and the person in charge at the Respondent's company went on maternity leave, as a result of which the Respondent only re-directed the website with the disputed domain name to "www.xu.com" in May 2013. It does not appear to be in dispute that around the time of the Complaint the disputed domain name was being used as a click-through revenue portal. At the time of filing of the Response the aforesaid website marketed and advertised the Respondent's agricultural products, without any of the material or links that were referred to in the Complaint.

As previously mentioned, it is difficult to believe that the Respondent was unaware of the Complainant's TRILLIAN mark or goods at the time he registered the disputed domain name. As noted, the Respondent bid for the disputed domain name through an on-line auction and was evidently no stranger to domain names. On his own assertions, he had been on the lookout for the disputed domain name for some time. It is difficult to accept that he was unaware of the Complainant or its mark. The website at the disputed domain name also contained references to the Complainant and its services.

Further, the Panel finds the Respondent's attempts to put in place a framework to support a claim that it had rights or legitimate interests to be pretextual, and insufficient to support the Respondent's claims that his use of the disputed domain name has been in good faith.

As a result the Panel finds that the Respondent registered and used the disputed domain name in bad faith.

Accordingly the Panel finds that the Complainant has established on a balance of probabilities that the Respondent has registered and is using the disputed domain name in bad faith.

**7. Decision**

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the disputed domain name <trillian.com> be transferred to the Complainant.

Richard Tan
Sole Panelist
Date: October 7, 2013