SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*
_____

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

February 14, 2020

By ECF

The Honorable P. Kevin Castel,
    United States District Court for the Southern District of New York,
        500 Pearl Street,
            New York, New York  10007.

Re:    *In re Jumia Techs. AG Sec. Litig.*, No. 19-cv-04397-PKC

Dear Judge Castel:

We represent Defendants Jumia Technologies AG ("Jumia"), Jeremy Hodara, Sacha Poignonnec, Antoine Maillet-Mezeray ("Management Board Defendants"), Gilles Bogaert, Andre T. Iguodala, Blaise Judja-Sato, Jonathan D. Klein, Angela Kaya Mwanza, Alioune Ndiaye, Matthew Odgers, and John H. Rittenhouse ("Supervisory Board Defendants") in the above-referenced action.  Defendants respectfully submit this pre-motion letter, under Rule 3.A of Your Honor's Individual Practices, to explain the grounds for their motion to dismiss the Amended Securities Class Action Complaint ("Amended Complaint" or "AC") (Dkt. 62) in advance of the pre-motion conference scheduled for March 19, 2020.[1]

I.    **Background**

This case arises out of Jumia's April 12, 2019 initial public offering ("IPO") of American Depository Shares on the New York Stock Exchange.  Jumia is the leading e-commerce platform in Africa, with operations across the continent.  *See* Form F-1, at 98 (Mar. 12, 2019).  As a stock corporation incorporated under German law, Jumia—unlike most public companies organized under U.S. law—uses a two-tier governance structure consisting of a "management board" and a "supervisory board."  (AC ¶ 24.)

The Amended Complaint's allegations are based principally on a so-called "report" issued after the IPO by a short seller—with a financial interest in driving Jumia's stock price down—that simply conflates different order-related metrics.  (*See* AC ¶¶ 8-15, 59-79, 81-83, 85-86, 93-98, 149-52, 159, 161, 164, 170-75, 201; *infra* p. 3.)  The Amended Complaint asserts claims under:  (i) Section 11 of the Securities Act of 1933 ("Securities Act") against all Defendants (AC ¶¶ 122-29); (ii) Section 15 of the Securities Act against the Management and Supervisory Board Defendants (AC ¶¶ 130-35); (iii) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Jumia and the Management Board Defendants (AC ¶¶ 213-17); and (iv) Section 20(a) of the Exchange Act against the Management Board Defendants (AC ¶¶ 218-22).  Plaintiffs

---

[1]    Defendants reserve the right to supplement the arguments summarized in this letter.

The Honorable P. Kevin Castel                                                    -2-

base those claims on three categories of allegedly false statements:  (i) Jumia's reporting of certain order-related metrics, namely its "Gross Merchandise Value" ("GMV"), "Active Sellers," and "Active Consumers" (AC ¶¶ 91-93, 95, 97, 99, 103, 105-06, 108, 110, 112, 166-70, 172, 174, 176, 180, 182-83, 185, 187, 189); (ii) Jumia's disclosure concerning issues involving its "JForce program" (AC ¶¶ 101, 178); and (iii) Ernst & Young's ("E&Y") "opinion on [Jumia's] financial statements" (AC ¶¶ 114, 191).  For the Exchange Act claims only, Plaintiffs also allege that two post-IPO statements by Mr. Poignonnec on Jumia's Q1 2019 earnings call were false.  (AC ¶¶ 194, 196.)

## II.     Plaintiffs Do Not Establish Jurisdiction Over the Supervisory Board Defendants.

The federal securities laws "allow[] the exercise of personal jurisdiction to the limits of the Due Process Clause of the Fifth Amendment."  *Prime Mover Capital Partners L.P.* v. *Elixir Gaming Techs., Inc.*, 761 F. Supp. 2d 103, 105 (S.D.N.Y. 2011).  "The question whether due process permits an exercise of jurisdiction requires 'an analysis consisting of two components: the "minimum contacts" test and the "reasonableness" inquiry.'"  *Id.*  Minimum contacts, in turn, can be established through a showing of either general or specific jurisdiction.  *Id.*  The Amended Complaint pleads neither for any Supervisory Board Defendant.

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."  *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 924 (2011).  Plaintiffs do not allege where any Supervisory Board Defendant lives or works.  Indeed, the Amended Complaint includes no facts whatsoever to show that any Supervisory Board Defendant's in-forum contacts are "so 'continuous and systematic' as to render [them] essentially at home in the forum."  *Daimler AG* v. *Bauman*, 571 U.S. 117, 139 (2014).  Conversely, Plaintiffs allege that the Supervisory Board Defendants served in a supervisory capacity for a "pan-African ecommerce platform," "incorporated under German law," and with "principal executive offices in Berlin, Germany," that is not alleged to engage in any U.S. operations.  (AC ¶ 24.)

For specific jurisdiction, minimum contacts "exist where the defendant purposely availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018).  Here, none of the Supervisory Board Defendants is alleged to have signed the Registration Statement, and the signature page of that document confirms they did not.  Instead, the Amended Complaint includes only a boilerplate allegation that the Supervisory Board Defendants "authorized the signing of the Registration Statement" and somehow "otherwise participated in the process which allowed the IPO to be successfully completed," which comes nowhere close to demonstrating minimum contacts.  (AC ¶ 133.)  Plaintiffs may not rely simply on the Supervisory Board Defendants' position, and conclusory allegations about their participation in the IPO do not fill the gap.  *See, e.g.*, *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008) ("A person's status as a board member is not alone sufficient to establish jurisdiction" and "conclusory allegations of participation in the fraud are insufficient."), *aff'd*, 334 F. App'x 404 (2d Cir. 2009); *Giuliano* v. *Barch*, 2017 WL 1234042, at *12 n.23 (S.D.N.Y. Mar. 31, 2017) ("Defendants' status

The Honorable P. Kevin Castel                                                        -3-

as directors in itself, even if they 'participated'—whatever that might mean—in the drafting and negotiating of the [allegedly false document] is insufficient to establish jurisdiction.").

## III.    Plaintiffs Do Not Allege a Single False Statement to Support a Section 11 Claim.

Plaintiffs fail to plead the most basic element of a Section 11 claim:  a material misstatement or omission.

*Order-related metrics.*  Although Plaintiffs allege that Jumia's reported GMV, Active Consumers, and Active Sellers were false because they included "orders that were returned, not delivered or cancelled" (*e.g.*, AC ¶ 94), Plaintiffs admit that the Registration Statement expressly defined those terms "irrespective of cancellations or returns" (AC ¶¶ 10 n.2, 71-72).[2] Plaintiffs' allegations thus amount to a disagreement over which metrics Jumia should have used, which is not actionable because "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012).[3]

Nor can Plaintiffs plead a "duty to disclose" the number of returned, not delivered, or cancelled orders, as required for an omissions claim. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Indeed, the Second Circuit has "easily rejected" arguments that defendants were required to disclose additional information about their operating metrics where such metrics were "literally true." *Bahash*, 506 F. App'x at 38; *see, e.g.*, *In re Eros Int'l Sec. Litig.*, 2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017) ("Defendants could have defined and reported 'users' in an alternate way that took into account the specifics of their use, but that does not amount to misrepresentation"), *aff'd*, 735 F. App'x 15 (2d Cir. 2018); *Altayyar* v. *Etsy, Inc.*, 242 F. Supp. 3d 161, 179 (E.D.N.Y. 2017) (rejecting "far-fetched claim that the defendants should have used a particular method for calculating their financial metrics"), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

*JForce issues.*  Plaintiffs' contention that Jumia's disclosure of the risk of "fraud perpetrated and fictitious transactions conducted on our platform" was false ignores the plain language of that risk disclosure. (AC ¶ 101.)  Although Plaintiffs assert that the risk disclosure did not disclose the number of "invalid orders," it warned investors that Jumia (i) "received information alleging that some . . . members of our JForce program . . . may have engaged in

---

[2]    To the extent Plaintiffs challenge anything other than Jumia's order-related metrics in the statements they quote, much of the surrounding language is nonactionable puffery, opinion statements, or forward-looking statements. (*See, e.g.*, AC ¶ 97 ("We believe that we are the only e-commerce business successfully operating across multiple regions in Africa"; "Our reach and capabilities position us as the preferred partner in Africa").)

[3]    The Registration Statement also contained multiple disclosures that put investors on notice that orders were returned, not delivered, or cancelled.  *See, e.g.*, Form F-1, at 20 (Jumia's markets "pose significant operational challenges," which "may place a higher risk on us, for example, due to a higher number of failed orders").

The Honorable P. Kevin Castel                                                    -4-

fraudulent activities," (ii) was "investigating these allegations," and (iii) was "unable to determine their accuracy and/or the potential scope of fraud" at that time (AC ¶¶ 101-02).  There was no duty to disclose more because nothing in that disclosure was rendered misleading by omitting the number of "invalid orders."  *See Omnicare, Inc.* v. *Laborers Pension Fund*, 575 U.S. 175, 193-94 (2015) (omissions claim requires pleading how "failure to include a material fact has rendered a published statement misleading"); *Tongue* v. *Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (plaintiffs must plead "a conflict between Defendants' statements" and allegedly omitted material facts).

Plaintiffs also cannot plead that Jumia had a duty to disclose the number of "invalid orders" while it was "investigating these allegations."  (AC ¶¶ 101-02.)  "'[D]isclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"  *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  Rather, "[b]y disclosing" the risk of potential misconduct, the investigation into such misconduct, and the adverse effects associated with such misconduct, Jumia "complied with its disclosure obligations under [Second Circuit] law."  *Id.*; *see, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 16 (S.D.N.Y. 2016) (dismissing claim that "at most pleads that the defendants disclosed an investigation was ongoing, but refused to provide details").

Moreover, Plaintiffs cannot allege that any omission of the number of "invalid orders" was material.  (AC ¶ 102.)  Jumia disclosed after the IPO on August 21, 2019, that its investigation found that such orders accounted for approximately "2% of our GMV in 2018," "4% in the first quarter of 2019," and "0.1% in the second quarter of 2019."  (AC ¶ 80.)  It is well settled that "[a]n omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial."  *In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014).  Nor have Plaintiffs "allege[d] properly that despite the relatively small size of the allegedly misstated transactions," disclosing them in the Registration Statement "would have made a qualitative difference in [Jumia]'s financial statements."  *ECA* v. *JPMC*, 553 F.3d 187, 205 (2d Cir. 2009).  Indeed, as Plaintiffs concede, Jumia reported that "[t]hese transactions had no impact on [its] financial statements."  (AC ¶ 80.)

*E&Y's audit opinion.*  Plaintiffs assert that E&Y's "opinion on [Jumia's] financial statements" was false because E&Y audited only "7 of the 14 countries that Jumia operated in" (AC ¶¶ 114-15), but Plaintiffs satisfy none of the prerequisites for pleading falsity under *Omnicare*.  "Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard."  *Querub* v. *Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016).  Here, Plaintiffs allege no facts to show that E&Y did not "actually hold[] the stated belief," *Omnicare*, 575 U.S. at 184, that Jumia's "consolidated financial statements present fairly, in all material respects, the financial position of the Company" (AC ¶ 114).  Nor do Plaintiffs identify any "supporting fact" in E&Y's opinion statement that was "untrue." *Omnicare*, 575 U.S. at 186.  And Plaintiffs can point to no duty to disclose the precise scope of the audit.  Indeed, E&Y's opinion makes clear that E&Y followed all applicable procedures and "conducted [the] audit[] in accordance with the standards of the PCAOB."  (AC ¶¶ 114, 191.)

The Honorable P. Kevin Castel                                                                      -5-

**IV.     The Amended Complaint Does Not Plead That the Supervisory Board Defendants May Be Subject to Section 11 Liability.**

In addition to certain underwriters, accountants, engineers, and appraisers, only the following parties may be liable under Section 11:  (i) "person[s] who signed the registration statement"; and (ii) "person[s] who w[ere] a director of (or person[s] performing similar functions) or partner in the issuer."  15 U.S.C. § 77k(a).  Here, Plaintiffs do not plead that the Supervisory Board Defendants signed the Registration Statement.  Nor do Plaintiffs adequately allege that members of a German supervisory board perform similar functions as members of a U.S. board of directors.  Rather, the Amended Complaint recognizes that Jumia has a two-tier structure with a "management board" and a "supervisory board," but does not allege that the Supervisory Board can direct the Management Board's "management of the business," or that the Supervisory Board otherwise has principal decisionmaking authority.  (AC ¶ 24.)  In fact, a German supervisory board's "predominant function is the supervision of the [management board]," whereas the "authority to 'direct the company . . . is statutorily vested in the [management board].'"  C. Meier-Schatz, *Corporate Governance & Legal Rules: A Transnational Look at Concepts & Problems of Internal Management Control*, 13 J. Corp. L. 431, 443 (1988).  Therefore, the management board, not the supervisory board, is the "German equivalent of a board of directors in the United States." *Zakre* v. *Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 487 (S.D.N.Y. 2005).  Perhaps most telling, 15 U.S.C. § 77f(a) requires that a registration statement "be signed by" "the majority of [the issuer's] board of directors or persons performing similar functions (or, if there [are] no [such persons], by the majority of the persons or board having the power of management of the issuer)."  That the SEC declared the Registration Statement effective without the signature of any Supervisory Board Defendant underscores that the Supervisory Board Defendants do not perform similar functions to U.S. directors and thus cannot be liable under Section 11.

**V.      The Amended Complaint Fails to Plead Section 15 Control Person Liability.**

Because Plaintiffs do not allege a primary Securities Act violation, their Section 15 control person liability claim also must be dismissed.  *See* 15 U.S.C. § 77o(a).

Plaintiffs' Section 15 claim against the Supervisory Board Defendants fails for another reason as well:  they are not "controlling persons."  *Id.*  Control is "the power to direct or cause the direction of the management and policies of [the primary violator]."  *In re Lehman Bros. Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).  Merely providing "advice and 'strategic direction' . . . falls far short."  *Id.* at 187.  Plaintiffs plead neither whether the Supervisory Board Defendants had the power to direct management's actions nor whether they were required to approve the Registration Statement.  Instead, Plaintiffs merely allege that the Supervisory Board Defendants "were controlling persons of Jumia by virtue of their positions as directors."  (AC ¶ 132.)  Such "boilerplate allegations that a party controlled another based on . . . [supposed] director status are insufficient."  *Emerson* v. *Mutual Fund Series Tr.*, 393 F. Supp. 3d 220, 260 (E.D.N.Y. 2019).  They also gloss over the far more circumscribed role of a supervisory board member in a German two-tier governance structure, such as the one used by Jumia.  (*See supra* Section IV.)

The Honorable P. Kevin Castel                                                    -6-

Nor is Plaintiffs' single, unsupported allegation that the Supervisory Board Defendants "authorized the signing of the Registration Statement" and "participated in the process which allowed the IPO to be successfully completed" (AC ¶ 133) sufficient to "demonstrate 'culpable participation'" in a Section 11 violation, *Lehman*, 650 F.3d at 186.

## VI.    Plaintiffs Do Not Adequately Allege the Elements of a Section 10(b) Claim.

Plaintiffs' Section 10(b) claim must be dismissed because they fail to plead at least three elements of that claim:  (i) "a material misrepresentation (or omission)"; (ii) "scienter, *i.e.*, a wrongful state of mind"; and (iii) "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss."  *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 182-83 (2d Cir. 2014).

*First*, the same challenged statements that Plaintiffs have not pled are false for their Section 11 claim can no more support their Section 10(b) claim.[4]  That leaves only the two additional statements made by Mr. Poignnonec on Jumia's Q1 2019 earnings call.  (AC ¶¶ 193-97.)[5]  Plaintiffs fail to show how those general discussions about the operation of the JForce program and the risks posed by "cancellations, failed deliveries, and returns" were materially false. (AC ¶¶ 194, 196.)  Nor do Plaintiffs plead any duty to disclose in those statements how many orders were not properly placed or "were returned, not delivered or cancelled."  (AC ¶¶ 195, 197.)

*Second*, the Amended Complaint does not "state with particularity facts giving rise to a strong inference that [D]efendant[s] acted with the required state of mind" as mandated by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b). *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  As a threshold matter, Plaintiffs do not adequately allege that the challenged statements were false or plead a single particularized fact showing that any Defendant knew about their supposed falsity.  Thus, to meet the stringent pleading standards of the PSLRA and Rule 9(b), Plaintiffs must allege particularized facts demonstrating either (i) "motive and opportunity to commit the fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

---

[4]     To the extent Plaintiffs' claims are based on Defendants having made the E&Y opinion statements, Defendants cannot be liable because, "[o]ne who prepares or publishes a statement on behalf of another is not its maker."  *Janus Capital Grp, Inc.* v. *First Deriv. Traders*, 564 U.S. 135, 142 (2011).  Here, "nothing within the audit opinions or implicit from surrounding circumstances [] would inform investors [that Defendants] had anything to do with the audit opinions."  *WM High Yield Fund* v. *O'Hanlon*, 2013 WL 3231680, at *7 (E.D. Pa. June 27, 2013).

[5]     Messrs. Hodara and Maillet-Mezeray cannot be liable under Section 10(b) for the Q1 2019 earnings call statements because the Amended Complaint fails to plead that they had "ultimate authority" over them.  *Janus*, 564 U.S. at 142 ("Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.").

The Honorable P. Kevin Castel                                                    -7-

The Amended Complaint contains no particularized allegations of motive or opportunity for any Defendant.  Instead, it generally asserts that Jumia "need[ed] to raise cash quickly" through the IPO and that the Management Board Defendants had to meet "performance targets" to "exercise[]" their stock options.  (AC ¶¶ 148-50, 155-58.)  But as the Second Circuit has made clear, such "[m]otives that are generally possessed by most corporate directors and officers do not suffice."  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see, e.g.*, *ECA*, 553 F.3d at 201 ("'[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'"); *Etsy*, 242 F. Supp. 3d at 183 ("A company and its officers and directors always have a 'generalized motive to ensure the success' of the company's IPO.").

Plaintiffs likewise fail to plead with particularity that any Defendant engaged in conscious misbehavior or acted in a manner that was "'highly unreasonable, representing an extreme departure from the standards of ordinary care,'" as required to plead recklessness.  *UBS*, 752 F.3d at 187.  Plaintiffs rely on conclusory allegations that, "[b]y virtue of their positions," the Management Board Defendants "had actual knowledge or reckless disregard" of the challenged statements' falsity.  (AC ¶¶ 143-47, 159-61.)  But courts routinely hold that alleging defendants "had access to adverse undisclosed information because of their senior positions with the company . . . [is] insufficient to establish scienter."  *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004).  And Plaintiffs' allegations that Defendants' "decision to include" the challenged order-related metrics "shows knowing intent to present metrics that looked misleadingly positive" are entirely circular.  (AC ¶¶ 151-54.)

*Third*, to plead loss causation, Plaintiffs must demonstrate that "the market reacted to a 'corrective disclosure,' which revealed an alleged misstatement's falsity."  *In re Merrill Lynch & Co. Sec. Litig.*, 568 F. Supp. 2d 349, 359 (S.D.N.Y. 2008).  Plaintiffs fail to do so because they cannot show that each of their three "corrective disclosures" "reveal[ed] some then-undisclosed fact with regard to the specific [alleged] misrepresentations," *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010), as opposed to simply "recharacteriz[ed] previously disclosed facts," *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008).

*May 9, 2019*.  Plaintiffs claim that, on May 9, 2019, a short seller's "report" revealed "'material discrepancies'" in GMV, Active Consumers, and Active Sellers between Jumia's Registration Statement and an alleged 2018 confidential investor presentation.  (AC ¶¶ 59-65, 201.)  But Plaintiffs concede that their comparison is between two entirely different metrics—GMV in the Registration Statement and "Net Merchandise Value" ("NMV"), "define[d] [] as GMV minus cancellations and returns," in the alleged presentation.  (AC ¶ 64 & n.4.)  Moreover, the Amended Complaint recognizes that the supposedly lower NMV numbers in the 2018 presentation were available to the market in a "2017 Annual Report" posted online by one of Jumia's pre-IPO investors *more than a year* before Plaintiffs' "corrective disclosure."  (AC ¶ 71.)

*August 21, 2019*.  Although Plaintiffs allege that, on August 21, 2019, Jumia "admitted" that "invalid orders" "generated by JForce" accounted for between approximately 0.1% and 4% of GMV (AC ¶¶ 80, 201), Jumia disclosed the JForce issues *more than four months* earlier.

The Honorable P. Kevin Castel                                                    -8-

Jumia's March 12, 2019 Registration Statement warned investors that sellers may "engage in fictitious or 'phantom' transactions" and that Jumia had "received information" that "members of our JForce program" "may have engaged in fraudulent activities." (AC ¶¶ 101, 178.)  Moreover, even if the August 21, 2019 disclosure included additional specifics, Plaintiffs may not rely on the fact that Jumia's "stock price dropped when a disclosed risk . . . materialized." *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *15 (S.D.N.Y. Mar. 26, 2019); *see, e.g., DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 458 (S.D.N.Y. 2018) (no loss causation where reported investigations "confirmed what had already been disclosed").

> *September 20, 2019.*  Plaintiffs allege that a September 20, 2019 *Bloomberg News* article discussed the infrastructure difficulties faced by "a Jumia driver" on "a typical day" and "*confirmed* [the short seller's] allegations" regarding "Jumia's percentage of failed deliveries." (AC ¶¶ 86, 201 (emphasis added).)  The infrastructure difficulties of running an e-commerce business in Africa, however, were disclosed in the Registration Statement, *see, e.g., supra* n.3, and also were the subject of news coverage for years before Jumia's IPO, *see, e.g.,* J. Bright, "An E-Commerce Challenge in Africa," *The New Yorker* (June 30, 2016) ("Fewer than a quarter of African roads are paved . . . and many of Jumia Group's core markets . . . struggle with access to electricity and . . . Internet service they need to order goods and services online.").  Where, as here, a disclosure simply "confirms" information already in the market, there is no loss causation as a matter of law. *See Odebrecht*, 323 F. Supp. at 459 ("Subsequent reports merely confirmed what the market already knew.  Therefore, these later reports were not corrective disclosures.").  And, in any event, the Registration Statement disclosed the percentage of GMV attributable to "either failed deliveries or [orders] returned by [Jumia's] consumers." (AC ¶¶ 99, 176.)

## VII.    Plaintiffs Fail to Adequately Allege Section 20(a) Control Person Liability.

> Because Plaintiffs do not plead a primary Exchange Act violation, their Section 20(a) control person liability claim also cannot stand. *See* 15 U.S.C. § 78t(a).

* * *

> We look forward to discussing these issues at the upcoming conference.

Respectfully submitted,

David R___

David M.J. Rein

cc:    All counsel of record (via ECF)