

**Jeremy A. Lieberman**
Managing Partner

February 28, 2020

**BY ECF**

Plaintiffs may amend their complaint within 14 days.
SO ORDERED.
Dated: 2/28/2020

The Honorable P. Kevin Castel
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

P. Kevin Castel
United States District Judge

Re: *In re Jumia Techs. AG Sec. Litig.*, No. 19-cv-04397-PKC

Dear Judge Castel:

We are the Court-appointed Co-Lead Counsel to Lead Plaintiff Hexuan Cai, named Plaintiffs Kalyan and Kalyanasundaram Venkataraman, Matthew Sacks, Yifeng Zhu and the proposed classes (collectively, "Plaintiffs") in the above-referenced action. We write in response to Defendants' pre-motion letters filed on February 14, 2020 (Dkt. Nos. 70-71), which explain the grounds for their proposed motion to dismiss the Amended Securities Class Action Complaint ("Amended Complaint" or "AC") (Dkt. No. 62) in advance of the pre-motion conference scheduled for March 19, 2020. In response to the Court's February 18, 2020 Memo Endorsement, Plaintiffs state that they wish to amend their complaint.

## I. Background

This is a federal securities class action on behalf of two classes of purchasers of Jumia Technologies AG's ("Jumia" or the "Company") American Depositary Shares ("ADSs") against Jumia and the following Defendants — Jeremy Hodara, Sacha Poignonnec, Antoine Maillet-Mezeray (collectively, the "Management Defendants"); Gilles Bogaert, Andre T. Iguodala, Blaise Judja-Sato, Jonathan D. Klein, Angela Kaya Mwanza, Alioune Ndiaye, Matthew Odgers, and John H. Rittenhouse (collectively, the "Supervisory Director Defendants"); and Morgan Stanley & Co. LLC, Citigroup Global Markets Inc., Berenberg Capital Markets, LLC, RBC Capital Markets, LLC, Stifel, Nicolaus & Company, Inc., Raymond James & Associates, Inc., William Blair & Company, L.L.C. (collectively, the "Underwriter Defendants"). Plaintiffs allege claims pursuant to: (i) Section 11 of the Securities Act of 1933 ("Securities Act") against all Defendants (AC ¶¶ 122-29); (ii) Section 15 of the Securities Act against the Management and Supervisory Director Defendants (*id.* ¶¶ 130-35); (iii) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Jumia and the Management Defendants (*id.* ¶¶ 213-17); and (iv) Section 20(a) of the Exchange Act against the Management Defendants (*id.* ¶¶ 218-22).

jalieberman@pomlaw.com

600 Third Avenue, New York, New York 10016  tel: 212.661.1100  www.pomerantzlaw.com

NEW YORK        CHICAGO        LOS ANGELES        PARIS



The Hon. P. Kevin Castel
Page 2

Jumia characterizes itself as the leading pan-African e-commerce platform, which, according to the Company, consists of a marketplace that connects sellers with consumers, a package shipment and delivery service, and a payment service. This case arises out of Jumia's April 12, 2019 initial public offering ("IPO") of ADSs on the New York Stock Exchange in which the Company raised approximately $196 million therefrom, net of underwriting discounts and commissions and other offering expenses. AC ¶¶ 54, 56-57.

On May 9, 2019, less than a month after Jumia's IPO, Citron Research, a longtime publisher of online investment reports, issued a research report entitled *"Not All IPOs are Created Equal. Jumia is a Fraud"* (the "May 9, 2019 Citron Report"). The May 9, 2019 Citron Report stated that Citron had obtained a copy of a confidential investor presentation, dated October 2018 (the "2018 Confidential Investor Presentation"), that Jumia used in an effort to raise private capital shortly before its IPO. Three of the four terms that Jumia defined as **"Key Terms and Performance Indicators Used in this Prospectus"** (emphasis in original) in its Registration Statement were Gross Merchandise Value ("GMV"), Active Sellers, and Active Consumers. The Registration Statement is replete with references to those metrics. Excerpts of the 2018 Confidential Investor Presentation that Citron reprinted in its May 9, 2019 report show that there were material discrepancies between the information concerning GMV, Active Consumers, and Active Sellers in the 2018 Confidential Investor Presentation and what Jumia disclosed in its Registration Statement. *Id.* ¶¶ 8-10.

For example, (i) The 2018 Confidential Investor Presentation stated that *orders that were returned, not delivered or cancelled accounted for 41% of Jumia's 2017 GMV* and indicated based on projected numbers that it would constitute a similar amount of Jumia's 2018 GMV. In contrast, the Registration Statement only *disclosed that 14.4% of Jumia's 2018 GMV consisted of orders that were failed deliveries or were returned by customers while misleadingly omitting any information about cancellations*; (ii) The 2018 Confidential Investor Presentation stated that Jumia had 2.1 million Active Consumers in 2017. The Registration Statement, however, stated that Jumia had 2.7 million Active Consumers in the same year; and (iii) The 2018 Confidential Investor Presentation stated that Jumia had 43,000 Active Merchants in 2017. The Registration Statement, however, stated that Jumia had 53,000 Active Sellers in the same year. *Id.* ¶¶ 59-64. Notably, even though Jumia did not disclose its high volume of canceled orders, it made its key performance indicators look better by calculating them without removing cancelled orders. The May 9, 2019 Citron Report also expressed concern that Jumia's Registration Statement contained misstatements about fraudulent transactions generated by Jumia's "JForce Consultants" in Nigeria. JForce Consultants are a sales force that places orders on Jumia's platform for other people. Jumia pays the JForce Consultant a commission for each order. *Id.* ¶ 65.

On May 28, 2019, Citron released additional evidence that Jumia had made material misstatements — a video entitled *"Jumia — Indisputable Evidence of Fraud"* along with a report linking to internal Jumia documents that supported the allegations in the video. The video and supporting documents presented the following: (i) internal Jumia documents showing that

325



The Hon. P. Kevin Castel
Page 3

Jumia reported a GMV in its Registration Statement that was 30% higher than in its pre-IPO internal records; (ii) internal Jumia documents and interviews with two former Jumia executives showing that more than 50% of Jumia's orders in Nigeria were fake or invalid; (iii) an October 2018 Jumia internal report showing that Ernst & Young Luxembourg only audited 7 of the 14 countries that Jumia operated in at the time of its IPO. Jumia did not disclose the limited scope of the audit in its Registration Statement. *Id.* ¶¶ 73-79.

Jumia made statements generally denying Citron's allegations, but later in 2019, in its second quarter earnings press release, filed with the SEC on August 21, 2019, the Company admitted that its JForce program had generated a significant number of "improper" *i.e.* fake orders that were subsequently cancelled. The Company admitted that improper orders accounted for 2% of Jumia's GMV in 2018, concentrated in the fourth quarter of 2018, and approximately 4% of Jumia's first quarter 2019 GMV. Jumia tried to downplay its admission about JForce, but numerous media and analyst reports agreed that the fact that the Company admitted to such a large number of improper orders was a significant problem for the Company and that Jumia's disclosure backed up the numbers in Citron's earlier reports. *Id.* ¶¶ 80-85.

On September 20, 2019, Bloomberg News published an article entitled *"Amazon of Africa Van Drivers Battle Hardships on Lagos Streets."* The article documented problems with Jumia's delivery system — ***including that Jumia's percentage of failed deliveries, including cancellations and returns, was around 40%*** — which, like Jumia's August disclosure, supported the numbers in Citron's reports and undercut Jumia's denials concerning misstatements in its Registration Statement. *Id.* ¶ 86.

## II. There Is No Dispute that Plaintiffs' Sections 11 and 15 Claims Are Subject to the Relaxed Pleading Requirements of Rule 8 and that the PSLRA Pleading Requirements Are Inapplicable

Plaintiffs have "adequately distinguish[ed] their [Securities Act claims from their Exchange Act claims] by creating a structural and descriptive separation of [those claims] from the fraud claims in the same complaint" thus "relieving them of the heightened pleading requirements of Rule 9(b)" with respect to their Sections 11 and 15 claims. *See Lewy v. Skypeople Fruit Juice, Inc.*, 11 Civ. 2700 (PKC), 2012 U.S. Dist. LEXIS 128416, *27-28 (S.D.N.Y. Sept. 10, 2012). Additionally, the PSLRA pleading requirements do not apply to Plaintiffs' Sections 11 and 15 claims. *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 338, 352 (S.D.N.Y 2003). Defendants do not contend otherwise. "Rule 8(a)(2), Fed. R. Civ. P., requires plaintiffs to offer only a 'short and plain statement of the claim showing that the pleader is entitled to relief.' To survive a motion to dismiss a complaint governed by Rule 8, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' In assessing plausibility, courts draw all reasonable inferences in favor of the non-movant." *Id.* at *20 (internal quotation marks and citations omitted). Plaintiffs have satisfied the minimal pleading standards of Rule 8 with respect their Sections 11 and 15 claims.



The Hon. P. Kevin Castel
Page 4

### III. Plaintiffs Adequately Plead False and Misleading Statements in Jumia's Registration Statement to Support a Section 11 Claim Against All Defendants

*Key Performance Indicators* (AC ¶¶ 91-93, 95, 97, 99, 103, 106, 108, 110, 112). Defendants argue that none of the *numerous* statements in the Registration Statement regarding "key" metrics can be the basis for Plaintiffs' Section 11 claim because they disclose "accurate historical data" and are "literally true." Dkt. No. 70 at 3. In the Second Circuit, however, "[t]he law is well settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression" are actionable under the federal securities laws. *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds, Gabelli v. SEC*, 568 U.S. 442 (2013); *In re Facebook, Inc.*, 986 F. Supp. 2d 524, 543 (S.D.N.Y. 2014) ("courts have . . . held that 'half-truths,' or 'literally true statements that create [] materially misleading impression[s]' are actionable under the federal securities laws."); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010) ("A statement can [] be misleading, though not technically false, it if amounts to a half-truth by omitting some material fact.") (internal quotation marks omitted). Defendants had a duty to disclose the omitted information "derived from a necessity to avoid misleading statements contained in offering documents. '[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate.'" *In re SunEdison Sec. Litig.*, 300 F. Supp. 3d 444, 472 (S.D.N.Y. 2018) (Castel, J.) (internal quotation marks omitted). Here, among other things, it was clearly misleading for Jumia to boost its key performance indicators by including cancelled orders, yet not disclose its huge number of cancellations in the only metric it provided concerning uncompleted orders. Furthermore, Plaintiffs do not admit that all of Jumia's figures were literally true — the Amended Complaint alleges, *inter alia*, that Jumia reported a GMV in its Registration Statement that was 30% higher than in its pre-IPO internal records. AC ¶ 74.

*JForce Statement* (AC ¶ 101). Paragraph 101 of the Amended Complaint states (emphasis added): "[W]e recently received information alleging that some of our independent sales consultants, members of our JForce program in Nigeria, may have engaged in fraudulent activities. ***We are currently investigating these allegations and are unable to determine their accuracy and/or the potential scope of fraud, if any.***" Defendants contend that this statement is not actionable because there was no duty to disclose that invalid orders in Nigeria exceeded 50%. Dkt. No. 70 at 4. Defendants are wrong. The statement at issue amounts to a half-truth because it is not complete and accurate. *See In re SunEdison Sec. Litig.*, 300 F. Supp. 3d at 472. Defendants also contend that "disclosure in not a rite of confession, and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" Dkt. No. 70 at 4. However, as Your Honor stated in *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (Castel, J.) (citations omitted), many courts have held that "a duty to disclose uncharged criminal conduct does arise if it is necessary to ensure that a corporation's statements are not misleading. The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether 'the alleged omissions . . . are sufficiently connected to Defendants' existing disclosures to make those public statements misleading." Here, the alleged



The Hon. P. Kevin Castel
Page 5

omission – that invalid orders exceeded 50% in Nigeria – was sufficiently connected to the false and misleading statement at issue and Defendants will be hard-pressed to show otherwise.

Defendants further argue that the claim should be dismissed because the alleged omission is immaterial, both quantitatively and qualitatively (Dkt. No. 70 at 4), but as Your Honor pointed out in *SunEdison*, "an omission's materiality is a mixed question of law and fact, and a statement's materiality 'will rarely be dispositive in a motion to dismiss . . . .'" *In re SunEdison Sec. Litig.*, 300 F. Supp. 3d at 472 (internal quotation marks and citations omitted). "'In judging whether an alleged omission was material in light of the information already disclosed to investors, we consider whether there is a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available.' The materiality analysis is 'inherently fact-specific.'" *Id.* (internal citation omitted).

Defendants rely on *In re Lone Pine Res.*, Inc., No. 12 Civ. 4839 (GBD), 2014 U.S. Dist. LEXIS 44568 (S.D.N.Y. Mar. 26, 2014) which includes a discussion about SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed Reg. 45, 150 (1999) (*see* Dkt. No. 70 at 4). SAB 99 considered both quantitative and qualitative factors for reviewing materiality. In that SAB, "[t]he SEC concluded that, as a rule of thumb, the agency's auditors could assume materiality for an omission or misstatement that would cause a 5% deviation in earnings or income, but that all relevant considerations must be weighed, and that auditors must consider both quantitative and qualitative factors in assessing an item's materiality. The SEC cautioned that [q]ualitative factors may cause misstatements of quantitatively small amounts to be material, and listed numerous factors, including market reaction, for weighing an item's materiality." *In re SunEdison Sec. Litig.*, 300 F. Supp. 3d at 472 (internal quotation marks and citations omitted). Defendants argue that applying the rationale of the SEC bulletin, the omission regarding invalid orders exceeding 50% in Nigeria is presumptively immaterial because it had an impact of less than 5% on Jumia's reported financial metrics. Dkt. No. 70 at 4. However, Your Honor noted in *SunEdison* that SAB 99 "cautioned agency auditors against applying a bright-line rule for deciding materiality. It did not conclude that a misstatement or omission causing a deviation of less than 5% was per se immaterial. . . . [T]he SEC warned against adopting such a 'formulaic approach.'" *In re SunEdison Sec. Litig.*, 300 F. Supp. 3d at 472 (internal citations omitted). SAB 99 states that "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." Here, the stock price dropped when Jumia, on August 21, 2019, before market hours, admitted in the Company's second quarter 2019 earnings press release, that there was a significant amount of fake orders generated by JForce in Nigeria. In response to that disclosure, the price of Jumia ADSs declined almost 17%. AC ¶¶ 80, 201.

Additionally, the Amended Complaint describes analyst disappointment resulting directly from the disclosure of the alleged omission which supports an inference that the omission was material. *See* AC ¶¶ 84-85; *In re Ply Gem Holdings, Inc., Sec. Litig.*, No. 14-CV-3577 (JPO), 2016 U.S. Dist. LEXIS 130588, at *13-14 (S.D.N.Y. Sept. 23, 2016). For example, on August



The Hon. P. Kevin Castel
Page 6

22, 2019, Morgan Stanley issued an analyst report that stated that Jumia's admission of improper sales in the JForce program in Nigeria was "[m]ore important that 2Q results" and the disclosure was "*Likely to Weigh on Multiple Investors Will Pay for JMIA*" (emphasis in original). The report further stated that the GMV affected by these issues "is a material part of JForce, which JMIA has talked about being an important growth driver" and that "failing to catch these challenges and potential internal control question marks are likely to weigh on the multiple investors will pay for this emerging market asset a few years away from cash flow break even." AC ¶ 84. Weeks later, Jumia's disclosure about JForce was still reverberating. On September 10, 2019, Tellimer, an investment company that specializes in and issues analyst reports concerning developing markets, posted an entry on its blog by Nigunan Tiruchelvam, Head of Consumer Equity Research, entitled "*Jumia Fraud Revelations Raises Three Questions*". The first question the post asked was "How material is Jumia's fraud?" (emphasis in original). It answered that Jumia's disclosure had a "high degree of materiality": "The fake orders are a much larger proportion of Jumia's gross profit. . . . *This suggests that about two-thirds of the gross profits in Q1 19 were tainted. In a slim margin and negative cash flow business, fraudulent orders have a high degree of materiality.*" (Emphasis added.) AC ¶ 85. These qualitative factors together make clear that the Amended Complaint adequately alleges materiality regarding the omission that invalid orders exceeded 50% in Nigeria.

*Report by Ernst & Young Luxembourg* (AC ¶¶ 114). Defendants appear to misunderstand Plaintiffs' allegations regarding this statement in the Registration Statement. The statement is false and misleading because the Registration Statement failed to disclose a material fact – that Ernst & Young Luxembourg only audited 7 of the 14 countries that Jumia operated in at the time of the IPO. AC ¶ 115. An engagement letter documents and confirms the scope of the audit work to be performed before the audit is even commenced. *See, e.g.,* https://www.ifac.org/system/files/downloads/ISA_210_standalone_2009_Handbook.pdf at 6. Here, Ernst & Young's audit scope did not include Senegal, Tunisia, Algeria, Rwanda, Uganda, Tanzania, and Cameroon. AC ¶ 115. Plaintiffs contend that Defendants' arguments based on *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), which sets forth the legal standard for statements of opinion, are misplaced given Plaintiffs' allegations. But even if *Omnicare* does apply, Defendants are liable under Section 11 because they omitted material facts about the basis for the opinion, thereby rendering the opinion misleading to a reasonable person. 135 S. Ct. at 1321.

Defendants also contend that Plaintiffs can point to no duty to disclose the scope of the audit (Dkt. No. 70 at 4), but again, the duty to disclose the omitted information is "derived from a necessity to avoid misleading statements contained in offering documents. '[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate.'" *In re SunEdison Sec. Litig.*, 300 F. Supp. 3d at 472 (internal quotation marks omitted). It was clearly materially misleading for Jumia to disclose information about Ernst & Young's audit without disclosing that the audit did not include *half* the jurisdictions the Company operated in.

Case 1:19-cv-04397-PKC   Document 84   Filed 02/28/20   Page 7 of 14



The Hon. P. Kevin Castel
Page 7

### IV.    Plaintiffs Adequately Allege Personal Jurisdiction over the Supervisory Director Defendants

In cases where defendants have moved to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction and no discovery has taken place, plaintiffs need only make a *prima facie* showing of personal jurisdiction by pleading legally sufficient allegations of jurisdiction. *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 761 F. Supp. 2d 103, 105 (S.D.N.Y. 2011). Additionally, "all facts are viewed in the light most favorable to plaintiff." *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 (VEC), 2014 U.S. Dist. LEXIS 161472, at *20 (S.D.N.Y. Nov. 18, 2014). The question whether due process permits an exercise of personal jurisdiction over the Supervisory Director Defendants "requires 'an analysis consisting of two components: the "minimum contacts test" and the "reasonableness" inquiry.'" *Id.*

Under the minimum contacts test, contacts with the forum may confer either specific or general jurisdiction. *Id.* at 106. "Specific jurisdiction exists when a forum exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Id.* (internal quotation marks and footnote omitted). General jurisdiction "'is based on the defendant's general business contacts with the forum . . . and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* The Supervisory Director Defendants contend that Plaintiffs have failed to satisfy the minimum contact test because they have not adequately alleged either specific or general jurisdiction. Dkt. No. 70 at 2.

Plaintiffs, however, assert that they have indeed met their burden of alleging a *prima facie* case of specific jurisdiction over the Supervisory Director Defendants sufficient to withstand challenge at this early stage of the litigation. The "minimum contacts necessary to support such jurisdiction exist where the defendant purposely availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). Here, the Supervisory Director Defendants, who are all directors of the Company, were controlling persons of Jumia. They supervised the Management Defendants, granted approval for certain significant matters, authorized the signing of the Registration Statement, and otherwise participated in the process which allowed the IPO to be successfully completed. AC ¶¶ 24, 29-37, 132-33. Indeed, the Supervisory Director Defendants (as well as other Defendants) invoked the benefit of trading Jumia ADSs on the New York Stock Exchange in the United States. *See id.* ¶ 24. Consequently, the Supervisory Director Defendants knew or should have known that their actions would render them amenable to suit in the United States. *See Landy v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 101 (S.D.N.Y. 1989) (finding that the court had personal jurisdiction over nonresident defendants who invoked the benefit of trading stock on a United States stock market); *see also In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 551 (D.N.J. 2005) ("United States courts frequently have asserted personal jurisdiction over individual defendants who . . ., as control persons, approve the filing or disseminating of,



The Hon. P. Kevin Castel
Page 8

particular forms required by the SEC which they knew or should have known would be relied on by U.S. investors.") (citation and internal quotation marks omitted).

Notwithstanding Plaintiffs' argument, Plaintiffs would like to amend the complaint to also allege general jurisdiction with respect to five of the eight Supervisory Director Defendants (Iguodala, Klein, Mwanza, Judja-Sato, and Rittenhouse) who we believe reside in the United States. *See* Registration Statement https://www.sec.gov/Archives/edgar/data/1756708/00011931 2519071692/d650749df1.htm, at 10 ("three of eight supervisory board members . . . are residents of jurisdictions other than the United States.") Where Congress has expressly authorized nationwide service of process, such as in the Securities Act, *see* 15 U.S.C.A. § 77v(a), a national contact analysis is appropriate when determining personal jurisdiction. *See FTC v. Quincy Bioscience Holding Co.*, 389 F. Supp. 3d 211, 218-19 (S.D.N.Y. 2019). Because these Supervisory Director Defendants "reside within the territorial boundaries of the United States, the minimal contacts, required to justify the federal government's exercise of power over them, are present." *Mariash v. Morrill*, 496 F.2d 1138, 1142-43 (2d Cir. 1974) (citation and internal quotation marks omitted).

## V. Plaintiffs Adequately Allege that the Supervisory Director Defendants May Be Subject to Section 11 Liability

Section 11 of the Securities Act states that directors of issuers may be subject to Section 11 liability (15 U.S. Code § 77k) and Plaintiffs allege that the Supervisory Director Defendants are directors of Jumia (AC ¶¶ 29-37). That should be sufficient to allege that they are the type of people who can be held liable pursuant to Section 11. The Supervisory Director Defendants contend that because Jumia is a German company, Plaintiffs must also allege that members of a German supervisory board perform similar functions as members of a U.S. board of directors. Dkt. No. 70 at 5. However, they fail to cite any support for their argument that such must be alleged. Moreover, Plaintiffs have further alleged that the Supervisory Director Defendants supervised the Management Defendants, granted approval for certain significant matters, authorized the signing of the Registration Statement, and otherwise participated in the process which allowed the IPO to be successfully completed. AC ¶¶ 24, 28-37, 132-33. For these reasons, the Supervisory Director Defendants' argument carries no weight.

## VI. Plaintiffs Sufficiently Plead Section 15 Control Person Liability Against the Management and Supervisory Director Defendants

Plaintiffs allege that the Management and Supervisory Defendants violated Section 15 of the Securities Act. *See* AC ¶¶ 131. Section 15 imposes liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person under" Section 11. 15 U.S.C. § 77o(a). The Management and Supervisory Director Defendants argue that the claim should be dismissed because the Amended Complaint fails to allege a primary violation under Section 11. Because Plaintiffs adequately allege a primary violation, their motion to dismiss on this ground should be denied. *In re SunEdison Sec. Litig.*, 300 F. Supp. 3d at 478.



The Hon. P. Kevin Castel
Page 9

The Supervisory Director Defendants also urge their dismissal on the ground that "they are not controlling persons". Dkt. No. 70 at 5 (internal citation omitted). (The Management Defendants concede that they are control persons for purposes of this claim.) "Control is defined as the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract or otherwise." *Id.* (internal quotation marks and citation omitted). By alleging that the Supervisory Director Defendants supervised the Management Defendants, authorized their signing of the Company's Registration Statement, granted approval for certain significant matters, and otherwise participated in the process which allowed the IPO to be successfully completed (AC ¶¶ 24, 28-37, 132-33), Plaintiffs have gone beyond alleging control by their mere status as directors of Jumia. They adequately allege control – "an inquiry that is, in any event, more appropriately decided on a motion for summary judgment than on a motion to dismiss." *Guevoura Fund v. Sillerman*, No. 15-cv-7192 (CM), 2016 U.S. Dist. LEXIS 128076, at *35-36 (S.D.N.Y. Sept. 12, 2016) (internal quotation marks and citation omitted).

## VII. Plaintiffs Adequately Allege the Elements of a Section 10(b) Claim Against Jumia and the Management Defendants

Jumia and the Management Defendants contend that Plaintiffs' Section 10(b) claim must be dismissed because they fail to plead three elements – a material misrepresentation or omission, scienter and loss causation. Dkt. No. 70 at 6. Defendants are wrong.

*Material Misrepresentation or Omission.* The same statements in the Registration Statement that Plaintiffs plead as false or misleading for their Section 11 claim support their Section 10(b) claim.[1] In addition to the duty to disclose to the omitted information "derived from a necessity to avoid misleading statements contained in offering documents," *In re SunEdison Sec. Litig.*, 300 F. Supp. 3d at 472, Jumia and the Management Defendants also had an affirmative, independent duty, pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303(ii), to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." By failing to make the alleged disclosures, Jumia and the Management Defendants breached this duty giving rise to their Section 10(b) claim. AC ¶ 141. Additionally, pursuant to Item 105 of Regulation S-K, 17 C.F.R. § 229.105, Jumia and the Management Defendants had an affirmative, independent duty to disclose in the Prospectus

---

[1] In a footnote, Defendants contend that they cannot be liable under Section 10(b) "based on Defendants having made the E&Y opinion statements" because "'[o]ne who prepares or publishes a statement on behalf of another is not its maker.'" Dkt. No. 70 at 6 n.4 (citing *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). Again, Defendants appear to misunderstand Plaintiffs' allegations. The Registration Statement is false and misleading because it failed to disclose that Ernst & Young Luxembourg only audited 7 of the 14 countries that Jumia operated in at the time Jumia issued its Registration Statement. AC ¶ 191. There can be "no dispute that [Jumia] and each of the . . . Defendants who signed the Registration Statement 'made' the statements under *Janus*." *City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395 (S.D.N.Y. 2011).



The Hon. P. Kevin Castel

Page 10

the Company's most significant risk factors that make the offering speculative or risky. By failing to make the alleged disclosures, Jumia and the Management Defendants also breached this duty giving rise to their Section 10(b) claim. AC ¶ 142.[2]

*Scienter.* Plaintiffs adequately plead a strong inference of scienter which arises if "a reasonable person would deem the inference of scienter…at least as compelling as any opposing inference one could draw from the facts alleged. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-26 (2007). The inference "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.* at 324 (internal quotations omitted). In evaluating the strength of an inference of scienter, "courts must consider the complaint in its entirety" because the "inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). Moreover, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

Here, there is ample support for scienter. Jumia has never made a profit and its accumulated losses though 2018, the year before its IPO, were 862 million euros, including a loss of 170.7 million euros in 2018 that was greater than the Company's 130.6 million euros in revenue that year. According to the May 9, 2019 Citron Report, Jumia's IPO was motivated by the Company's need to raise cash quickly. At the end of 2018, the unprofitable Company had less than a year's worth of cash left and its two largest shareholders, MTN Group Ltd. and Rocket Internet, wanted to exit their investments. The 2018 Confidential Investor Presentation was used in a failed last-ditch effort to raise money privately. Accordingly, the Management Defendants and Jumia had a strong motivation to make the company's numbers look better in the Registration Statement so that its IPO would be successful. AC ¶¶ 148-50. *See In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 444 (S.D.N.Y. 2000) (finding scienter where company had motive to inflate the price of its IPO, and senior executives had opportunity which "may fairly be imputed to the corporation"); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (finding motive where company was "sufficiently short on cash at the time of the misrepresentations . . . heightening its need for a lucrative stock sale."); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 299 (D. Mass. 2006) (finding strong motive evidence where plaintiffs alleged that company "needed an immediate cash infusion" due to its "desperate cash crunch").

Furthermore, a comparison between the 2018 Confidential Investor Presentation and the Registration Statement shows that the numbers in the Registration Statement were intentionally

---

[2] Moreover, Plaintiffs allege two additional actionable statements made by Defendant Poignonnec during Jumia's First Quarter 2019 Earnings Call. *See* AC ¶¶ 193-97. The first statement was in response to an analyst's question about JForce and fraud in Nigeria; and the second statement was in response to an analyst's question regarding cancellations, failed deliveries and delivery rates. In both instances, Defendant Poignonnec's voluntary responses were false and misleading because he breached his duty to be both complete and accurate (*Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 296 (S.D.N.Y. 2018)), as further explained in the Amended Complaint.



The Hon. P. Kevin Castel
Page 11

and/or recklessly manipulated to look misleadingly favorable. Jumia's disclosure in the 2018 Confidential Investor Presentation that 41% of its GMV was returned, not delivered or cancelled in 2017 shows the awareness that it was an important metric to shareholders. The exclusion of that metric from the Registration Statement and the inclusion of the statement that only 14.4% of Jumia's GMV in 2018 was either "failed deliveries or return[s]" was clearly intended to make it appear that Jumia was disclosing all material information when instead, it was disclosing a misleadingly favorable metric that excluded cancellations for the purpose of deceiving shareholders. Moreover, since Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing cancelled orders ("irrespective of *cancellations or returns*") there was no justification for Jumia's decision to only disclose in the Registration Statement that in 2018, 14.4% of its GMV was "*failed deliveries or return[s]*" without disclosing its large volume of cancellations. The only possible motivation for Jumia's decision to exclude cancellations from that metric — while including them in GMV, Active Consumers, and Active Sellers — is that the Management Defendants and Jumia intended to mislead investors into believing that only 14.4% of GMV consisted of uncompleted orders when, in reality, almost 41% of Jumia's GMV consisted of uncompleted orders in 2017 with a similar amount in 2018. Furthermore, the phrases "failed deliveries or return[s]" and "cancellations or returns" sound sufficiently similar that it appears that Jumia and the Management Defendants intentionally intended to confuse and mislead investors. Jumia's decision to include Active Sellers and Active Consumers who had not actually completed an order on Jumia's platform in their Registration Statement numbers, even though those same consumers and sellers were not included in the numbers in the 2018 Confidential Investor Presentation, also shows knowing intent to present metrics that looked misleadingly positive. AC ¶¶ 151-54.

Additionally, according to the Registration Statement, all of the Management Defendants are participants in Jumia's 2019 stock option program. The stock options can only be exercised once the performance targets have been reached and "the minimum performance target is based on GMV growth." Furthermore, "[i]n the event that the performance target(s) is/are not met by the end of the waiting period, all stock options will be completely forfeited." The Registration Statement stated that Defendants Hodara and Poignonnec would receive up to 269,288 options under the 2019 stock option program if performance targets were met. Moreover, Defendants Hodara and Poignonnec both owned an additional 2,209,192.52 in options with an exercise price of 1 euro at the end of 2018. Accordingly, all the Management Defendants had a strong motivation to inflate GMV to avoid the forfeiture of their stock options. Additionally, the Management Defendants had a strong motivation to keep the price of Jumia's ADSs high to increase the value of their options. *Id.* ¶¶ 155-58. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) ("personal financial gain may weigh heavily in favor of a scienter inference"); *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 737-38 (S.D. Ohio 2006) (the "magnitude of a defendant's compensation package, together with other factors, may provide a heightened showing of motive to commit fraud."); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 327-28 (S.D.N.Y. 2001) (finding "opportunity because it is apparent for all of the named individual defendants by virtue of the positions they held" and stating that "the



The Hon. P. Kevin Castel
Page 12

artificial inflation of a stock price in order to achieve some more specific goal" may be sufficient for motive).

Furthermore, Defendant Poignonnec gave an interview to Real Money in which he admitted that "[the prospectus and the investor document referenced are not consistent" with Jumia's Registration Statement. He further stated that "[t]he documents are calculated differently, since the prospectus presents active consumers in the same way we present gross merchandise volume." These statements show that he was familiar with the 2018 Confidential Investor Presentation and knew there were material discrepancies between it and the Registration Statement. Defendant Poignonnec's scienter can also be inferred from his false exculpatory statements during Jumia's First Quarter 2019 Earnings Call concerning fraud in Jumia's Nigeria operation and the volume of Jumia's cancelled orders. AC ¶¶ 159-60.

Given that GMV, Active Sellers, and Active Consumers are three of the four metrics defined as "Key Terms and Performance Indicators" in the Registration Statement, it is inconceivable that Defendants Poignonnec and Hodara as Co-CEOs of the Company and members of its management board, and Defendant Maillet-Mezeray, as CFO and Principal Accounting Officer of the Company, would have been unaware of the fact that there was material information about those metrics in the 2018 Confidential Investor Presentation and other internal documents that was not disclosed in the Registration Statement. *Id.* ¶ 161. The fact that the alleged false and/or misleading statements pertained to Jumia's core operations further supports an inference of scienter as to the Management Defendants. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (fact that "defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent" supported inference that "high-level officers and directors had knowledge of those facts by virtue of their positions with the company"). Furthermore, "courts have generally held that the scienter of a corporation's executive-level employees and corporate officer may be attributed to the corporation." *Thomas v. Shiloh Indus.*, No. 1:15-CV-7449, 2018 U.S. Dist. LEXIS 160235, at *9 (S.D.N.Y. Sept. 19, 2018).

*Loss Causation.* Plaintiffs have adequately alleged loss causation. To plead loss causation, a complaint "must simply give Defendants 'some indication' of the actual loss suffered and…a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). "This can be done by alleging…the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud…." *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539-GHW, 2017 U.S. Dist. LEXIS 42513, at *81-82 (S.D.N.Y. Mar. 23, 2017) (internal quotation marks omitted). The burden of pleading loss causation is "not a heavy one". *Loreley*, 797 F.3d at 187. Plaintiffs have satisfied this standard.

Plaintiffs allege that the falsity of the misrepresentations and omissions was revealed to the public for the first time: (i) when Citron Research issued its report on May 9, 2019 (AC ¶¶



The Hon. P. Kevin Castel
Page 13

59-65, 201); (ii) on August 21, 2019, when Jumia admitted that there was a significant amount of fake orders generated by JForce in Nigeria (*id.* ¶¶ 80, 201); and (iii) on September 20, 2019, when Bloomberg News published an article confirming Citron's allegations that Jumia's percentage of failed deliveries, including cancellations and returns, was around 40% (*id.* ¶¶ 86, 201). And Plaintiffs allege that the market reacted negatively to the three corrective disclosures by a significant decline in Jumia's ADS's on each of those dates or over more than one date (*id.* ¶ 201). "Many district courts in this Circuit have found similar allegations sufficient to plead loss causation under a theory of corrective disclosure. *See, e.g.*, *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273-74 (S.D.N.Y. 2010) (loss causation adequately pled where plaintiff 'identified several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and also alleged[d] that the value of plaintiffs' Ambac stock declined immediately following the corrective disclosures'). . . *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252-53 (S.D.N.Y. 2007) (4.5% drop in market price of shares in response to announcement of SEC investigation into options backdating was sufficient to plead loss causation). . . ." *Carpenters Pension Trust Fund of St. Louis v Barclays PLC*, 750 F.3d 227, 233-34 (2d Cir. 2014).

Although Defendants claim that the alleged corrective disclosures relied on information that was theoretically available to the public (Dkt. No. 70 at 7-8), Plaintiffs contend that each of the disclosures revealed new information to the market directly contrary to Defendants' statements that had not been previously pieced together, published, and widely disseminated. *See Vale*, 2017 U.S. Dist. LEXIS 42513, at *86-87 ("the Court cannot conclude that [an analyst report] alone put the market on notice of the critical facts underlying the disclosure of the Brazilian court's ruling...sufficient to conclude as a matter of law that this disclosure was not corrective."); *City of Roseville Emps.' Ret. Sys.*, 814 F. Supp. 2d at 415-16 (holding that certain "publicly discoverable" information cannot be said to be so manifestly well-known that it was, as a matter of law, already part of the total mix of information available to investors").

## VIII.  Plaintiffs Adequately Allege Section 20(a) Control Person Liability Against the Management Defendants

Plaintiffs also adequately plead control person liability under Section 20(a) of the Exchange Act against the Management Defendants because they allege a primary violation by the Company, the controlled person; control of the violator by the Management Defendants; and that the Management Defendants were culpable participants in the controlled person's fraud (AC ¶¶ 143-202, 213-22). *ATSI Communc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). That is all that is required.[3]

We look forward to discussing these issues with Your Honor at the conference scheduled for March 19, 2020.

---

[3] Plaintiff reserve the right to supplement the arguments summarized in this letter.

Case 1:19-cv-04597-PKC Document 84 Filed 02/28/20 Page 14 of 14



The Hon. P. Kevin Castel
Page 14

Respectfully submitted,

**POMERANTZ LLP**                                **THE ROSEN LAW FIRM, P.A.**

By: _/s/ Jeremy A. Lieberman_                    By: _/s/ Phillip Kim_
      Jeremy A. Lieberman                           Phillip Kim

cc: All Counsel of Record (via ECF)