UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Jumia Technologies AG Securities Litigation, | Master File No. 1:19-cv-04397-PKC |
|  | DEMAND FOR JURY TRIAL |

**SECOND AMENDED SECURITIES CLASS ACTION COMPLAINT**

Lead Plaintiff Hexuan Cai ("Cai") and Named Plaintiffs Kalyan and Kalyanasundaram Venkataraman (the "Venkataramans"), Matthew Sacks ("Sacks"), and Yifeng Zhu ("Zhu") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon information and belief as to the investigation conducted by Plaintiffs' counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Jumia Technologies AG ("Jumia" or the "Company"), securities analyst research reports, press releases, and other public statements issued by, or about, the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of two classes of purchasers of Jumia's American Depository Shares ("ADSs"), the Securities Act Class and the Exchange Act Class.

2.      The "Securities Act Class" includes the following: As to claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") (the "Securities Act Claims" or "Securities Act Counts"), all purchasers who purchased or otherwise acquired Jumia's ADSs pursuant or traceable to the Registration Statement (defined below) issued in connection with Jumia's April 2019 initial public stock offering (the "IPO"), and were damaged thereby.

3.      The "Exchange Act Class" includes the following: As to claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), all purchasers who purchased or otherwise acquired Jumia's ADSs between April 12, 2019 and November 11, 2019, inclusive (the "Exchange Act Class Period"), and were damaged thereby.

2

4.     Defendant Jumia characterizes itself as the leading pan-African e-commerce platform, which, according to Jumia, consists of a marketplace that connects sellers with consumers, a package shipment and delivery service, and a payment service.

5.     On March 12, 2019, Jumia filed a Form F-1 Registration Statement with the SEC for the Company's IPO.  The Company filed amendments to the Form F-1 on March 28, 2019, April 9, 2019, and April 10, 2019.  That Registration Statement, as amended, was signed by the Management Defendants (defined below) and Defendant Donald J. Puglisi ("Puglisi"), and declared effective by the SEC on April 10, 2019. On April 12, 2019, Jumia began to sell 13.5 million ADSs to the public at a price of $14.50 per ADS.

6.     On April 15, 2019, Jumia filed a prospectus with the SEC for the IPO (which, along with Jumia's Form F-1 and amendments, constitutes the "Registration Statement").  Jumia raised approximately $196 million from the sale of its ADSs, net of underwriting discounts and commissions and other offering expenses.

7.     The Registration Statement issued in connection with the IPO and other subsequent statements made by Defendants (defined below) were materially false and misleading and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

8.     On May 9, 2019, less than a month after Jumia's IPO, Citron Research, a longtime publisher of online investment reports, issued a research report entitled *"Not All IPOs are Created Equal. Jumia is a Fraud"* (the "May 9, 2019 Citron Report").

9.     The May 9, 2019 Citron Report stated that Citron had obtained a copy of a confidential investor presentation, dated October 2018 (the "2018 Confidential Investor Presentation"), that Jumia used in an effort to raise private capital shortly before its IPO.

10.     Three of the four terms that Jumia defined as "**Key Terms and Performance Indicators Used in this Prospectus**" (emphasis in original) in its Registration Statement[1] were Gross Merchandise Value ("GMV"), [2] Active Sellers, and Active Consumers, and the Registration Statement is replete with references to those metrics.   Excerpts of the 2018 Confidential Investor Presentation that Citron reprinted in its May 9, 2019 report show that there were material discrepancies between the information concerning GMV, Active Consumers, and Active Sellers in the 2018 Confidential Investor Presentation and what Jumia disclosed in its Registration Statement:

- The 2018 Confidential Investor Presentation stated that ***orders that were returned, not delivered or cancelled accounted for 41% of Jumia's 2017 GMV*** and indicated based on projected numbers that such orders would constitute 35% of Jumia's 2018 GMV. In contrast, the Registration Statement only ***disclosed that 14.4% of Jumia's 2018 GMV consisted of orders that were failed deliveries or were returned by customers while misleadingly omitting any information about cancellations***.  This was misleading because, *inter alia*, Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing cancelled orders.

---

[1]     When this Complaint refers to statements in the Registration Statement, it means that the statements appear both in the Form F-1/A Amendment No. 2 that Jumia filed with the SEC on April 9, 2019 and the final Form 424(B)4 Prospectus that Jumia filed with the SEC on April 15, 2019.

[2]     The Registration Statement states that GMV "corresponds to the total value of orders including shipping fees, value-added tax, and before deductions of any discounts or vouchers, irrespective of cancellations or returns."

- The 2018 Confidential Investor Presentation stated that Jumia had 2.1 million Active Consumers in 2017.  The Registration Statement, however, stated that Jumia had 2.7 million Active Consumers in the same year.

- The 2018 Confidential Investor Presentation stated that Jumia had 43,000 Active Merchants in 2017.  The Registration Statement, however, stated that Jumia had 53,000 Active Sellers in the same year.

11.    The May 9, 2019 Citron Report also expressed concern that Jumia's Registration Statement contained misstatements about fraudulent transactions generated by Jumia's "JForce Consultants" in Nigeria.  JForce Consultants are a sales force that places orders on Jumia's platform for other people.  Jumia pays the JForce Consultant a commission for each order.

12.    On May 28, 2019, Citron released additional evidence that Jumia had made material misstatements — a video entitled *"Jumia — Indisputable Evidence of Fraud"* (the "May 28, 2019 Citron Video") along with a report linking to internal Jumia documents that supported the allegations in the video.  The video and supporting documents presented the following:

- Internal Jumia documents showing that Jumia reported a GMV in its Registration Statement that was 30% higher than in its pre-IPO internal records.

- Internal Jumia documents and interviews with two former Jumia executives showing that more than 50% of Jumia's orders in Nigeria were fake or invalid.

- An October 2018 Jumia internal report showing that Ernst & Young Luxembourg only audited 7 of the 14 countries that Jumia operated in at the time of its IPO.  The Registration Statement failed to disclose that Ernst & Young had audited *only half* the counties that Jumia operated in.

13.     Jumia made statements generally denying Citron's allegations, but later in 2019, in its second quarter earnings press release, filed with the SEC on August 21, 2019, the Company admitted that its JForce program and other Jumia sales consultants and employees had generated a significant number of "improper" *i.e.* fake orders that were subsequently cancelled.   The Company admitted that improper orders accounted for 3% of Jumia's GMV in 2018, concentrated in the fourth quarter of 2018, and approximately 5% of Jumia's first quarter 2019 GMV.

14.     Jumia tried to downplay its admission, but numerous media and analyst reports agreed that the Company's admission to such a large number of improper orders was a material problem for the Company and that Jumia's disclosure backed up the numbers in Citron's earlier reports.

15.     On September 20, 2019, Bloomberg News published an article entitled *"Amazon of Africa Van Drivers Battle Hardships on Lagos Streets"*.   The article documented problems with Jumia's delivery system — ***including that Jumia's percentage of failed deliveries, including cancellations and returns, was around 40%*** — which, like Jumia's August disclosure, supported the numbers in Citron's reports and undercut Jumia's denials concerning misstatements in its Registration Statement.

16.     At the time of the filing of the First Amended Complaint on December 30, 2019, Jumia's ADSs was trading at $6.25, 43% of their IPO price.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.   This Court has jurisdiction over the subject matter of this action under Section

27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. §77v, and

28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

18.     Venue is proper in this District under Section 27(c) of the Exchange Act, 15

U.S.C. § 78aa(c), §22(a) of the Securities Act, 15 U.S.C. §77v(a)), and 28 U.S.C. § 1391(b)-(d).

Many of the acts complained of herein occurred, in substantial part, in this District, as the

Company's IPO was marketed in this District.

19.     In connection with the acts alleged in this Complaint, Defendants (defined below)

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications and the facilities of the of the New

York Stock Exchange ("NYSE"), a national securities exchange located in this District.

20.     Defendants Sacha Poignonnec ("Poignonnec") and Jeremy Hodara ("Hodara")

rang the opening bell of the NYSE when Jumia's ADSs began trading.  Additionally, Jumia

solicited investors through media interviews in this District, including on Bloomberg Technology

and CNBC.  During an interview with Bloomberg Technology, in response to a question why

Jumia decided to list its ADSs on the NYSE, Defendants Poignonnec and Hodara discussed the

importance of listing Jumia ADSs in New York:

> [Poignonnec] in New York already a lot of marketplaces are listed, and investors
> are very used to seeing those businesses. And for us it was a natural place where
> the investors understand the business of Jumia . . .
>
> [Hodara] being listed in New York as a first-day company is a big deal. And it's
> very important for all our ecosystem and all our partners that Jumia actually made
> it here in New York, and that's something that matters a lot . . . .

## SECURITIES ACT CLAIMS

21.     Pursuant to the Securities Act, the Defendants are strictly liable for material misstatements in the Registration Statement issued in connection with the IPO. These claims specifically exclude any allegations of knowledge or scienter.

22.     The Securities Act Claims are based solely on negligence and strict liability, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants (defined below)—i.e., the Securities Act Claims do not allege, arise from, or sound in, fraud. Plaintiffs specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims. All of the sources used in this Amended Complaint to support Plaintiffs' Securities Act Claims have been introduced solely for the purpose of showing there were material misstatements in Jumia's Registration Statement. Plaintiffs expressly disclaim any language in those sources that indicates that those misstatements were fraudulent or were made with scienter or recklessly for the purpose of their Securities Act Claims.

## I.     PARTIES

23.     Lead Plaintiff Cai and Named Plaintiffs the Venkataramans purchased Jumia ADSs, as set forth in previously filed certifications incorporated by reference herein, that are traceable to the IPO.

24.     Named Plaintiffs Sacks and Zhu purchased Jumia ADSs, as set forth in the certifications attached as Exhibit 1 to the First Amended Complaint, filed December 30, 2019, that are traceable to the IPO.

25.     Defendant Jumia operates a pan-African e-commerce platform. The Company is incorporated under German law and maintains its principal executive offices in Berlin, Germany. Its ADSs are listed and trade on the NYSE under the ticker symbol "JMIA."

26.     Defendant Hodara has served as Jumia's Co-Chief Executive Officer and a member of its management board at all relevant times.  He works in Jumia's office in Dubai, United Arab Emirates.  Defendant Hodara signed the Registration Statement.

27.     Defendant Poignonnec has served as Jumia's Co-Chief Executive Officer and a member of its management board at all relevant times.  He works in Jumia's office in Dubai, United Arab Emirates.  Defendant Poignonnec signed the Registration Statement.

28.     Defendant Antoine Maillet-Mezeray ("Maillet-Mezeray") has served as Jumia's Chief Financial Officer and Principal Accounting Officer at all relevant times.  He works in Jumia's office in Dubai, United Arab Emirates.   Defendant Maillet-Mezeray signed the Registration Statement.

29.     Defendants Hodara, Poignonnec and Maillet-Mezeray are collectively referred to herein as the "Management Defendants."

30.     Defendant Gilles Bogaert ("Bogaert") has been a member of the Company's supervisory board since at least January 2019.

31.     Defendant Andre T. Iguodala ("Iguodala") has been a member of the Company's supervisory board since at least January 2019 and served on its Compensation Committee. Defendant Iguodala is a United States resident, residing in Lafayette, California.

32.     Defendant Blaise Judja-Sato ("Judja-Sato") has been a member of the Company's supervisory board since at least January 2019 and served on its Audit Committee, Compensation Committee, and Corporate Governance and Nominations Committee. Defendant Judja-Sato is a is a United States resident, residing in New York.

33.     Defendant Jonathan D. Klein ("Klein") has served as the Chairperson of the Company's supervisory board since at least January 2019 and is also Chairperson of its

Compensation Committee. Defendant Klein was also a member of the supervisory board's IPO Committee from its inception until its termination following Jumia's IPO.  Defendant Klein is a is a United States resident, residing in New York.

34.     Defendant Angela Kaya Mwanza ("Mwanza") has been a member of the Company's supervisory board since March 2019 and serves on its Audit Committee. Defendant Mwanza is a United States resident, residing in New York.

35.     Defendant Alioune Ndiaye ("Ndiaye") has been a member of the Company's supervisory board since at least January 2019 and serves on its Corporate Governance and Nominations Committee.

36.     Defendant Matthew Odgers ("Odgers") has been a member of the Company's supervisory board since at least January 2019 and is also Chairperson of its Corporate Governance and Nominations Committee. Defendant Odgers was also a member of the supervisory board's IPO Committee from its inception until its termination following Jumia's IPO.

37.     Defendant John H. Rittenhouse ("Rittenhouse") has been Deputy Chairman of the Company's supervisory board since at least January 2019 and is also Chairperson of its Audit Committee.  Defendant Rittenhouse was also a member of the supervisory board's IPO Committee from its inception until its termination following Jumia's IPO. Defendant Rittenhouse is a United States resident, residing in Belvedere, California.

38.     Bogaert, Iguodala, Judja-Sato, Klein, Mwanza, Ndiaye, Odgers, and Rittenhouse are collectively referred to herein as the "Supervisory Director Defendants."

39.     Defendant Puglisi was the duly appointed representative of Jumia in the United States at the time of its IPO.  Puglisi signed the Registration Statement.

40.     The Management Defendants, Supervisory Director Defendants, and Puglisi are collectively referred to herein as the "Individual Defendants."

41.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Jumia's Registration Statement.

42.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Jumia's Registration Statement.

43.     Defendant Berenberg Capital Markets, LLC ("Berenberg") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Jumia's Registration Statement.

44.     Defendant RBC Capital Markets, LLC ("RBC Capital") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Jumia's Registration Statement.

45.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Jumia's Registration Statement.

46.     Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Jumia's Registration Statement.

47.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Jumia's Registration Statement.

11

48.     Defendants Morgan Stanley, Citigroup, Berenberg, RBC Capital, Stifel, Raymond James, and William Blair are collectively referred to herein as the "Underwriter Defendants."

49.     Unless otherwise noted, Jumia, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

## II.     ALLEGATIONS CONCERNING THE RESPONSIBILITIES OF THE SUPERVISORY BOARD FOR THE SECURITIES ACT CLAIMS.

50.     According to the Registration Statement, in accordance with the German Stock Corporation Act, Jumia has a management board of directors and supervisory board of directors. The management board is responsible for the day-to-day management of the business. The principal function of the supervisory board is to supervise the management board. The supervisory board is also responsible for appointing and removing the members of the management board, representing the Company in connection with transactions between a current or former member of the management board and the Company, and granting approvals for certain significant matters.

51.     The Registration Statement further explained:

> ***The supervisory board has comprehensive monitoring responsibilities***. To ensure that our supervisory board can carry out these functions properly, our management board must, among other duties, regularly report to our supervisory board regarding our current business operations and future business planning (including financial, investment and personnel planning). ***In addition, our supervisory board or any of its members is entitled to request special reports from the management board on all matters regarding the Company***, our legal and business relations with affiliated companies and any business transactions and matters at such affiliated companies that may have a significant impact on our position at any time.

(emphasis added).

52.     The Registration also stated that "[o]n February 4, 2019, the Supervisory Board authorized [Jumia's 2017 and 2018] consolidated financial statements for issuance."

**A. Responsibilities of the Supervisory Board's IPO Committee.**

53.     On February 8, 2019, the supervisory board resolved pursuant to Jumia's articles of association to create the IPO Committee, adopted the rules of procedure for it, and appointed Defendants Rittenhouse, Klein, and Odgers to that committee.

54.     According to both the rules of procedure for the IPO Committee and for Jumia's management board, the IPO Committee's approval was required for the following items:

(a) Resolution to proceed with and implement the IPO and to undertake all necessary and appropriate legal transactions and measures for such purpose;

***(b) Resolution regarding the final submission of the prospectus for the public offering in connection with the IPO;***

(c) Resolution on the offer and placement of the new shares/ ADS resulting from the IPO capital increase;

(d) Resolution on the admission for subscription of the new shares under exclusion of the subscription rights of the existing shareholders of the Company in connection with the IPO capital increase;

(e) Resolution regarding the underwriting of the new shares by the syndicate banks mandated for the IPO as set forth in the underwriting agreement;

(f) Resolution on the public offering of the shares/ADS;

(g) Resolution on the determination of the price range within which purchase orders may be placed per share/ADS;

(h) Resolution on the issue price and final offering price of the shares/ADS;

(i) Resolution on the execution of the IPO capital increase and on the number of new shares to be issued in the course of the IPO capital increase;

(j) Resolution on the signing and execution of the Underwriting Agreement, Volume Agreement, Pricing Agreement.

(emphasis added).

55.     On April 11 and 12, 2019, the IPO Committee unanimously passed the resolutions necessary for Jumia's IPO to begin.

**B.  Responsibilities of the Supervisory Board's Audit Committee**

56.     Defendant Rittenhouse served as chairperson and Defendants Judja-Sato and Mwanza served as members of the Audit Committee at the time of Jumia's IPO and at all other relevant times.

57.     According to the Registration Statement, the Audit Committee of Jumia's Supervisory Board has the following responsibilities:

> ***Our audit committee assists the supervisory board in overseeing the accuracy and integrity of our financial statements***, our accounting and financial reporting processes and audits of our financial statements, the effectiveness of our internal control system, our risk management system, our compliance with legal and regulatory requirements, the independent auditors' qualifications and independence, the performance of the independent auditors and the effectiveness of our internal audit functions. The audit committee's duties and responsibilities to carry out its purposes include, among others:
>
> - the preparation of the supervisory board recommendation to the shareholders' meeting on the appointment of the independent auditors to audit our financial statements and the respective proposal to the supervisory board;
>
> - direct responsibility for the appointment, compensation, retention and oversight of the work of the independent auditors, who shall report directly to the audit committee, provided that the auditor appointment and termination shall be subject to approval by the shareholders' meeting;
>
> - the pre-approval, or the adoption of appropriate procedures to pre-approve, all audit and non-audit services to be provided by the independent auditors;
>
> - the handling of matters and processes related to auditor independence;
>
> - the establishment, maintenance and review of procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters; and
>
> - the review and approval of all our related party transactions in accordance with our policies in effect from time to time.
>
> The audit committee shall have the resources and authority appropriate to discharge its duties and responsibilities, including the authority to select, retain, terminate, and approve the fees and other engagement terms of special or

14

independent counsel, accountants or other experts and advisors, as it deems necessary or appropriate, without seeking approval of the management board or supervisory board. We shall provide for appropriate funding, as determined by the audit committee, in its capacity as a committee of the supervisory board, for payment of compensation to the independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for us, compensation of any advisers employed by the audit committee, and ordinary administrative expenses of the committee that are necessary or appropriate in carrying out its duties.

(emphasis added).

### C. Responsibilities of the Supervisory Board's Compensation Committee.

58.    Defendant Klein served as chairperson and Defendants Judja-Sato and Iguodala served as members of the Compensation Committee at the time of Jumia's IPO and at all other relevant times.

59.    According to the Registration Statement, the Compensation Committee of Jumia's Supervisory Board has the following responsibilities:

Our compensation committee consists of three members, one of whom is the chairperson of the supervisory board. Our compensation committee is responsible for:

- considering all aspects of compensation and employment terms for the management board, and in this regard (i) making recommendations to and preparing decisions for the supervisory board, (ii) preparing presentations to the shareholders' meeting (as applicable), to discuss amendments to existing, or the establishment of new, employment agreements for the members of the management board, including issues of compensation guidelines, incentive programs, strategy and framework;

- considering the compensation and general employment terms for second level executives, and in this regard it is authorized to make recommendations to the management board;

- commissioning, when appropriate, its own independent review of the compensation guidelines and the compensation packages paid to the members of the management board, to ensure that the guidelines reflect the best practices and that the packages remain competitive and in line with market practice;

- presenting an evaluation of the management board's performance and making a recommendation to the supervisory board regarding the employment terms and compensation of the management board;

- assisting the supervisory board in the oversight of regulatory compliance with respect to compensation matters, including monitoring our system for compliance with the relevant provisions of the German Corporate Governance Code concerning the disclosure of information about compensation for the management board and other senior executives; and

- examining compensation guidelines that serve as a framework for all compensation matters to be submitted to and determined by the supervisory board.

**D. Responsibilities of the Supervisory Board's Corporate Governance and Nominations Committee.**

60.     Defendant Odgers served as chairperson and Defendants Judja-Sato and Ndiaye served as members of the Corporate Governance and Nominations Committee at the time of Jumia's IPO and at all other relevant times.

61.     According to the Registration Statement, the Corporate Governance and Nominations Committee of Jumia's Supervisory Board has the following responsibilities:

> Our corporate governance and nominations committee consists of at least three members. The committee is responsible for, among other things, preparing all recommendations to the supervisory board with regard to the following items:
>
> - the appointment and dismissal of management board members, as well as the nomination of the management board chairperson;
>
> - completion of, amendments to and termination of employment contracts with management board members; and
>
> - election proposals for suitable supervisory board candidates to be presented to the shareholders' meeting.

**III. UNDERWRITER LIABILITY ALLEGATIONS FOR THE SECURITIES ACT CLAIMS.**

62.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows.

16

63.     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared tens of millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Jumia, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

64.     The Underwriter Defendants also demanded and obtained an agreement from Jumia that Jumia would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Jumia had purchased millions of dollars in directors' and officers' liability insurance.

65.     Representatives of the Underwriter Defendants also assisted Jumia and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Jumia, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning Jumia's most up-to-date operational and financial results and prospects.

66.     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Jumia's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Jumia's ADSs would be sold; (iii) the language to be used in the Registration Statement; what disclosures about Jumia's business and operations would be

made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Jumia's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Jumia's existing problems as detailed herein.

67.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiffs and the other members of the Securities Act Class.

## IV.   SUBSTANTIVE ALLEGATIONS SHOWING THAT THERE WERE MATERIALLY FALSE AND MISLEADING STATEMENTS IN JUMIA'S REGISTRATION STATEMENT.

### A.   Jumia's IPO in April 2019.

68.     Defendant Jumia characterizes itself as the leading pan-African e-commerce platform.  Its platform consists of a marketplace that connects sellers with consumers, a package shipment and delivery service, and a payment service.

69.     Jumia was founded in 2012 as Africa Internet Holding GmbH.  On December 17 and 18, 2018, the Company changed its legal form into a German stock corporation (Aktiengesellschaft) and changed its name to Jumia Technologies AG.  These changes became effective on January 31, 2019, upon registration with the commercial register of the local court (Amtsgericht) in Berlin, Germany.

70.     On March 12, 2019, Jumia filed a Form F-1 Registration Statement with the SEC for the Company's IPO.  The Company filed amendments to the Form F-1 on March 28, 2019, April 9, 2019, and April 10, 2019.  The Registration Statement, as amended, was signed by the Management Defendants and Defendant Puglisi, and declared effective by the SEC on April 10,

18

2019. On April 12, 2019, Jumia began to sell 13.5 million ADSs to the public at a price of $14.50 per ADS.

71.     On April 15, 2019, Jumia filed a prospectus with the SEC, which forms part of the Registration Statement.  Jumia raised approximately $196 million from the sale of its ADSs, net of underwriting discounts and commissions and other offering expenses.

72.     According to the Registration Statement, the Company's operations were conducted in six regions in Africa, which consisted of fourteen countries — Nigeria, Kenya, Egypt, Morocco, Ivory Coast, South Africa, Ghana, Senegal, Tunisia, Algeria, Rwanda, Uganda, Tanzania, and Cameroon — that, together, accounted for 72% of Africa's 2018 Gross Domestic Product.  Nigeria, which accounted for 28.6% of Jumia's GMV, makes up a larger portion of Jumia's business than any other country.

**B. Less Than a Month After Jumia's IPO, Citron Research Issued a Report Revealing it had Obtained a 2018 Confidential Investor Presentation that Showed that the Registration Statement Had Reported Jumia's Key Performance Indicators in a False and Misleading Way.**

73.     On May 9, 2019, less than a month after Jumia's IPO, Citron Research issued the May 9, 2019 Citron Report, entitled *"Not All IPOs are Created Equal. Jumia is a Fraud."*[3]

74.     Citron Research publishes an online investment newsletter that, according to its website, has amassed an unparalleled investigative track record over its seventeen-year existence, with more than fifty companies it highlighted becoming targets of regulatory interventions.  Citron Research's website further notes that its reports are based upon the findings of a team of investigators, led by Andrew Left, its founder, who has been quoted in major financial

---

[3]     References to the titles of the May 9, 2019 Citron Report and May 28, 2019 Citron Video are merely to identify the reports and should not be construed as substantive allegations of fraud.

publications, including *Forbes*, *Fortune*, *Wall Street Journal*, *Barron's*, *CNBC*, *Investors' Business Daily*, and *Business Week*.

75. The May 9, 2019 Citron Report stated that Citron had obtained a copy of the 2018 Confidential Investor Presentation that Jumia used during an effort to raise money privately in October 2018. Citron stated that there were "many material discrepancies in reported key financial metrics when comparing this confidential document with Jumia's F-1 filing from last month."

76. The May 9, 2019 Citron Report compared the following excerpts from the October 2018 Confidential Investor Presentation and Jumia's Registration Statement:



77. The excerpts above show that for the fiscal year 2017, the Confidential Investor Presentation reported that Jumia had **2.1 million Active Consumers and 43,000 Active**

*Merchants*, but Jumia's Registration Statement instead publicly reported *2.7 million Active Consumers and 53,000 Active Sellers for that fiscal year*.

78.     The 2018 Confidential Investor Presentation further stated that in fiscal year 2017, 209 million Euros of Jumia's 507 million Euro GMV *were for returned, not delivered or cancelled orders, accounting for 41% of Jumia's total GMV*.  Additionally, the estimated Total Net Merchandise Value ("NMV") that Jumia included in the 2018 Confidential Investor Presentation indicated that the Company projected that the percentage of Jumia's GMV that were returned, not delivered or cancelled in 2018 would be approximately 35%,[4] which Jumia later confirmed in its February 25, 2020 fourth quarter and full year 2019 earnings press release. Jumia did not publicly disclose these troubling numbers in its Registration Statement, however. Instead, Jumia disclosed that in fiscal year 2018, orders accounting for 14.4% of its GMV were either failed deliveries or returned by its consumers, *but did not disclose the percentage of cancellations*.  Additionally, Jumia's Registration Statement *did not disclose what percentage of GMV represented returned, not delivered or cancelled orders in 2017*.  The May 9, 2019 Citron Report correctly stated that this was "[t]he most disturbing disclosure that Jumia removed from its F-1 filing."

79.     The May 9, 2019 Citron Report also expressed concern that Jumia's Registration Statement made misstatements about fraudulent transactions generated by Jumia's JForce Consultants in Nigeria.  JForce Consultants are a sales force of Nigerians that place orders on Jumia's platform for other people using their IDs.   Jumia pays the JForce Consultant a

---

[4]     The excerpts of the October 2018 Confidential Investor Presentation published by Citron defines NMV as GMV minus cancellations and returns.  Since the October 2018 Confidential Investor Presentation forecasted that Jumia's 2018 NMV would be 543 million euros and Jumia later reported a GMV of 828 million Euros, based on the estimated 2018 NMV, the percentage of Jumia's GMV that was from orders that were returned, not delivered or cancelled was approximately 35%.

commission for each order.  According to the 2018 Confidential Investor Presentation, JForce Consultants accounted for 34% of Jumia's NMV in 2017 and Jumia projected JForce to account for around the same amount in 2018.

80.    Jumia held its earning call for the first quarter of 2019 on May 13, 2019 ("First Quarter 2019 Earnings Call").   In his opening remarks, Defendant Poignonnec denied the allegations in the May 9, 2019 Citron Report in a vague and general way:

> We are of course aware of a recent opinion piece that was published. We would like to say upfront that we completely stand by our prospectus, our audited financials and the risk factors. We're very excited about the future and our prospects. We will not be distracted from executing on our strategy, and carrying out our mission by those we [sic] seek to create doubts, to profit at our expense, and that of our long term stakeholders.

81.    Defendant Poignonnec also dismissed a question about "JForce and fraud in Nigeria":

> I would like to say very upfront that the Jforce agents which are consultants which are part of Jforce get commissions of course on the percentage of their completed transaction after all cancellations and returns. And this is of course key and very normal. We do that. We have even actually introduced penalties as well as extra incentive to drive lower cancellations and returns for the orders which are generated by the Jforce consultant. So for us this is a very innovative marketing channel which helps consumers adopt ecommerce. It's also very useful channel to gather insights on the consumers, in addition to the data we collect online. And it's been a very successful channel which is particularly adapted to the needs of our market.

82.    On the same day as the First Quarter 2019 Earnings Call, the website Real Money, https://realmoney.thestreet.com/, published an article by Kevin Curran entitled *"Jumia CEO Sacha Poignonnec Responds to Citron's Incendiary Short Report"* that contained additional comments on the May 9, 2019 Citron Report from Defendant Poignonnec.   Defendant Poignonnec did not deny the authenticity of the 2018 Confidential Investor Presentation and admitted that "[t]he prospectus and the investor document referenced are not consistent."   He

further stated that "[t]he documents are calculated differently, since the prospectus presents active consumers in the same way we present gross merchandise volume."

83.     No Defendant has ever challenged the authenticity of the 2018 Confidential Investor Presentation or Citron's account of the figures it contained.

84.     Rocket Internet was one of the Company's largest shareholders prior to its IPO. Rocket Internet's Annual Reports, which included a limited amount of financial information for Jumia prior to its IPO, provide some insight into Defendant Poignnec's comments.

85.     Rocket Internet's 2017 Annual Report stated that Jumia had 2.2 million Active Customers that year.  That is almost the same as the 2.1 million active customers listed for 2017 in the 2018 Confidential Presentation and also inconsistent with the 2.7 million Active Consumers Jumia disclosed in its Registration Statement.  The reason for this discrepancy appears to be a difference of definition.   Jumia's Registration Statement defined Active Consumers as "unique consumers who placed an order on our marketplace within the 12-month period preceding the relevant date, *irrespective of cancellations or returns*." (emphasis added). That definition *includes people who have never actually completed a transaction on Jumia's platform*.   In contrast, Rocket Internet's 2017 Annual Report only included people who had made "valid orders" in its count of Active Customers.[5]  Rocket Internet's 2017 Annual Report does not define "valid orders," but Rocket Internet's 2016 Annual Report defines "Valid Orders" as part of its definition of "Total Transactions."   It defines "Total Transactions" as the "Total number of *valid (i.e. not failed or declined) orders* starting the fulfilment process less cancelled orders…"  (emphasis added).

---

[5]     Rocket Internet's 2017 Annual Report defines Active Consumers as the "[n]umber of customers having made at least one order as defined in 'total orders' with the last 12 months before end of period."  It further defined "Total Orders" as the "Total number of valid orders placed on the platform within the period."

86.     Based on the above, the following is true about the contrasts between Jumia's 2018 Confidential Investor Presentation and the Registration Statement:

(1) Defendant Poignonnec's comments confirmed the authenticity of the 2018 Confidential Investor Presentation and the numbers it reported.

(2) The difference between the 2.7 million Active Consumers in 2017 reported in the Registration Statement and the 2.1 million Active Consumers for that same year reported in the 2018 Confidential Investor Presentation is accounted for *by the inclusion of people who had not completed a transaction with Jumia* as "Active Consumers" in its Registration Statement.

(3) Given that the Registration Statement defines Active Sellers in a similar way to Active Consumers (as "unique sellers who received an order on our marketplace within the 12-month period preceding the relevant date, *irrespective of cancellations or returns*" (emphasis added)), it is reasonable to assume that the 10,000 seller discrepancy between the 53,000 Active Sellers in 2017 reported in Jumia's Registration Statement and 43,000 Active Merchants in 2017 reported in the 2018 Confidential Investor Presentation exists for the same reason as the Active Consumer discrepancy: the inclusion of sellers who had not actually completed a transaction on the Jumia platform as Active Sellers in Jumia's Registration Statement.

(4) None of the statements made by Defendant Poignonnec directly disputed that the 2018 Confidential Investor Presentation accurately stated that 41% of Jumia's 2017 GMV consisted of returned, not delivered, or cancelled orders and Jumia later admitted that such orders made up approximately 35% of 2018 GMV, but that information was not disclosed in the Registration Statement.

24

(5) Jumia's key performance indicators in the Registration Statement — GMV, Active
Consumers, and Active Sellers — were all calculated without removing the high
percentage of orders that were returned, not delivered, or cancelled.

**C.  Less Than Three Weeks After Issuing its First Report, Citron Releases a Video and
Accompanying Report Showing that Jumia Misstated its GMV; that More Than
50% of Jumia's Nigerian Orders are Fraudulent or Invalid; and that Ernst &
Young Luxembourg Only Audited Seven of the Fourteen Countries Jumia Operated
in Prior to Jumia's IPO.**

87.    On May 28, 2019, Citron released the May 28, 2019 Citron Video, entitled
"*Jumia — Indisputable Evidence of Fraud*", along with a report linking to internal Jumia
documents that support the allegations in the video.

88.    In the May 28, 2019 Citron Video, Citron founder Andrew Left stated that pre-
IPO internal Jumia documents show that Jumia reported GMVs for 2017 and 2018 in its
Registration Statement that were 30% higher than its pre-IPO internal records.  Jumia's internal
records showed GMVs of 381 million Euros for 2017 and 645 million euros for 2018, but it
reported 507 and 828 million euros for those years in its Registration Statement, respectively.
The report accompanying the Video cited an internal email from a member of Jumia's Financial
Planning and Analysis group, Wael Dib, who works in Jumia's Dubai office like the
Management Defendants, to what the report describes as "Jumia CFOs," and said that the email
attached an excel spreadsheet with Jumia's monthly GMV and NMV by country.  A screenshot
of the email in the video shows that the subject line of the email was "August 18: Ecommerce
GMV & NMV Data, Topline Report and KPIs."  The body of the email stated:

Dear all,

Please find attached the topline report

Please update your packages with the KPIs sent above so that the information
your country managers and CEOs will be reviewing will be the same

Note: will send soon the:
- NMV/GMV file (still waiting a response from BI team)
- Investors KPI report (solving out an issue with BI team)
- FPA KPIs (to be received from BI team)

The screenshot of the email further shows that the people that Wael Dib sent it to included Ernest Eguasa, the CFO of Jumia Nigeria, Ibrahim Megahed, the CFO of Jumia Egypt, Mehdi Essaoui, the CFO at Jumia Morocco, Giraud Njakou, CFO in Cameroon, Siaka Tiote, Financial Planner & Analyst at Jumia Ivory Coast and Senegal, and Abdeladim Habiballah, Senior Financial Planning & Analysis at Jumia Morocco.

89.     The May 28, 2019 Citron Video also included strong additional evidence that Jumia had a large volume of undisclosed cancelled and/or fraudulent orders.

90.     The Video features clips of interviews with two former Jumia executives with their faces obscured.  The first former Jumia executive stated that more than 50% of Jumia's orders in Nigeria were fake:

> And also there is a very important point related to fake orders.  Just if we talk about Nigeria, *the fake orders exceed 50% as per Jumia internal report and on a group level, the fraud and fake orders are around 40%.*  Because if you talk about 50% fake orders, it's like a strategy of the company.

(emphasis added).

91.     The second former Jumia executive stated that Jumia's own customer service agents placed fraudulent orders:

> Yeah, a higher percentage of orders are not completely true.  This is because *some of these orders are placed by us individually at the office.  It is not like a real order from customer so, some of these orders are placed by the customer service agents who have targets, to ensure that they place like a hundred orders per day.*  For example, one hundred orders, so you call a client and say, oh we haven't seen your order from us and then this client say "oh no, I don't like your product, you guys delay my orders, you guys deliver a bad product to me.  I'm not ordering from you again."  And then we place the order anyway, and we send it to them free of charge just to make up for the orders.

(emphasis added).

92.     Additionally, the report accompanying the video cited another internal email from Wael Dib to Jumia CFOs that attached an excel spreadsheet with monthly invalid or fraudulent orders by country that confirmed the first Jumia executive's statement that more than 50% of Jumia's orders in Nigeria are invalid or fraudulent.  Citron further noted that this meant that even Jumia's internal GMV was inflated.

93.     The May 28, 2019 Citron Video also stated that Jumia's Registration Statement misrepresented Ernst & Young Luxembourg's audit.  The Video shows footage of a Jumia internal report entitled *"Jumia – Audit Workshop Morocco: Overview of Timeline and Audit Stream October 2018"*.  The Video further shows a page in the audit report that listed 7 of the 14 countries as "Not in Group Audit Scope": Senegal, Tunisia, Algeria, Rwanda, Uganda, Tanzania, and Cameroon.  The report accompanying the video stated that the presentation was attached to an email from Jumia Group SVP of Finance Nathalie De Witte, who is located in Jumia's Dubai office, to Jumia CFOs.

**D.   In August 2019, Jumia Admits That JForce and Other Jumia Sales Consultants and Employees were a Significant Source of Fake Orders.**

94.     In the second quarter 2019 earnings press release that Jumia filed with the SEC on August 21, 2019, Jumia admitted that there was a significant amount of fake transactions generated by JForce and other Jumia sales consultants and employees:

> *[W]e identified several JForce agents and sellers who collaborated with employees in order to benefit from differences between commissions charged to sellers and higher commissions paid to JForce agents. The transactions in question generated approximately 1% of our GMV in each of 2018 and the first quarter of 2019* and had virtually no impact on our 2018 or 2019 financial statements. We have terminated the employees and JForce agents involved, removed the sellers implicated and implemented measures designed to prevent similar instances in the future. The review of this matter is closed.

More recently, ***we have also identified instances where improper orders were placed, including through the JForce program, and subsequently cancelled. Based on our findings to date, we believe that the transactions in question generated approximately 2% of our GMV in 2018, concentrated in the fourth quarter of 2018, approximately 4% in the first quarter of 2019*** and approximately 0.1% in the second quarter of 2019. These 0.1% have already been adjusted for in the reported GMV figure for the second quarter of 2019.  These transactions had no impact on our financial statements. We have suspended the employees involved pending the outcome of our review and are implementing measures designed to prevent similar instances in the future. We continue our review of this matter.

(emphasis added).

95.     On the same day that Jumia admitted to fake orders caused by its JForce program and other Jumia sales consultants and employees, Bloomberg News published an article by John Bowker and Loni Prinsloo entitled *"Jumia Identifies Graft in Nigerian Sales Force as Losses Widen"*.  The article stated that Jumia's disclosure about JForce "***backed up warnings made by short-seller Citron in a report three months ago***." (emphasis added).   The article further indicated that Jumia's advertising for candidates to join JForce made fraudulent orders likely since it "promise[d] the opportunity to 'earn unlimited income' while having 'complete freedom and control over your activities.'"  The article also further noted that Nigeria is ranked 744th on a list of 780 countries on the Corruption Perceptions Index, compiled by Transparency International.

96.     On August 22, 2019, The Guardian, an English language independent daily newspaper published in Lagos, Nigeria, published a story by Tonye Bakare on its website www.guardian.ng entitled *"Jumia Sacks Three Over 'Improper Sales Practices'"*.  Consistent with the Bloomberg News article published a day earlier, it stated that "[t]he acknowledgement of the dubious figures by Jumia on Wednesday" reinforced Citron's claims.

97.     The Breaking Times, which describes itself as an "Africa-based online multi-dimensional news and information media company," published an article by Ikokwu Ikemba entitled *"Jumia Admits to Fraud as it Reports Q2 2019 Earnings"* on its website www.thebreakingtimes.com on August 22, 2019.  As with other contemporary media reports, the article emphasized the significance of Jumia's disclosure and the fact that it supported Citron's allegations:

> Despite JUMIA trying their best to highlight some of the more positive numbers from their second quarter…***attention by those trading the e-commerce company's stock seemed to be more focussed on the sales and order fraud that JUMIA has now finally admitted***.
>
> ….
>
> What is curious when you read JUMIA's Q2 financials and the statements around fraudulent activity is that not only is a very small section light on details afforded to the serious fraud, it is also that ***when you read between the lines JUMIA executives are essentially saying that they were not aware of fraudulent activity that amounted to approximately $18 million under their watch, if that is the case then at minimum they should be held accountable for being incompetent or did they know all along?***
>
> ***Given that the types of fraud they claim to have only recently uncovered is the same as was alluded in a scathing report by Citron Research earlier in May 2019, one has to wonder whether the recent statements by JUMIA are merely a public relations damage control strategy*** to contain the fall out from the fraud being exposed.

(emphasis added).

98.     Also on August 22, 2019, Morgan Stanley issued an analyst report in response Jumia's second quarter 2019 earnings release.  The report stated that Jumia's admission of improper orders was "***[m]ore important than 2Q results***" and the disclosure was "**Likely to Weigh on Multiple Investors Will Pay for JMIA**" (emphasis added for first quote; emphasis in original for second quote).  The report further stated that the GMV affected by these issues "is a material part of JForce, which JMIA has talked about being an important growth driver" and that "failing to catch these challenges and potential internal control question marks are likely to

weigh on the multiple investors will pay for this emerging market asset a few years away from cash flow break even."

99.     Weeks later, Jumia's disclosure about fraudulent orders was still reverberating. On September 10, 2019, Tellimer, an investment company that specializes in and issues analyst reports concerning developing markets, posted an entry on its blog[6] by Nigunan Tiruchelvam, Head of Consumer Equity Research, entitled *"Jumia Fraud Revelation Raises Three Questions".* The first question the post asked was "**How material is Jumia's fraud?**" (emphasis in original). It answered that Jumia's disclosure had a "***high degree of materiality***":

> The improper orders were EUR16mn (US$17.5mn) in gross merchandise value (GMV) in Q418-Q219. This accounts for 2% of GMV in 2018 and 4% of GMV in Q1 19. The fake orders are a much larger proportion of Jumia's gross profit. Gross margins are typically c6% of GMV. ***This suggests that about two-thirds of the gross profits in Q1 19 were tainted. In a slim margin and negative cash flow business, fraudulent orders have a high degree of materiality.***

(emphasis added).   Tellimer's article also asked: "**Does it vindicate Citron's allegations**?" (emphasis in original).   It answered that while Tellimer had not independently verified Citron's allegations, "***the latest revelations seriously damage Jumia's credibility. Its denial of Citron's allegations seems to ring hollow***." (emphasis added).

### E.   Bloomberg News Publishes Additional Reporting Indicating That 40% of Jumia's Orders Result in Failed Deliveries, Cancellations, or Returns.

100.     On September 20, 2019, Bloomberg News published an article by Tope Alake entitled *"Amazon of Africa Van Drivers Battle Hardships on Lagos Streets"* that undermined Jumia's denial of Citron's allegations.   The article discussed a typical day of a Jumia driver in Lagos, Nigeria which the article describes as featuring "[f]aulty payment systems, patchy phone-

---

[6]     https://blog.tellimer.com/jumia-fraud-revelation-raises-three-questions.

network coverage, parking woes and unreliable customers."   It further stated that Jumia's percentage of failed deliveries, including cancellations and returns, was around 40%:

> *It's easy to see why Jumia's investors have a concern over the company's high level of failed deliveries across its 14 countries -- some 40%, including cancellations and returns* -- and question the viability of ordering goods online and having them delivered in major African cities. The skepticism is evident in the share price, down about 25% since its high-profile initial public offering in New York in April.

(emphasis added).

101.    On October 10, 2019, the Motley Fool, which is a private financial and investment advice company, published an article by Jeremy Bowman on its website fool.com entitled *"Why Jumia Technologies Stock Fell 29% Last Month: Shares of the African e-commerce company slipped after a news report detailed its struggles"*.   According to the article, Bloomberg News' September 20, 2019 report "seemed to prompt a new round of selling for the busted IPO" since Bloomberg's statement "that approximately 40% of the company's orders result in either cancellations or returns, illuminat[ed] the difficulties in bringing e-commerce to a continent that lacks much of the infrastructure -- including roads, an address system, and internet connectivity."

**F.   Jumia Fires Additional Employees for Placing Fake Transactions and Later Announces That GMV for the Fourth Quarter of 2019 Decreased Year-Over-Year.**

102.    In the third quarter 2019 earnings press release that Jumia filed with the SEC on November 12, 2019, before the market opened, Jumia stated that it had fired additional employees for generating fake transactions:

> As disclosed in our report on second quarter results dated August 21, 2019, we have been conducting a sales practices review. *The sales practices review, which relates to certain improper orders that were placed and subsequently cancelled, is ongoing. Employees involved in this practice, who were previously suspended, have now been terminated or resigned.* We are implementing measures designed

to prevent similar conduct in the future and, more broadly, are taking steps to strengthen our internal controls and corporate governance.

(emphasis added).

103.     In its fourth quarter and full year 2019 earnings press release that Jumia filed with the SEC on February 25, 2020, Jumia stated that GMV for the fourth quarter of 2019 decreased year-over-year:

GMV was €301 million, a year-over-year decrease of 3%. Adjusting for perimeter changes as a result of the portfolio optimization undertaken during the quarter, as well as previously reported improper sales practices, GMV of the fourth quarter of 2019 would have been €293 million, up 6% from €275 million in the fourth quarter of 2018.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS IN JUMIA'S REGISTRATION STATEMENT.

104.     Jumia's Registration Statement contained numerous untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading.  Defendants are liable for those false and misleading statements either because they are strictly liable or because the statements were made negligently.

105.     Jumia's Registration Statement repeatedly stated that the Company's GMV was 507.1 million euros in 2017 and 828.2 million euros in 2018 and emphasized the importance of the metric. It referred to GMV as a one of its four "key performance indicators."

106.     The Registration Statement further stated that "Active Consumers" and "Active Sellers" were two of Jumia's three other "key performance indicators."

107.     In both the "**Prospectus Summary**" and "**Management's Discussion and Analysis of Financial Condition and Results of Operations**," the Registration Statement stated: "Our business has grown substantially. As of December 31, 2018, we had 4.0 million

Active Consumers, up from 2.7 million Active Consumers as of December 31, 2017. Our GMV was €828.2 million in 2018, up from €507.1 million in 2017. GMV is the primary driver of our revenue." (emphasis in original)

108.    Jumia's Registration Statement later presented GMV in the following table in three different places:

| | As of and for the year ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | | 2018 | | |
| | | | (unaudited, in millions) | | |
| Active Consumers | | 2.7 | | 4.0 | |
| GMV | € | 507.1 | € | 828.2 | $ | 948.8 |
| Adjusted EBITDA | € | (126.8) | € | (150.1) | $ | (172.0) |

109.    Jumia's Registration Statement presented the following table breaking GMV and Active Consumers down by quarter:

| | 2017 | | | | 2018 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | | | | (unaudited, in millions) | | | | |
| GMV | € 88.6 | € 101.8 | € 118.9 | € 197.9 | € 152.4 | € 166.3 | € 198.4 | € 311.0 |
| Active Consumers[1] | 1.9 | 2.0 | 2.3 | 2.7 | 3.0 | 3.2 | 3.5 | 4.0 |
| Adjusted EBITDA[2] | € (24.1) | € (28.7) | € (28.6) | € (45.4) | € (30.2) | € (35.6) | € (35.8) | € (48.6) |

110.    The Registration Statement further stated concerning the "***Growth and engagement of our Active Customers***" that "[o]ur GMV is a function of the number of Active Consumers on our platform and the amount they spend on our marketplace. As of December 31, 2018, we had 4.0 million Active Consumers, up from 2.7 million Active Consumers as of December 31, 2017. GMV increased from €507.1 million in 2017 to €828.2 million in 2018." (emphasis in original).

111.    The foregoing statements concerning Jumia's GMV and Active Consumers in Paragraphs 107-110 were false and misleading because the 2017 and 2018 GMV numbers that

Jumia disclosed in its Registration Statement were 30% higher than in its pre-IPO internal records. Additionally, even if the GMV numbers Jumia disclosed were correct, the foregoing statements were still false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled. Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled. The foregoing statements were also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market. The foregoing statements were also false and misleading because Jumia failed to disclose that approximately 600,000 of the 2.7 million people it stated were Active Consumers in 2017, or approximately 22%, had not completed a transaction on Jumia's platform in 2017 and that a significant percentage of the 4.0 million people who it stated were Active Customers in 2018 had not completed a transaction on Jumia's platform in 2018.

112.    In a Section entitled "*Revenue,*" the Registration Statement stated "GMV increased by 63.3% from €507.1 million in 2017 to €828.2 million in 2018, mainly due to a 74.7% increase in GMV from third-party sales. All regions contributed to the growth of GMV, with particularly strong contributions from West Africa and Egypt." (emphasis in original).

113.    The foregoing statement concerning Jumia's GMV was false and misleading because the 2017 and 2018 GMV numbers that Jumia disclosed in its Registration Statement were 30% higher than in its pre-IPO internal records. Additionally, even if the GMV numbers

Jumia disclosed were correct, the foregoing statement was still false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled. Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled.   The foregoing statement was also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.

114.   Jumia's Registration Statement also cited GMV, Active Consumers, and Active Sellers when discussing "***Strengths Related to Our Competitive Position***":

> ***Pan-African leader***. We believe that we are the only e-commerce business successfully operating across multiple regions in Africa. Through our full scale operations in six regions of Africa, we generated €507.1 million in GMV in 2017 and €828.2 million in 2018, more than any other e-commerce player in the markets in which we operate. Our reach and capabilities position us as the preferred partner in Africa for sellers, from individuals to large global brands, and as the preferred shopping destination for consumers. On our platform, we had 81 thousand Active Sellers as of December 31, 2018 and a total of 4.0 million Active Consumers as of December 31, 2018.

(emphasis in original.)

115.   The foregoing statement was false and misleading because the 2017 and 2018 GMV numbers that Jumia disclosed in its Registration Statement were 30% higher than in its pre-IPO internal records.  Additionally, even if the GMV numbers Jumia disclosed were correct, the foregoing statement was still false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of

orders that were returned, not delivered or cancelled.  Jumia's key performance indicators in the

Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated

without removing the high percentage of orders returned, not delivered, or cancelled.   The

foregoing statement was also false and misleading because Jumia failed to disclose that a

material amount of fake or invalid orders had been generated by its JForce program and other

Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid

orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria,

the Company's largest market.  The foregoing statement was also false and misleading because

Jumia failed to disclose that a significant percentage of the 4.0 million Active Customers and

81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in

2018.

116.    The Registration Statement made the following statement concerning transactions

that were placed on Jumia's platform, but were not completed:

> ***We face challenges with failed deliveries, excessive returns, late collections,***
> ***unrecoverable receivables and voucher abuse, which may materially and***
> ***adversely affect our business and prospects.***
>
> We typically provide our consumers with the option to pay cash on delivery.
> Many of our consumers choose this option. . . . In situations where the consumer
> elects to pay cash on delivery, he/she must be present at home in order to provide
> payment at the time of delivery; otherwise, the delivery will fail. . . .  If a
> consumer is not present, we schedule a new delivery time. We typically make
> three delivery attempts, and if all of these attempts fail, we return the product to
> the seller. . . .
>
> Even if the product is successfully delivered to the consumer and delivery is
> verified, most of our sellers are required, either by local regulations or by our
> operating standards, to allow consumers to return goods within a certain period of
> time after delivery. For example, in Egypt, which is one of our largest markets,
> consumers have a legal right to return any product within fourteen days after
> delivery so long as the product is in the same condition as when delivered.
> Furthermore, if our sellers offer more consumer friendly return policies, the
> number of returns may increase, which could adversely affect our business. ***In***

*2018, orders accounting for 14.4% of our GMV were either failed deliveries or returned by our consumers. . . .*

We also face the risk that third-party delivery agents might misappropriate inventory, and we struggle to verify delivery when our third-party delivery partners deliver packages without obtaining consumer signatures. When goods are delivered without verification, we may be required to deliver a duplicate product. When a third-party delivery agent successfully delivers a product and accepts cash payment from the consumer, we face the additional risks of late collections (in the event that the third-party delivery agent does not remit the funds to us on time) or unrecoverable receivables (in the event that the third-party delivery agent commits fraud or becomes insolvent). These risks are particularly acute in countries where the percentage of outsourced deliveries remains high. For example, in Kenya, where approximately 95% of our consumers paid in cash or with cash equivalents on delivery in 2016, we discovered in early 2018 that €720 thousand of cash payments remained uncollected in 2016, the large majority of which was never subsequently collected. The extent of the effect on our cash flows in 2016 was due to our previous use of an insufficient cash reconciliation system, which has now been replaced with an automated system that allows us to monitor transactions in each of our markets on a daily basis. Even though we have taken measures to reduce the risks of fraud and uncollected receivables, these risks – whether facilitated by our employees, sellers, partners or consumers – remain, due largely to the prevalence of cash on delivery in many of our markets.

(emphasis of title in original; other emphasis added.)

117.     The foregoing statement was false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled.   Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled.   The foregoing statement was also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.

118.    Jumia's Registration Statement made the following disclosure concerning fraudulent and fictitious transactions:

> ***Failure to deal effectively with any fraud perpetrated and fictitious transactions conducted on our platform could harm our business.***
>
> We face risks with respect to fraudulent activities on our platform. . . . Given the countries in which we operate, the number of participants on our platform and the fragmentation of our business, it is a challenge to anticipate, detect and address fraudulent activities. Although we have implemented various measures to detect and reduce the occurrence of fraudulent activities on our platform, there can be no assurance that such measures will be effective in combating fraudulent transactions or improving overall satisfaction among sellers, consumers and other participants. Additional measures that we take to address fraud could also negatively affect the attractiveness of our platform to sellers or consumers.
>
> For example, we may receive complaints from consumers who may not have received goods that they had purchased, or complaints from sellers who have not received payment for the goods ordered. In addition to fraudulent transactions with legitimate consumers, sellers may also engage in fictitious or "phantom" transactions with themselves or collaborators in order to artificially inflate their own ratings on our marketplace, reputation and search results rankings. This activity may harm other sellers by enabling the perpetrating seller to be favored over legitimate sellers and may harm consumers by deceiving them into believing that a seller is more reliable or trusted than the seller actually is. Recently, we also received information alleging that a seller in Morocco bribed one of our employees in order to receive favorable marketing treatment. In addition, we recently received information alleging that some of our independent sales consultants, members of our JForce program in Nigeria, may have engaged in fraudulent activities. ***We are currently investigating these allegations and are unable to determine their accuracy and/or the potential scope of fraud, if any.***
>
> In addition to seller fraud, we face the risk of fraud perpetrated directly by our consumers. For example, a group of consumers in Kenya fraudulently used electronic payment suppliers to acquire approximately €550,000 in goods on our marketplace in December 2017. Consumer fraud may harm seller confidence in the integrity of our marketplace and the certainty of payment.
>
> Illegal, fraudulent or collusive activities by our employees could have a material adverse effect on our business, financial condition, results of operations and prospects and could subject us to liability or negative publicity. While we have not experienced any material events of this nature in the past, we have identified allegations of employee misconduct, which led us to improve our internal controls and our cash reconciliation system. . . .

(emphasis of title in original; other emphasis added.)

119.    The foregoing statement, including the bold and italicized portion that indicated that there might not be any fraud in the JForce program, was false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market. The foregoing statement was also false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled.

120.    Jumia's Registration Statement made the following disclosure concerning the number of Active Sellers in 2017 and 2018:

> The success of our marketplace, which is central to our business model, is driven by the breadth and quality of the goods and services offered, which depends largely on the number of sellers on our marketplace and their ability to increase the range of goods and services they offer to our consumers. ***As of December 31, 2018, we had 81 thousand Active Sellers on our platform, up from 53 thousand Active Sellers as of December 31, 2017.*** The number of sellers offering similar goods on our marketplace is a key driver of price attractiveness and quality of service, as they compete for market share on our marketplace. Competition between sellers is also essential to our monetization, as it increases the appetite for sellers to use our services that are geared toward enhancing the sellers' visibility or their quality of service.

(emphasis added).

121.    The foregoing statement regarding Active Sellers was false and misleading because Jumia failed to disclose that 10,000 of the 53,000 sellers it stated were Active Sellers in 2017, or almost 19%, had not completed a transaction on Jumia's platform in 2017 and a

significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

122.    The Registration Statement repeated the Active Consumer and Active Seller numbers for 2018 several more times, showing the importance of those metrics.

123.    The "**Prospectus Summary,**" "**Management's Discussion and Analysis of Financial Condition and Results of Operations**" and a section discussing the "**overview**" of the "**business**" set forth in the Registration Statement all stated "[o]n our platform, we had 81 thousand Active Sellers as of December 31, 2018 and a total of 4.0 million Active Consumers as of December 31, 2018. We believe that the number and quality of sellers on our marketplace, and the breadth of their respective offerings, attract more consumers to our platform, increasing traffic and orders, which in turn attracts even more sellers to Jumia, creating powerful network effects." (emphasis in original).

124.    The foregoing statements regarding Active Consumers and Active Sellers were false and misleading because Jumia failed to disclose that a significant percentage of the 4.0 million Active Customers and 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

125.    The "**Prospectus Summary**" and a section of the Registration Statement entitled "***Our Value Proposition to Customers***" stated: "***Selection, price and convenience***: We believe that our platform is the largest e-commerce marketplace in Africa. With a total of 81 thousand Active Sellers as of December 31, 2018 and over 29.5 million product listings on our marketplace as of December 31, 2018, consumers have access to goods from a wide range of categories." (emphasis in original).

40

126.    The foregoing statements regarding Active Sellers were false and misleading because Jumia failed to disclose that a significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

127.    The Registration Statement also stated the following about the importance of Jumia's seller network: "Our seller network consisted of 81 thousand Active Sellers as of December 31, 2018, who range from small merchants and artisans to larger corporations. If we fail to maintain and expand our existing relationships or to build new relationships with sellers on acceptable commercial terms, we will not be able to maintain and expand our broad product and service offering, which could adversely affect our business."

128.    The foregoing statement regarding Active Sellers was false and misleading because Jumia failed to disclose that a significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

129.    The section of the Registration Statement entitled "***Our Value Proposition to Sellers***" stated the following concerning the importance of Jumia's customer base: "***Access to a large and growing consumer base***: We believe that our brand has become synonymous with online and mobile shopping in our markets, and we have built a logistics service that provides sellers with access to consumers across a wide delivery footprint. As a result, through our platform, local sellers can efficiently reach consumers across a particular country, and international sellers can efficiently reach a large number of consumers across most major markets in Africa. In 2018, we connected sellers with 4.0 million Active Consumers." (emphasis in original).

130.    The foregoing statement regarding Active Consumers was false and misleading because Jumia failed to disclose that a significant percentage of the 4 million Active Customers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

131.    Jumia's Registration Statement made the following statement concerning GMV and Active Consumers for the First Quarter of 2019:

> **Trading Update for the First Quarter of 2019**
>
> In the three months ended March 31, 2019, Active Consumers and GMV developed in line with historical trends. Benefiting from increasing e-commerce penetration in our countries of operation and increasing brand awareness, our **Active Consumers increased from 4.0 million as of December 31, 2018 to approximately 4.3 million as of March 31, 2019. Based on preliminary numbers, GMV increased by approximately 55% compared to the first quarter of 2018 driven by strong contributions from third-party sales.** We expect that our adjusted EBITDA loss prior to the application of IFRS 16 will increase in absolute terms compared to the first quarter of 2018, but improve as a percentage of GMV.

(emphasis added).

132.    The foregoing statement was false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.  The foregoing statement was also false and misleading because Jumia failed to disclose the large number of orders it included in its GMV that were returned, not delivered or cancelled, which was approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV.  Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled.  The foregoing statement was also false and misleading because Jumia failed to disclose that a

significant percentage of the 4.3 million Active Customers it reported for the first quarter of 2019 had not completed a transaction on Jumia's platform.

133.    Jumia's Registration Statement made the following statement concerning the Company's operations in Nigeria:

> [I]n Nigeria, which is our largest and most mature geographic market, our gross profit less fulfillment expense was positive 0.9% of GMV in the second half of 2018, up from negative 2.0% during the same period in 2017, demonstrating the operating leverage of our overall logistics platform.

134.    The foregoing statement concerning Jumia's operations in Nigeria was false and misleading since it failed to disclose that its platform in Nigeria was actually struggling because fake or invalid orders, including fake transactions generated by the JForce program,  exceeded 50% in Nigeria, the Company's largest market, but included those orders in its GMV.

135.    Finally, Jumia's Registration Statement included the following report by Ernst & Young Luxembourg concerning its audit of Jumia:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

> To the Management and the Supervisory Board of Jumia Technologies AG (formerly Africa Internet Holding GmbH)

**Opinion on the Financial Statements**

> *We have audited the accompanying consolidated statement of financial position of Africa Internet Holding GmbH and subsidiaries (the Company) as of December 31, 2018 and 2017, the related consolidated statements of operations and comprehensive income (loss), changes in equity and cash flows for each of the two years in the period ended December 31, 2018, and the related notes (collectively referred to as the "consolidated financial statements")*. In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2018, in conformity with International Financial Reporting Standards as issued by the International Accounting Standard Board.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young
Ernst & Young
Société Anonyme
Cabinet de Révision Agréé

We have served as the Company's auditor since 2014.

Luxembourg
February 6, 2019

(bold in original; bold and italics added).

136.    The foregoing statement concerning Ernst & Young's audit of Jumia was false

and misleading because Ernst & Young only audited 7 of the 14 countries that Jumia operated in

at the time Jumia issued its Registration Statement.  Ernst & Young's audit scope did not include Senegal, Tunisia, Algeria, Rwanda, Uganda, Tanzania, and Cameroon.

## VI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Securities Act Class.  Excluded from the Securities Act Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

138.    The members of the Securities Act Class are so numerous that joinder of all members is impracticable.  While the exact number of Securities Act Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Securities Act Class. Record owners and other members of the Securities Act Class may be identified from records maintained by Jumia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

139.    Plaintiffs' claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

140.    Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Securities Act Class.

141.     Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class.  Among the questions of law and fact common to the Securities Act Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether the Registration Statement was negligently prepared and contained materially misleading statements and/or omitted material information required to be stated therein;

142.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    SECURITIES ACT COUNTS

### COUNT I
### Violations of Section 11 of the Securities Act Against All Defendants

143.     Plaintiffs incorporate the foregoing Paragraphs 1-142 by reference.

144.     This Count is brought against all Defendants pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiffs and all members of the Securities Act Class who purchased or otherwise acquired Jumia ADSs pursuant or traceable to the materially false and misleading Registration Statement for the IPO.

145.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

46

146.     This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive is expressly excluded from this count.

147.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

148.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

149.     At the time of their purchases of Jumia ADSs, Plaintiffs and other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

150.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT II

### Violations of Section 15 of the Securities Act Against the Individual Defendants

151.     Plaintiffs incorporate the foregoing Paragraphs 1-150 by reference.

152.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants.

153.     The Individual Defendants were controlling persons of Jumia by virtue of their positions as directors or senior officers of Jumia.  The Individual Defendants each had a series of

47

direct and indirect business and personal relationships with other directors and officers and major shareholders of Jumia.

154.    The Individual Defendants were culpable participants in the violations of §11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

155.    This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive is expressly excluded from this count.

156.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## **EXCHANGE ACT CLAIMS**

### I.    **PARTIES AND CONTROL PERSON ALLEGATIONS.**

157.    Plaintiffs, who purchased or otherwise acquired Jumia ADSs during the Exchange Act Class Period, bring these claims on behalf of the Exchange Act Class against Jumia and the Management Defendants only.

158.    Each of the Management Defendants, by virtue of their high-level positions with Jumia, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents. The

Management Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

159.    The Management Defendants, as senior executive officers of Jumia, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Exchange Act Class Period.  The Management Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Management Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

160.    As senior officers and controlling persons of a publicly-held company whose ADSs were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Management Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Jumia's operations and business, and to correct any previously issued statements that were materially misleading or untrue when made, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Management Defendants' wrongful conduct during the Exchange Act Class Period as described herein violated these specific requirements and obligations.

161.    In making the statements complained of herein, the Management Defendants, who were senior officers and controlling persons of Jumia, were acting on behalf of the Company in

the regular course of business. Therefore, each of the statements made by the Management Defendants is attributable to Jumia.

162.    Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303(ii), Jumia and the Management Defendants also had an affirmative, independent duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." By failing to disclose that (1) approximately 41% of Jumia's reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled; (2) Jumia had a material amount of fake or invalid orders generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market; (3) 10,000 of the 53,000 sellers the Company stated were Active Sellers in 2017, or almost 19%, had not completed a transaction on Jumia's platform in 2017 and a significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018; and (4) approximately 600,000 of the 2.7 million people the Company stated were Active Consumers in 2017, or approximately 22%, had not completed a transaction on Jumia's platform in 2017 and that a significant percentage of the 4.0 million people who it stated were Active Customers in 2018 had not completed a transaction on Jumia's platform in 2018, Jumia and the Management Defendants failed to satisfy this duty.  These omissions give rise to Plaintiffs' Exchange Act Claims because they render statements by the Company, including the ones enumerated below, materially misleading.

163.    Additionally, pursuant to Item 105 of Regulation S-K, 17 C.F.R. § 229.105, Jumia and the Management Defendants had an affirmative, independent duty to disclose in the

Prospectus the Company's most significant risk factors that make the offering speculative or risky.  By failing to disclose that (1) approximately 41% of Jumia's reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled; (2) Jumia had a material amount of fake or invalid orders generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market; (3) 10,000 of the 53,000 sellers the Company stated were Active Sellers in 2017, or almost 19%, had not completed a transaction on Jumia's platform in 2017 and a significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018; and (4) approximately 600,000 of the 2.7 million people the Company stated were Active Consumers in 2017, or approximately 22%, had not completed a transaction on Jumia's platform in 2017 and that a significant percentage of the 4.0 million people who it stated were Active Customers in 2018 had not completed a transaction on Jumia's platform in 2018, Jumia and the Management Defendants failed to satisfy this duty. Since, according to the Company's Registration Statement, GMV, Active Sellers, and Active Consumers are three of the Company's four "key performance indicators," the omissions described in this paragraph posed a grave threat to Jumia's business and were among the most significant factors making an investment in Jumia risky.  These omissions give rise to Plaintiffs' Exchange Act Claims because they render statements by the Company, including the ones enumerated below, materially misleading.

## II.    ALLEGATIONS SOLELY FOR PLAINTIFFS' EXCHANGE ACT CLAIMS SHOWING THAT JUMIA AND THE MANAGEMENT DEFENDANTS ACTED WITH SCIENTER.

164.    The Management Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Jumia disseminated in the marketplace during the Exchange Act Class Period.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Jumia's operations. Throughout the Exchange Act Class Period, the Management Defendants exercised their power and authority to cause Jumia to engage in the wrongful acts complained of herein. The Management Defendants, therefore, were "controlling persons" of Jumia within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Jumia's ADSs.

165.    By reason of their senior management positions and/or being directors of Jumia, each of the Management Defendants had the power to direct the actions of, and exercised the same to cause, Jumia to engage in the unlawful acts and conduct complained of herein.  Each of the Management Defendants exercised control over the general operations of Jumia and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Exchange Act Class complain.

166.    By virtue of their positions at Jumia, the Management Defendants had actual knowledge or reckless disregard for the discrepancies between Jumia's internal documents and Jumia's Registration Statement and other public statements.  Accordingly, the Management Defendants had actual knowledge of materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the

Exchange Act Class, or, in the alternative, Management Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to such defendants. Said acts and omissions of such defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Management Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

167.   The Management Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Management Defendants were able to and did, directly or indirectly, control the content of the statements of Jumia.

168.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Jumia's ADSs were artificially inflated throughout the Exchange Act Class Period.  In ignorance of the adverse facts concerning Jumia's business and financial condition which were concealed by the Management Defendants, Plaintiffs and the other members of the Exchange Act Class purchased or otherwise acquired Jumia's ADSs at artificially inflated.

**A. The Timing and Nature of the Discrepancies Between the Registration Statement and the 2018 Confidential Investor Presentation Show that Jumia and the Management Defendants Intentionally or Recklessly Misled Shareholders.**

169.   Jumia has never made a profit and its accumulated losses though 2018, the year before its IPO, were 862 million euros, including a loss of 170.7 million euros in 2018 that was greater than the Company's 130.6 million euros in revenue that year.

170.    According to the May 9, 2019 Citron Report, Jumia's IPO was motivated by the Company's need to raise cash quickly.  At the end of 2018, the unprofitable Company had less than a year's worth of cash left and its two largest shareholders, MTN Group Ltd. ("MTN") (31.28%) and Rocket Internet (21.74%), wanted to exit their investments.

171.    MTN, which owned almost a third of Jumia, was desperate to raise money because of its high levels of debt and an enormous fine that it owed the Nigerian government.

172.    In October 2015, MTN, which is Africa's largest wireless operator, was fined $3.9 billion by the Nigerian government because it failed to disconnect 5.1 million subscribers amid concerns that the lines were being used by Boko Haram insurgents.  After a series of negotiations, the Nigerian government reduced the fine to about $1.5 billion, and gave MTN three years to pay it.  MTN did not finish paying off the fine until after Jumia went public in 2019.[7]

173.    MTN was also motivated to take Jumia public because it was suffering under crushing debt.  On February 8, 2019, Bloomberg published an article entitled "*MTN Prepared for Share Sale of African Online Retailer Jumia*".  The article explained that MTN had been considering a listing or private sale of its shares of Jumia since August 2018 and was planning to raise as much as $600 million from selling its shares in Jumia's IPO.  The article further stated that  "[a] successful listing of both Jumia and the Nigeria unit could help MTN reduce debt, which increased to 69.8 billion rand in June [2018] from 57.1 billion rand at the end of 2017.  The rising liabilities and a dispute over non-payment of back taxes in Nigeria is weighing on the company's share price, which has fallen by almost a third in the last 12 months."

---

[7] *See "MTN Pays off bulk of  $1.5 Billion Nigeria Fine"* published on the Mail & Guardian's (a South African Newspaper) website on May 22, 2019.

174.    According to a Reuters article published on September 20, 2018 entitled "*Rocket Internet prepares IPO for African platform Jumia: sources*," Rocket Internet was also looking to cash out its investment in Jumia.   The article stated: "Rocket Internet, which helped set up [Jumia] in 2012, is seeking a partial exit from the consumer electronics and fashion retailer, in line with its strategy of selling or listing established internet firms."

175.    The 2018 Confidential Investor Presentation was used in a last-ditch effort to raise money privately. Accordingly, after the effort to raise money privately failed, the Management Defendants and Jumia had a strong motivation to make the company's numbers look better so that its IPO would be successful.

176.    Furthermore, a comparison between the 2018 Confidential Investor Presentation and the Registration Statement shows that the numbers in the Registration Statement were intentionally and/or recklessly manipulated to look misleadingly favorable.

177.    Jumia's disclosure in the 2018 Confidential Investor Presentation that 41% of its GMV was returned, not delivered or cancelled in 2017 shows the awareness that it was an important metric to shareholders.   The exclusion of that metric from the Registration Statement and the inclusion of the statement that only 14.4% of Jumia's GMV in 2018 was either "failed deliveries or return[s]" was clearly intended to make it appear that Jumia was disclosing all material information when instead, it was disclosing a misleadingly favorable metric that excluded cancellations for the purpose of deceiving shareholders.

178.    Moreover, since Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing cancelled orders ("irrespective of ***cancellations or returns***") there was no justification for Jumia's decision to only disclose in the Registration Statement that in 2018, 14.4% of its GMV

was "***failed deliveries or return[s]***" without disclosing its large volume of cancellations.   The only possible motivation for Jumia's decision to exclude cancellations from that metric — while including them in GMV, Active Consumers, and Active Sellers — is that the Management Defendants and Jumia intended to mislead investors into believing that only 14.4% of GMV consisted of uncompleted orders when, in reality, approximately 41% of Jumia's 2017 GMV and 35% of its 2018 GMV consisted of uncompleted orders.   Furthermore, the phrases "failed deliveries or return[s]" and "cancellations or returns" sound sufficiently similar that it appears that Jumia and the Management Defendants intentionally intended to confuse and mislead investors.

179.    Jumia's decision to include Active Sellers and Active Consumers who had not actually completed an order on Jumia's platform in their Registration Statement numbers, even though those same consumers and sellers were not included in the numbers in the 2018 Confidential Investor Presentation, also shows knowing intent to present metrics that looked misleadingly positive.

**B. The Management Defendants Were Motivated to Misrepresent GMV Because of Jumia's Stock Option Program.**

180.    According to the Registration Statement, all of the Management Defendants are participants in Jumia's 2019 stock option program.

181.    The stock options can only be exercised once the performance targets have been reached and "the minimum performance target is based on GMV growth."   The Registration Statement further states that "[i]n the event that the performance target(s) is/are not met by the end of the waiting period, all stock options will be ***completely forfeited***."  (emphasis added.)

182.    Exhibit 10.5 of the Registration Statement elaborated further on the performance targets for the 2019 stock options program.   The stock options "may only be exercised if at least

56

the following criteria is met:" "The average annual growth rate (previous business year compared to current business year) of the GMV of Jumia Group… amounts to at least 10% during the four years of the Waiting Period." Additionally, with respect to members of the management board, "the Compensation Committee of the Supervisory Board, and in the absence of a Compensation Committee, the Supervisory Board is entitled – in its sole discretion – to determine Additional Performance Targets for each grant of Stock Options to Participants."

183.    The Registration Statement stated that Defendants Hodara and Poignonnec would receive up to 269,288 options under the 2019 stock option program if performance targets were met.  Additionally, Defendants Hodara and Poignonnec both owned an additional 2,209,192.52 in options with an exercise price of 1 euro at the end of 2018.

184.    Accordingly, all the Management Defendants have a strong motivation to inflate GMV to avoid the forfeiture of their stock options.  Additionally, the Management Defendants have a strong motivation to keep the price of Jumia's ADSs high to increase the value of their options.

**C. Additional Scienter Allegations Concerning the Management Defendants.**

185.    As discussed herein in Paragraph 82 above, Defendant Poignonnec gave an interview to Real Money in which he admitted that "[the prospectus and the investor document referenced are not consistent" with Jumia's Registration Statement.  He further stated that "[t]he documents are calculated differently, since the prospectus presents active consumers in the same way we present gross merchandise volume."  These statements show that he was familiar with the 2018 Confidential Investor Presentation and knew there were material discrepancies between it and the Registration Statement.

186.     Defendant Poignnonec's scienter can also be inferred from his false exculpatory statements during Jumia's First Quarter 2019 Earnings Call concerning fraud in Jumia's Nigeria operation and the volume of Jumia's cancelled orders (described in Paragraphs 80-81).

187.     Given that GMV, Active Sellers, and Active Consumers are three of the four metrics defined as "Key Terms and Performance Indicators" in the Registration Statement, it is inconceivable that Defendants Poignnonec and Hodara as Co-CEOs of the Company and members of its management board, and Defendant Maillet-Mezeray, as CFO and Principal Accounting Officer of the Company, would have been unaware of the fact that there was material information about those metrics in the 2018 Confidential Investor Presentation and other internal documents that was not disclosed in the Registration Statement.  Additionally, they would have been aware of emails from Wael Dib, who worked in the same office in Dubai as them, to the Jumia CFOs, given their high-level positions within Jumia.  As discussed above in Paragraphs 88 and 92, emails and attachments from Wael Dib to the Jumia CFOs show that the GMV Jumia reported in its Registration Statement was 30% higher than its pre-IPO internal records and that more than 50% of Jumia's orders in Nigeria were invalid or fraudulent.  They also would have been aware that Ernst & Young's pre-IPO audit of the Company only considered 7 of the 14 countries that Jumia operated in given its importance and the fact that the Senior Vice President of Finance, Nathalie De Witte, who also worked in the same office as them, emailed the Jumia CFOs about it (Paragraph 93).  At a minimum, these failures show reckless disregard for making false and misleading statements to shareholders.

### D. The Scienter of the Management Defendants and Other Employees and Agents of the Company is Imputed to Jumia.

188.     The scienter of the Management Defendants and other employees and agents of the Company is imputed to Jumia under *respondeat superior* and agency principles as all of the

wrongful acts complained of herein were carried out within the scope of their employment with authorization.

189.    As explained herein, their fraudulent conduct enabled the Company to attract investors and raise funds for corporate purposes, thereby defrauding third parties for the corporation.

190.    Since *respondeat superior* extends to employees other than the Management Defendants, regardless of whether the allegations against the Management Defendants are sufficient, knowledge of the 2018 Confidential Investor Presentation, the emails between Wael Dib and Jumia CFOs and Nathalie De Witte and the Jumia CFOs, and other facts alleged in this complaint must be imputed to Jumia. Therefore, Jumia knowingly or recklessly made the false and misleading statements detailed below.

## III.   MATERIALLY FALSE AND MISLEADING STATEMENTS MADE BY JUMIA AND THE MANAGEMENT DEFENDANTS DURING THE EXCHANGE ACT CLASS PERIOD.

191.    The Management Defendants signed Jumia's Registration Statement.

192.    Jumia's Registration Statement repeatedly stated that the Company's GMV was 507.1 million euros in 2017 and 828.2 million euros in 2018 and emphasized the importance of the metric. It referred to GMV as a one of its four "key performance indicators."

193.    The Registration Statement further stated that "Active Consumers" and "Active Sellers" were two of Jumia's three other "key performance indicators."

194.    In both the "**Prospectus Summary**" and "**Management's Discussion and Analysis of Financial Condition and Results of Operations**," the Registration Statement stated: "Our business has grown substantially. As of December 31, 2018, we had 4.0 million Active Consumers, up from 2.7 million Active Consumers as of December 31, 2017. Our GMV

was €828.2 million in 2018, up from €507.1 million in 2017. GMV is the primary driver of our revenue." (emphasis in original).

195.     Jumia's Registration Statement later presented GMV in the following table in three different places:

| | As of and for the year ended December 31, | | | | |
| | 2017 | | 2018 | | |
| | | | (unaudited, in millions) | | |
|---|---|---|---|---|---|
| Active Consumers | | 2.7 | | 4.0 | |
| GMV | € | 507.1 | € | 828.2 | $ 948.8 |
| Adjusted EBITDA | € | (126.8) | € | (150.1) | $ (172.0) |

196.     Jumia's Registration Statement presented the following table breaking GMV and Active Consumers down by quarter:

| | 2017 | | | | 2018 | | | |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | | | | (unaudited, in millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| GMV | € 88.6 | € 101.8 | € 118.9 | € 197.9 | € 152.4 | € 166.3 | € 198.4 | € 311.0 |
| Active Consumers[1] | 1.9 | 2.0 | 2.3 | 2.7 | 3.0 | 3.2 | 3.5 | 4.0 |
| Adjusted EBITDA[2] | € (24.1) | € (28.7) | € (28.6) | € (45.4) | € (30.2) | € (35.6) | € (35.8) | € (48.6) |

197.     The Registration Statement further stated concerning the "***Growth and engagement of our Active Customers***" that "[o]ur GMV is a function of the number of Active Consumers on our platform and the amount they spend on our marketplace. As of December 31, 2018, we had 4.0 million Active Consumers, up from 2.7 million Active Consumers as of December 31, 2017. GMV increased from €507.1 million in 2017 to €828.2 million in 2018." (emphasis in original).

198.     The foregoing statements concerning Jumia's GMV and Active Consumers in Paragraphs 194-197 were false and misleading because the 2017 and 2018 GMV numbers that Jumia disclosed in its Registration Statement were 30% higher than in its pre-IPO internal

records.  Additionally, even if the GMV numbers Jumia disclosed were correct, the foregoing statements were still false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled.  Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled.  The foregoing statements were also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.  The foregoing statements were also false and misleading because Jumia failed to disclose that approximately 600,000 of the 2.7 million people it stated were Active Consumers in 2017, or approximately 22%, had not completed a transaction on Jumia's platform in 2017 and that a significant percentage of the 4.0 million people who it stated were Active Customers in 2018 had not completed a transaction on Jumia's platform in 2018.

199.   In a Section entitled "*Revenue*," the Registration Statement stated "GMV increased by 63.3% from €507.1 million in 2017 to €828.2 million in 2018, mainly due to a 74.7% increase in GMV from third-party sales. All regions contributed to the growth of GMV, with particularly strong contributions from West Africa and Egypt." (emphasis in original).

200.   The foregoing statement concerning Jumia's GMV was false and misleading because the 2017 and 2018 GMV numbers that Jumia disclosed in its Registration Statement were 30% higher than in its pre-IPO internal records.  Additionally, even if the GMV numbers Jumia disclosed were correct, the foregoing statement was still false and misleading because

Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled. Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled. The foregoing statement was also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.

201.    Jumia's Registration Statement also cited GMV, Active Consumers, and Active Sellers when discussing "***Strengths Related to Our Competitive Position***":

> ***Pan-African leader***. We believe that we are the only e-commerce business successfully operating across multiple regions in Africa. Through our full scale operations in six regions of Africa, we generated €507.1 million in GMV in 2017 and €828.2 million in 2018, more than any other e-commerce player in the markets in which we operate. Our reach and capabilities position us as the preferred partner in Africa for sellers, from individuals to large global brands, and as the preferred shopping destination for consumers. On our platform, we had 81 thousand Active Sellers as of December 31, 2018 and a total of 4.0 million Active Consumers as of December 31, 2018.

(emphasis in original.)

202.    The foregoing statement was false and misleading because the 2017 and 2018 GMV numbers that Jumia disclosed in its Registration Statement were 30% higher than in its pre-IPO internal records. Additionally, even if the GMV numbers Jumia disclosed were correct, the foregoing statement was still false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled. Jumia's key performance indicators in the

Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled.   The foregoing statement was also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.   The foregoing statement was also false and misleading because Jumia failed to disclose that a significant percentage of the 4.0 million Active Customers and 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

203.    The Registration Statement made the following statement concerning transactions that were placed on Jumia's platform, but were not completed:

> ***We face challenges with failed deliveries, excessive returns, late collections, unrecoverable receivables and voucher abuse, which may materially and adversely affect our business and prospects.***
>
> We typically provide our consumers with the option to pay cash on delivery. Many of our consumers choose this option. . .  In situations where the consumer elects to pay cash on delivery, he/she must be present at home in order to provide payment at the time of delivery; otherwise, the delivery will fail. . . .   If a consumer is not present, we schedule a new delivery time. We typically make three delivery attempts, and if all of these attempts fail, we return the product to the seller. . . .
>
> Even if the product is successfully delivered to the consumer and delivery is verified, most of our sellers are required, either by local regulations or by our operating standards, to allow consumers to return goods within a certain period of time after delivery. For example, in Egypt, which is one of our largest markets, consumers have a legal right to return any product within fourteen days after delivery so long as the product is in the same condition as when delivered. Furthermore, if our sellers offer more consumer friendly return policies, the number of returns may increase, which could adversely affect our business. ***In 2018, orders accounting for 14.4% of our GMV were either failed deliveries or returned by our consumers. . . .***

> We also face the risk that third-party delivery agents might misappropriate inventory, and we struggle to verify delivery when our third-party delivery partners deliver packages without obtaining consumer signatures. When goods are delivered without verification, we may be required to deliver a duplicate product. When a third-party delivery agent successfully delivers a product and accepts cash payment from the consumer, we face the additional risks of late collections (in the event that the third-party delivery agent does not remit the funds to us on time) or unrecoverable receivables (in the event that the third-party delivery agent commits fraud or becomes insolvent). These risks are particularly acute in countries where the percentage of outsourced deliveries remains high. For example, in Kenya, where approximately 95% of our consumers paid in cash or with cash equivalents on delivery in 2016, we discovered in early 2018 that €720 thousand of cash payments remained uncollected in 2016, the large majority of which was never subsequently collected. The extent of the effect on our cash flows in 2016 was due to our previous use of an insufficient cash reconciliation system, which has now been replaced with an automated system that allows us to monitor transactions in each of our markets on a daily basis. Even though we have taken measures to reduce the risks of fraud and uncollected receivables, these risks – whether facilitated by our employees, sellers, partners or consumers – remain, due largely to the prevalence of cash on delivery in many of our markets.

(emphasis of title in original; other emphasis added.)

204.    The foregoing statement was false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled.   Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled.   The foregoing statement was also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.

205.    Jumia's Registration Statement made the following disclosure concerning fraudulent and fictitious transactions:

> **_Failure to deal effectively with any fraud perpetrated and fictitious transactions conducted on our platform could harm our business._**
>
> We face risks with respect to fraudulent activities on our platform. . . .  Given the countries in which we operate, the number of participants on our platform and the fragmentation of our business, it is a challenge to anticipate, detect and address fraudulent activities. Although we have implemented various measures to detect and reduce the occurrence of fraudulent activities on our platform, there can be no assurance that such measures will be effective in combating fraudulent transactions or improving overall satisfaction among sellers, consumers and other participants. Additional measures that we take to address fraud could also negatively affect the attractiveness of our platform to sellers or consumers.
>
> For example, we may receive complaints from consumers who may not have received goods that they had purchased, or complaints from sellers who have not received payment for the goods ordered. In addition to fraudulent transactions with legitimate consumers, sellers may also engage in fictitious or "phantom" transactions with themselves or collaborators in order to artificially inflate their own ratings on our marketplace, reputation and search results rankings. This activity may harm other sellers by enabling the perpetrating seller to be favored over legitimate sellers and may harm consumers by deceiving them into believing that a seller is more reliable or trusted than the seller actually is. Recently, we also received information alleging that a seller in Morocco bribed one of our employees in order to receive favorable marketing treatment. In addition, we recently received information alleging that some of our independent sales consultants, members of our JForce program in Nigeria, may have engaged in fraudulent activities. **_We are currently investigating these allegations and are unable to determine their accuracy and/or the potential scope of fraud, if any._**
>
> In addition to seller fraud, we face the risk of fraud perpetrated directly by our consumers. For example, a group of consumers in Kenya fraudulently used electronic payment suppliers to acquire approximately €550,000 in goods on our marketplace in December 2017. Consumer fraud may harm seller confidence in the integrity of our marketplace and the certainty of payment.
>
> Illegal, fraudulent or collusive activities by our employees could have a material adverse effect on our business, financial condition, results of operations and prospects and could subject us to liability or negative publicity. While we have not experienced any material events of this nature in the past, we have identified allegations of employee misconduct, which led us to improve our internal controls and our cash reconciliation system. . . .

(emphasis of title in original; other emphasis added.)

206.    The foregoing statement, including the bold and italicized portion that indicated that there might not be any fraud in the JForce program, was false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market. The foregoing statement was also false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled.

207.    Jumia's Registration Statement made the following disclosure concerning the number of Active Sellers in 2017 and 2018:

> The success of our marketplace, which is central to our business model, is driven by the breadth and quality of the goods and services offered, which depends largely on the number of sellers on our marketplace and their ability to increase the range of goods and services they offer to our consumers. ***As of December 31, 2018, we had 81 thousand Active Sellers on our platform, up from 53 thousand Active Sellers as of December 31, 2017.*** The number of sellers offering similar goods on our marketplace is a key driver of price attractiveness and quality of service, as they compete for market share on our marketplace. Competition between sellers is also essential to our monetization, as it increases the appetite for sellers to use our services that are geared toward enhancing the sellers' visibility or their quality of service.

(emphasis added).

208.    The foregoing statement regarding Active Sellers was false and misleading because Jumia failed to disclose that 10,000 of the 53,000 sellers it stated were Active Sellers in 2017, or almost 19%, had not completed a transaction on Jumia's platform in 2017 and a

significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

209.    The Registration Statement repeated the Active Consumer and Active Seller numbers for 2018 several more times, showing the importance of those metrics.

210.    The "**Prospectus Summary,**" "**Management's Discussion and Analysis of Financial Condition and Results of Operations**" and a section discussing the "**overview**" of the "**business**" set forth in the Registration Statement all stated "[o]n our platform, we had 81 thousand Active Sellers as of December 31, 2018 and a total of 4.0 million Active Consumers as of December 31, 2018. We believe that the number and quality of sellers on our marketplace, and the breadth of their respective offerings, attract more consumers to our platform, increasing traffic and orders, which in turn attracts even more sellers to Jumia, creating powerful network effects." (emphasis in original).

211.    The foregoing statements regarding Active Consumers and Active Sellers were false and misleading because Jumia failed to disclose that a significant percentage of the 4.0 million Active Customers and 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

212.    The "**Prospectus Summary**" and a section of the Registration Statement entitled "*Our Value Proposition to Customers*" stated: "*Selection, price and convenience*: We believe that our platform is the largest e-commerce marketplace in Africa. With a total of 81 thousand Active Sellers as of December 31, 2018 and over 29.5 million product listings on our marketplace as of December 31, 2018, consumers have access to goods from a wide range of categories." (emphasis in original).

213.    The foregoing statements regarding Active Sellers were false and misleading because Jumia failed to disclose that a significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

214.    The Registration Statement also stated the following about the importance of Jumia's seller network: "Our seller network consisted of 81 thousand Active Sellers as of December 31, 2018, who range from small merchants and artisans to larger corporations. If we fail to maintain and expand our existing relationships or to build new relationships with sellers on acceptable commercial terms, we will not be able to maintain and expand our broad product and service offering, which could adversely affect our business."

215.    The foregoing statement regarding Active Sellers was false and misleading because Jumia failed to disclose that a significant percentage of the 81,000 Active Sellers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

216.    The section of the Registration Statement entitled "***Our Value Proposition to Sellers***" stated the following concerning the importance of Jumia's customer base:  "***Access to a large and growing consumer base***: We believe that our brand has become synonymous with online and mobile shopping in our markets, and we have built a logistics service that provides sellers with access to consumers across a wide delivery footprint. As a result, through our platform, local sellers can efficiently reach consumers across a particular country, and international sellers can efficiently reach a large number of consumers across most major markets in Africa. In 2018, we connected sellers with 4.0 million Active Consumers." (emphasis in original).

68

217.    The foregoing statement regarding Active Consumers was false and misleading because Jumia failed to disclose that a significant percentage of the 4 million Active Customers it reported for 2018 had not completed a transaction on Jumia's platform in 2018.

218.    Jumia's Registration Statement made the following statement concerning GMV and Active Consumers for the First Quarter of 2019:

*Trading Update for the First Quarter of 2019*

In the three months ended March 31, 2019, Active Consumers and GMV developed in line with historical trends. Benefiting from increasing e-commerce penetration in our countries of operation and increasing brand awareness, our ***Active Consumers increased from 4.0 million as of December 31, 2018 to approximately 4.3 million as of March 31, 2019. Based on preliminary numbers, GMV increased by approximately 55% compared to the first quarter of 2018 driven by strong contributions from third-party sales.*** We expect that our adjusted EBITDA loss prior to the application of IFRS 16 will increase in absolute terms compared to the first quarter of 2018, but improve as a percentage of GMV.

(emphasis added).

219.    The foregoing statement was false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.  The foregoing statement was also false and misleading because Jumia failed to disclose the large number of orders it included in its GMV that were returned, not delivered or cancelled, which was approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV.  Jumia's key performance indicators in the Registration Statement — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled. The foregoing statement was also false and misleading because Jumia failed to disclose that a

69

significant percentage of the 4.3 million Active Customers it reported for the first quarter of 2019 had not completed a transaction on Jumia's platform.

220.    Jumia's Registration Statement made the following statement concerning the Company's operations in Nigeria:

> [I]n Nigeria, which is our largest and most mature geographic market, our gross profit less fulfillment expense was positive 0.9% of GMV in the second half of 2018, up from negative 2.0% during the same period in 2017, demonstrating the operating leverage of our overall logistics platform.

221.    The foregoing statement concerning Jumia's operations in Nigeria was false and misleading since it failed to disclose that its platform in Nigeria was actually struggling because fake or invalid orders, including fake transactions generated by the JForce program,  exceeded 50% in Nigeria, the Company's largest market, but included those orders in its GMV.

222.    Finally, Jumia's Registration Statement included the following report by Ernst & Young Luxembourg concerning its audit of Jumia:

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

> To the Management and the Supervisory Board of Jumia Technologies AG (formerly Africa Internet Holding GmbH)

#### Opinion on the Financial Statements

> *We have audited the accompanying consolidated statement of financial position of Africa Internet Holding GmbH and subsidiaries (the Company) as of December 31, 2018 and 2017, the related consolidated statements of operations and comprehensive income (loss), changes in equity and cash flows for each of the two years in the period ended December 31, 2018, and the related notes (collectively referred to as the "consolidated financial statements")*. In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2018, in conformity with International Financial Reporting Standards as issued by the International Accounting Standard Board.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young
Ernst & Young
Société Anonyme
Cabinet de Révision Agréé

We have served as the Company's auditor since 2014.

Luxembourg
February 6, 2019

(bold in original; bold and italics added).

223.    The foregoing statement concerning Ernst & Young's audit of Jumia was false and misleading because Ernst & Young only audited 7 of the 14 countries that Jumia operated in

at the time Jumia issued its Registration Statement.  Ernst & Young's audit scope did not include Senegal, Tunisia, Algeria, Rwanda, Uganda, Tanzania, and Cameroon.

224.     On May 13, 2019, Jumia filed a Form 6-K signed by Defendants Poignonnec.  It attached a press release with Jumia's first quarter results that stated the following about Jumia's GMV and Active Consumers:

| | 2018 | | | | 2019 |
|---|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
| **GMV[1] (€ million)** | 152 | 166 | 198 | 311 | 240 |
| **LTM Active Consumers (million)** | 3.0 | 3.2 | 3.5 | 4.0 | 4.3 |

225.     The foregoing statement was false and misleading because the 2018 GMV numbers that Jumia disclosed were 30% higher than in its pre-IPO internal records. The foregoing statement was also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV.  Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.  The foregoing statement was also false and misleading because Jumia failed to disclose the large number of orders it included in its GMV that were returned, not delivered or cancelled, which was approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV.  Jumia's key performance indicators — GMV, Active Consumers, and Active Sellers — were all calculated without removing the high percentage of orders returned, not delivered, or cancelled.  The foregoing statement was also false and misleading because Jumia failed to disclose that a significant percentage of the Active Customers it reported for 2018 and 2019 had not completed a transaction on Jumia's platform.

226.     On May 13, 2019, Jumia held its First Quarter 2019 Earnings Call.  Defendants Poignonnec and Maillet-Mezeray were participants on the call.

227.    During the First Quarter 2019 Earnings Call, Mark Mahaney from Royal Bank of Canada asked about JForce and fraud in Nigeria: "[C]ould you just address the issue of Jforce and fraud [ph] in Nigeria as an operating risk? And how you tried to hedge that? How you tried to manage that?"  Defendant Poignonnec responded:

> I would like to say very upfront that the Jforce agents which are consultants which are part of Jforce get commissions of course on the percentage of their completed transaction after all cancellations and returns. And this is of course key and very normal. We do that.
>
> We have even actually introduced penalties as well as extra incentive to drive lower cancellations and returns for the orders which are generated by the Jforce consultant. So for us this is a very innovative marketing channel which helps consumers adopt ecommerce. It's also very useful channel to gather insights on the consumers, in addition to the data we collect online. And it's been a very successful channel which is particularly adapted to the needs of our market.

228.    The foregoing statement was false and misleading because Jumia failed to disclose that fake or invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria.  The foregoing statements were also false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV consisted of orders that were returned, not delivered or cancelled.

229.    Later on during the First Quarter 2019 Earnings Call, Aaron Kessler of Raymond James asked if Defendant would "address some of the recent concerns around maybe its delivery rates, failed deliveries and cancellations kind of where we're at now on that?"  Defendant Poignonnec responded:

> Then on the failed delivery; these are normal features of an e-commerce business and for us we have cancellations, failed deliveries and returns and those are expected to be higher in the nation's e-commerce markets where the majority of the business is still cash on delivery.

230.    The foregoing statement was false and misleading because Jumia failed to disclose that approximately 41% of its reported 2017 GMV and 35% of its reported 2018 GMV

consisted of orders that were returned, not delivered or cancelled.  The foregoing statement was also false and misleading because Jumia failed to disclose that a material amount of fake or invalid orders had been generated by its JForce program and other Jumia sales consultants and employees, but included those orders in its GMV. Fake and invalid orders, including fake transactions generated by the JForce program, exceeded 50% in Nigeria, the Company's largest market.  .

## IV.   LOSS CAUSATION.

231.   As detailed herein, during the Exchange Act Class Period, Jumia and the Management Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Jumia ADSs.  This scheme operated as a fraud or deceit on purchasers of Jumia ADSs by failing to disclose and misrepresenting the adverse facts detailed herein.  When Jumia and the Management Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Jumia ADSs declined significantly as the prior artificial inflation came out of the price of Jumia ADSs.

232.   By concealing the adverse facts detailed herein from investors, Jumia and the Management Defendants presented a misleading picture of Jumia's business, prospects, and operations.  Jumia and the Management Defendants' false and misleading statements had the intended effect and caused Jumia ADSs to trade at artificially inflated levels throughout the Exchange Act Class Period, reaching as high as $49.77 per ADS on April 17, 2019.  As a result of their purchases of Jumia ADSs at artificially inflated prices during the Exchange Act Class Period, Plaintiffs and the other Exchange Act Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

233.     When the truth about the Company was revealed to the market, the price of Jumia ADSs fell significantly.   The decline removed the inflation from the price of Jumia ADSs, causing real economic loss to investors who had purchased Jumia ADSs during the Exchange Act Class Period.  The decline in the price of Jumia ADSs, when the corrective disclosures came to light, was a direct result of the nature and extent of Jumia and the Management Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price decline in Jumia ADSs negates any inference that the loss suffered by Plaintiffs and the other Exchange Act Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Jumia and the Management Defendants' fraudulent conduct.

234.     The disclosures that corrected the market price to eliminate the inflation maintained by Jumia and the Management Defendants' material misstatements and omissions are detailed below:

(1) As detailed in Paragraphs 73-79, Citron issued its first report concerning Jumia on May 9, 2019.  In response to the issuance of the May 9, 2019 Citron Report, the price of Jumia ADSs declined over 26% on heavy trading volume over a two-day period, from $33.11 per ADS on May 8, 2019 to $24.50 per ADS on May 10, 2019.

(2) As detailed in Paragraph 94, on August 21, 2019, before market hours, Jumia admitted, in the Company's second quarter 2019 earnings press release that was filed with the SEC, that there were a significant amount of fake orders generated by JForce and other Jumia sales consultants and employees.  In response to that disclosure, the price of Jumia ADSs declined almost 17% on heavy trading volume over, from $14.75 per ADS on August 21, 2019 to $12.27 per ADS on August 22, 2019.

(3) As detailed in Paragraph 100, on September 20, 2019, after the close of the market, Bloomberg News published an article entitled *"Amazon of Africa Van Drivers Battle Hardships on Lagos Streets"* that stated Jumia's percentage of failed deliveries, including cancellations and returns, was around 40%.  This supported Citron's allegations and undermined Jumia's denial of them.  In response to the publication of that Bloomberg Article, the price of Jumia ADSs declined more than 23% on heavy trading volume over a three-business day period, from $10.38 per ADS on September 20, 2019 to $7.95 per ADS on September 25, 2019.

(4) As detailed in Paragraph 102, on November 12, 2019, before market hours, Jumia stated in the Company's third quarter 2019 earnings press release that was filed with the SEC that it had fired additional employees for generating fake transactions.  In response to that disclosure, the price of Jumia ADSs declined over 12% on heavy trading volume over, from $6.66 per ADS on November 11, 2019 to $5.84 per ADS on November 12, 2019.

235.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Exchange Act Class members was a direct result of Jumia and the Management Defendants' fraudulent scheme to artificially inflate the price of Jumia ADSs and the subsequent significant decline in the value of Jumia ADSs when their prior misrepresentations and omissions were revealed.

## V.    NO STATUTORY SAFE HARBOR

236.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements

alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Jumia and the Management Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Jumia who knew that the statement was false when made.

## VI.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

237.   Plaintiffs bring these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Exchange Act Class.  Excluded from the Exchange Act Class are Jumia and the Management Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Jumia and the Management Defendants have or had a controlling interest.

238.   The members of the Exchange Act Class are so numerous that joinder of all members is impracticable.  Throughout the Exchange Act Class Period, Jumia ADSs were actively traded on the NYSE.  While the exact number of Exchange Act Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Exchange Act Class.  Record owners and other members of the Exchange Act Class may be identified from

records maintained by Jumia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

239.    Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

240.    Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Exchange Act Class.

241.    Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class.  Among the questions of law and fact common to the Exchange Act Class are:

- whether the federal securities laws were violated by Jumia and the Management Defendants' acts as alleged herein;

- whether statements made by Jumia and the Management Defendants to the investing public during the Exchange Act Class Period misrepresented material facts about the business, operations and management of Jumia;

- whether the Management Defendants caused Jumia to issue false and misleading financial statements;

- whether Jumia and the Management Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Jumia ADSs during the Exchange Act Class Period were artificially inflated because of the Jumia and the Management Defendants' conduct complained of herein; and

- whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

242.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    PRESUMPTION OF RELIANCE

243.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Jumia and the Management Defendants made public misrepresentations or failed to disclose material facts during the Exchange Act Class Period;

- the omissions and misrepresentations were material;

- Jumia ADSs are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Exchange Act Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

- Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold Jumia ADSs between the time Jumia and the Management Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

244.    Based upon the foregoing, Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

245.    Alternatively, Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Jumia and the

Management Defendants omitted material information in their statements during the Exchange Act Class Period in violation of a duty to disclose such information, as detailed herein.

## VIII.   EXCHANGE ACT COUNTS

**COUNT III**

**Violations of Section 10(b) of the Exchange Act Against Jumia and the Management Defendants**

246.   Plaintiffs incorporate the foregoing Paragraphs 1-20, 23-29, 68-103, and 157-245 by reference.

247.   During the Exchange Act Class Period, Jumia and the Management Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

248.   Jumia and the Management Defendants:   (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADSs during the Exchange Act Class Period.

249.   Plaintiffs and the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Jumia ADSs.  Plaintiffs and the Exchange Act Class would not have purchased Jumia ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Jumia and the Management Defendants' misleading statements.

250.     As a direct and proximate result of Jumia and the Management Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of Jumia ADSs during the Exchange Act Class Period.

## COUNT IV

### Violations of Section 20(a) of the Exchange Act Against the Management Defendants

251.     Plaintiffs incorporate the foregoing Paragraphs 1-20, 23-29, 68-103, and 157-250 by reference.

252.     The Management Defendants acted as controlling persons of Jumia within the meaning of Section 20(a) of the Exchange Act.

253.     By virtue of their positions as officers and/or directors of Jumia, and/or their ownership of Jumia securities, the Management Defendants had the power and authority to, and did, cause Jumia to engage in the wrongful conduct alleged.

254.     As a direct and proximate result of the Management Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of Jumia ADSs during the Exchange Act Class Period.

255.     By reason of such conduct, the Management Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and appointing Plaintiffs' counsel as Co-Class Counsel;

B. Awarding Plaintiffs and other members of the two classes damages together with interest thereon;

C. Awarding Plaintiffs and other members of the two classes their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements; and

D. Awarding Plaintiff and other members of the two classes such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: March 13, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Phillip Kim*
        Phillip Kim
Laurence Rosen
Brian B. Alexander
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com
balexander@rosenlegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman
Brenda Szydlo
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
bszydlo@pomlaw.com

**POMERANTZ LLP**

Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603

Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Plaintiffs and the Proposed Classes***