# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*

*New York, New York 10004-2498*
_____

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

April 3, 2020

By ECF

The Honorable P. Kevin Castel,
    United States District Court for the Southern District of New York,
        500 Pearl Street,
            New York, New York  10007.

        Re:    *In re Jumia Techs. AG Sec. Litig.*, No. 19-cv-04397-PKC

Dear Judge Castel:

We represent Defendants Jumia Technologies AG ("Jumia"), Jeremy Hodara, Sacha Poignonnec, Antoine Maillet-Mezeray ("Management Defendants"), Gilles Bogaert, Andre T. Iguodala, Blaise Judja-Sato, Jonathan D. Klein, Angela Kaya Mwanza, Alioune Ndiaye, Matthew Odgers, John H. Rittenhouse ("Supervisory Board Defendants"), and Donald J. Puglisi in the above-referenced action.  As directed by the Court during the March 19, 2020 conference, Defendants respectfully submit this pre-motion letter, under Rule 3.A of the Court's Individual Practices, to explain the grounds for their motion to dismiss Plaintiffs' Second Amended Securities Class Action Complaint ("SAC" or "Complaint") (Dkt. 87).[1]  No further conference has been scheduled in this case.

In short, this is Plaintiffs' third attempt to plead actionable securities claims, but this latest pleading does not fix the flaws of its predecessors.  This action fundamentally must fail because Plaintiffs try to base securities claims on matters that Jumia expressly disclosed to investors *before* they bought shares in Jumia's initial public offering ("IPO").  Plaintiffs' primary theory is that Jumia, the leading e-commerce platform in Africa, misstated its order-related metrics, including "Gross Merchandise Value" ("GMV")—a measure of the monetary value of gross orders—by not excluding order cancellations and returns.  But, as Plaintiffs must admit, Jumia's Registration Statement made plain that GMV was a *gross*, not *net*, metric, and that Jumia calculated GMV and the other metrics "*irrespective of cancellations or returns.*"  (SAC ¶¶ 10 n.2, 85-86 (emphasis added).)  Plaintiffs' other core theory is that Jumia should have disclosed that independent sales consultants in its JForce program, who help customers place orders, improperly placed orders to boost their personal commissions.  Jumia, however, disclosed in its Registration Statement that it was "investigating these allegations," but did not yet know their "accuracy" or "the potential scope of the fraud."  (SAC ¶¶ 118, 205.)  Jumia was not required to (and could not) disclose *the results* of an *ongoing* investigation.

---

[1]    Defendants reserve the right to supplement the arguments summarized in this letter.

The Honorable P. Kevin Castel                                                          -2-

The Complaint also should be dismissed because Plaintiffs have not pleaded facts showing that any challenged statement was materially false. Plaintiffs' securities fraud claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") separately fails because their allegations of scienter amount to no more than ordinary motives to achieve business success. Nor do Plaintiffs plead loss causation because their purported "corrective disclosures" did not reveal new information about the alleged misstatements.

Members of Jumia's Supervisory Board have additional grounds for dismissal as well. The Supervisory Board Defendants did not sign the Registration Statement, and their roles under Jumia's German corporate structure are not those of "directors." Accordingly, the Supervisory Board Defendants cannot be liable under Section 11 of the Securities Act of 1933 ("Securities Act"). And for two Supervisory Board Defendants who reside and work outside the United States, Plaintiffs have not alleged personal jurisdiction.

## I.    Background

This case arises out of Jumia's April 12, 2019 IPO of American Depositary Shares on the New York Stock Exchange. Jumia is a stock corporation incorporated under German law that—unlike public companies organized under U.S. law—uses a two-tier governance structure consisting of a "management board" and a "supervisory board." (SAC ¶ 50.) As Jumia disclosed, it faces the challenges of operating an e-commerce platform in countries with "underdeveloped infrastructure" and where many "consumers either do not have a bank account or do not trust online payments" and prefer "cash on delivery." Jumia Form F-1, at 20 (Mar. 12, 2019).

Like the prior pleadings, the Complaint's allegations are based principally on a so-called "report" issued after the IPO by a short-seller—with a financial interest in driving Jumia's stock price down—that conflates gross and net order-related metrics. (*See* SAC ¶¶ 8-15, 73-93, 95-97, 99-101, 127-36, 170, 175-77, 179, 185, 187, 190, 197-202, 234.) The Complaint asserts the same claims as its predecessor, specifically under: (i) Section 11 of the Securities Act against all Defendants (SAC ¶¶ 143-50); (ii) Section 15 of the Securities Act against the Management and Supervisory Board Defendants (SAC ¶¶ 151-56); (iii) Section 10(b) of the Exchange Act against Jumia and the Management Defendants (SAC ¶¶ 246-50); and (iv) Section 20(a) of the Exchange Act against the Management Defendants (SAC ¶¶ 251-55). Plaintiffs base those claims on three categories of allegedly false statements: (i) Jumia's reporting of certain order-related metrics, namely its GMV, "Active Sellers," and "Active Consumers" (SAC ¶¶ 107-110, 112, 114, 116, 120, 122-23, 125, 127, 129, 131, 133, 192-97, 199, 201, 203, 207, 209-10, 212, 214, 216, 218, 220, 224); (ii) Jumia's disclosure concerning issues involving its JForce program (SAC ¶¶ 118, 205); and (iii) Ernst & Young's ("E&Y") "opinion on [Jumia's] financial statements" (SAC ¶¶ 135, 222). For the Exchange Act claims only, Plaintiffs also challenge two post-IPO statements by Mr. Poignonnec on Jumia's Q1 2019 earnings call (SAC ¶¶ 227, 229) and a press release attached to Jumia's May 13, 2019 6-K (SAC ¶ 224).

The Honorable P. Kevin Castel                                                         -3-

## II.    Plaintiffs Still Fail to Allege a Single False Statement to Support a Section 11 Claim.

Plaintiffs' Section 11 claim, even as most recently amended, remains fundamentally flawed: the Complaint fails to plead any misstatement.[2]

*Order-related metrics*. Although Plaintiffs allege that a number of statements concerning Jumia's GMV, Active Consumers, and Active Sellers were false because they included "orders that were returned, not delivered or cancelled" (*e.g.*, SAC ¶ 111), Plaintiffs admit that the Registration Statement expressly defined those terms to be "irrespective of cancellations or returns" (SAC ¶¶ 10 n.2, 85-86).[3] That plain language is the start and end of the analysis. Plaintiffs simply disagree with how Jumia should have defined these metrics, which is not actionable because "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012). Nor would it surprise investors that "*Gross* Merchandise Value" is a gross measure or that an e-commerce business in Africa experienced cancellations and returns.[4]

Plaintiffs nevertheless suggest that the order-related metrics were misleading because the Registration Statement did not disclose the precise number of returned, undelivered, or cancelled orders. (Dkt. 84 at 4.) But Plaintiffs fail to plead the requisite "duty to disclose" that information. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 361 (2d Cir. 2010) ("[A]n omission is actionable . . . only when the corporation is subject to a duty to disclose the omitted facts."). Unable to identify any statutory disclosure duty, Plaintiffs are left with the theory that

---

[2]    For this reason, Plaintiffs' claim fails irrespective of the pleading standard. Nonetheless, "[w]here, as here, the claims sound in fraud—indeed, they are identical to [P]laintiffs' [] fraud claims under § 10(b)—the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies, requiring that the circumstances of the alleged fraud be set forth in the complaint with particularity." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). To avoid this, Plaintiffs mechanically divide their Complaint into separate sections addressing their Section 11 and Section 10(b) claims, but Plaintiffs' Section 11 claim is based on the same allegations—stemming from a short-seller's "report" explicitly alleging fraud—as their Section 10(b) claim and is grounded in the same allegedly fraudulent conduct. In fact, every statement Plaintiffs claim is false under Section 11, they also claim is false under Section 10(b)— and their explanation of why is identical for both claims.

[3]    To the extent Plaintiffs challenge anything other than Jumia's order-related metrics in the statements they quote, much of the surrounding language is nonactionable puffery, opinion statements, or forward-looking statements. (*See, e.g.*, SAC ¶ 114 ("We believe that we are the only e-commerce business successfully operating across multiple regions in Africa"; "Our reach and capabilities position us as the preferred partner in Africa").)

[4]    The Registration Statement in fact contained multiple disclosures that put investors on notice that orders were returned, not delivered, or cancelled. *See, e.g.*, Jumia Form F-1, at 20 (Jumia's markets "pose significant operational challenges," which "may place a higher risk on us, for example, due to a higher number of failed orders").

The Honorable P. Kevin Castel                                                                                            -4-

Jumia's statements were "half-truths" that required further disclosure.  (Dkt. 84 at 4.)  But the Complaint fails to explain how the alleged omission of the number of returned, undelivered, or cancelled orders rendered false any of the Registration Statement's disclosures.  The Second Circuit has "easily rejected" arguments that defendants were required to disclose under a "half-truth" theory additional information about their operating metrics where such metrics, as defined, were "literally true."  *Bahash*, 506 F. App'x at 38; *see, e.g.*, *In re Eros Int'l Sec. Litig.*, 2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017) ("Defendants could have defined and reported 'users' in an alternate way that took into account the specifics of their use, but that does not amount to misrepresentation."), *aff'd*, 735 F. App'x 15 (2d Cir. 2018); *Altayyar* v. *Etsy, Inc.*, 242 F. Supp. 3d 161, 179 (E.D.N.Y. 2017) (rejecting "far-fetched claim that the defendants should have used a particular method for calculating their financial metrics"), *aff'd*, 731 F. App'x 35 (2d Cir. 2018). Thus, "[w]hatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated [metrics]."  *Bahash*, 506 F. App'x at 38.[5]

> *JForce issues*.  Plaintiffs contend that the Registration Statement should have disclosed the number of "invalid orders" that independent sales consultants participating in Jumia's JForce program had improperly placed to generate commissions for themselves.  (SAC ¶ 119.)  But Jumia disclosed to IPO investors the risk of "fraud perpetrated and fictitious transactions conducted on our platform."  (SAC ¶ 118.)  In fact, Jumia warned investors that it had (i) "received information alleging that some . . . members of our JForce program . . . may have engaged in fraudulent activities," (ii) was "investigating these allegations," and (iii) was "unable to determine their accuracy and/or the potential scope of fraud" at that time.  (*Id*.)

> Plaintiffs' theory that Jumia should have disclosed the number of "invalid orders" while it was "investigating these allegations" makes no sense.  (SAC ¶¶ 118-19.)  Jumia could not have disclosed the *results* of an *ongoing* investigation.  Moreover, "'disclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"  *UBS*, 752 F.3d at 184; *see, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (Castel, J.) (rejecting that "defendants had a duty to disclose the alleged illegal . . . scheme because [company's] reported [] sales were inflated as a result of the alleged scheme"). Rather, "[b]y disclosing" the risk of potential misconduct, the investigation into such misconduct, and the potential for adverse effects, Jumia "complied with its disclosure obligations under [Second Circuit] law."  *UBS*, 752 F.3d at 184; *see, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 16 (S.D.N.Y. 2016) (dismissing claim that "at most pleads that the defendants disclosed an investigation was ongoing, but refused to provide details").  And as the Complaint concedes, Jumia disclosed the impact of "invalid orders" "generated by JForce" on GMV on August 21, 2019, four months after the IPO, when it "closed" its investigation.  (SAC ¶¶ 94, 234.)

---

[5]    Although the Complaint challenges two additional statements—one concerning Jumia's Q1 2019 performance and another its operations in Nigeria—Plaintiffs allege that those statements were false for the same reasons as the other statements concerning Jumia's order-related metrics. (SAC ¶¶ 131-34.)  The two new statements thus also do not support a Section 11 claim.

The Honorable P. Kevin Castel                                                                -5-

Even if Jumia could somehow have disclosed the results of its investigation prior to completion, Plaintiffs have not alleged that the omission of those results was material. "[T]he materiality hurdle remains a meaningful pleading obstacle." *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 472 (S.D.N.Y. 2018) (Castel, J.); *see, e.g.*, *ECA* v. *JPMC*, 553 F.3d 187, 202 (2d Cir. 2009) (affirming dismissal for failure to plead materiality); *IBEW* v. *RBS*, 783 F.3d 383, 390-91 (2d Cir. 2015) (same). After disclosing the existence of the investigation prior to the IPO, Jumia informed investors several months later that it had closed its investigation and found that JForce-generated invalid orders accounted for "approximately 1% of our GMV in each of 2018 and the first quarter of 2019." (SAC ¶ 94.) It is well settled that "[a]n omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial." *In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014). To try to get around this obvious materiality problem, Plaintiffs improperly sum the results of the JForce investigation with a different "sales practices review." (SAC ¶¶ 13, 94, 102.) But, as Jumia disclosed, even "[i]n aggregate, the improper orders identified generated less than 3% of our GMV in 2018" and "less than 2% of our GMV in 2019." Jumia Form 6-K Ex. 99.1, at 13 (Feb. 25, 2020).

Nor have Plaintiffs "allege[d] properly that despite the relatively small size of the allegedly misstated transactions," disclosing them in the Registration Statement "would have made a qualitative difference in [Jumia]'s financial statements." *ECA*, 553 F.3d at 205. Tellingly, the Complaint is devoid of allegations regarding many of the qualitative factors often relied on in this Circuit, such as whether the alleged misstatement (i) "masks a change in earnings or other trends," (ii) "changes a loss into income or vice versa," or (iii) "involves concealment of an unlawful transaction." *IBEW*, 783 F.3d at 391. In fact, as Plaintiffs concede, Jumia reported that the transactions "had virtually no impact on our 2018 or 2019 financial statements." (SAC ¶ 94.) Fundamentally, it is implausible that the results of an investigation can be qualitatively material where that investigation and its subject matter was previously disclosed to investors. Plaintiffs are reduced to pointing to three news articles, one analyst report, and one blog post that touched on disclosure of the investigation results (SAC ¶¶ 95-99), but that limited coverage goes to only one qualitative factor: market reaction. "Consideration of potential market reaction . . . is by itself too blunt an instrument to be depended on in considering whether a fact is material," *Hutchison* v. *Deutsche Bank Secs., Inc.*, 647 F.3d 479, 490 (2d Cir. 2011), and the SEC guidance adopted by courts in this Circuit "limits the usefulness of this factor to instances where management expects 'that a known misstatement may result in a significant positive or negative market reaction,'" *ECA*, 553 F.3d at 205, which Plaintiffs do not plead here.

*E&Y's audit opinion.* As a final, tag-along claim, Plaintiffs assert that E&Y's "opinion on [Jumia's] financial statements" was false because E&Y audited only "7 of the 14 countries that Jumia operated in." (SAC ¶¶ 135-36, 222-23.) This satisfies none of the prerequisites for pleading falsity under *Omnicare*. "Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard," *Querub* v. *Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016), as are Plaintiffs' allegations concerning "facts going to the basis for the [audit] opinion," *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Here, Plaintiffs allege no facts to

The Honorable P. Kevin Castel                                                                    -6-

show that E&Y did not "actually hold[] the stated belief," *id.* at 184, that Jumia's "consolidated financial statements present fairly, in all material respects, the financial position of the Company" (SAC ¶ 135).  Nor do Plaintiffs identify any "supporting fact" in E&Y's opinion statement that was "untrue."  *Omnicare*, 575 U.S. at 186.  And Plaintiffs can point to no duty to disclose the precise scope of the audit.  In fact, E&Y's opinion makes clear that E&Y followed all applicable procedures and "conducted [the] audit[] in accordance with the standards of the PCAOB," which Plaintiffs do not contest.  (SAC ¶¶ 135, 222.)

### III.    The Complaint Does Not Plead That the Supervisory Board Defendants May Be Subject to Section 11 Liability.

Although Plaintiffs amended their Complaint to add allegations about the role of the Supervisory Board and its committees (SAC ¶¶ 50-61), those allegations only underscore why the Supervisory Board Defendants cannot be liable under Section 11.  As relevant here, Section 11 applies to:  (i) "person[s] who signed the registration statement"; (ii) "person[s] who w[ere] a director"; and (iii) "person[s] performing similar functions" of a director.  15 U.S.C. § 77k(a).  The Complaint does not plead that the Supervisory Board Defendants signed the Registration Statement.  And as members of a German Supervisory Board—one of two boards in Jumia's two-tier governance structure (SAC ¶ 50)—the Supervisory Board Defendants are not U.S. "directors."

Nor do Plaintiffs show that the Supervisory Board Defendants "perform[] similar functions" to U.S. directors.  The Complaint alleges that Jumia's Supervisory Board is "responsible for appointing and removing the members of the management board, representing the Company in connection with transactions between a current or former member of the management board and the Company, and granting approvals for certain significant matters."  (*Id.*)  Plaintiffs emphasize the Supervisory Board's "comprehensive monitoring responsibilities" and right "to request special reports from the management board on all matters regarding the Company."  (SAC ¶ 51.)  Those allegations confirm that the role of the Supervisory Board "is to *supervise* the management board" and not to *direct* the company.  (SAC ¶ 50 (emphasis added).)  In fact, the "authority to 'direct the company . . . is statutorily vested in the [management board].'"  C. Meier-Schatz, *Corporate Governance & Legal Rules: A Transnational Look at Concepts & Problems of Internal Management Control*, 13 J. Corp. L. 431, 443 (1988).  Therefore, the management board, not the supervisory board, is the "German equivalent of a board of directors in the United States."  *Zakre* v. *Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 487 (S.D.N.Y. 2005).  That is exactly what the Registration Statement disclosed:  "Our management board is responsible for the day-to-day management of our business," and "[t]he principal function of our supervisory board is to supervise our management board."  Jumia Form F-1, at 127.

Perhaps most telling, 15 U.S.C. § 77f(a) requires that a registration statement "be signed by" "the majority of [the issuer's] board of directors or persons performing similar functions (or, if there [are] no [such persons], by the majority of the persons or board having the power of management of the issuer)."  Here, the SEC declared the Registration Statement effective without the signature of any Supervisory Board Defendant.  Simply put, the Supervisory Board

The Honorable P. Kevin Castel                                                        -7-

Defendants are not directors and do not perform similar functions and thus cannot be liable under Section 11.

## IV.     Plaintiffs Do Not Establish Jurisdiction Over Messrs. Bogaert and Ndiaye.

The Complaint pleads neither general nor specific jurisdiction for Messrs. Bogaert and Ndiaye. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 924 (2011). Plaintiffs do not allege that Messrs. Bogaert or Ndiaye reside or work in the United States. In fact, Plaintiffs have conceded that they do not. (*See* Dkt. 84 at 8.)

Specific jurisdiction exists only where a party "purposely availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). Here, too, the allegations Plaintiffs added to the Complaint underscore the lack of specific jurisdiction over Messrs. Bogaert and Ndiaye. As in the prior pleadings, Plaintiffs do not (because they cannot) allege that Messrs. Bogaert or Ndiaye signed the Registration Statement. Further, the Complaint now highlights that neither Messrs. Bogaert nor Ndiaye were members of the Supervisory Board's IPO Committee that Plaintiffs allege "approv[ed]" the "final submission of the prospectus for . . . the IPO." (SAC ¶¶ 54, 55.)[6] Plaintiffs thus are forced to again fall back on the boilerplate allegation that the "Individual Defendants" generally, not Messrs. Bogaert or Ndiaye specifically, "authorized the signing of the Registration Statement" and "otherwise participated in the process which allowed the IPO to be successfully completed." (SAC ¶ 154.) That allegation is entirely unsupported for Messrs. Bogaert and Ndiaye and, indeed, conflicts with Plaintiffs' description of the IPO Committee. In any event, simply relying on Messrs. Bogaert's and Ndiaye's position does not establish minimum contacts, and conclusory allegations of "participation" in the IPO do not fill the gap. *See, e.g.*, *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008) ("A person's status as a board member is not alone sufficient to establish jurisdiction" and "conclusory allegations of participation in the fraud are insufficient."), *aff'd*, 334 F. App'x 404 (2d Cir. 2009); *Giuliano* v. *Barch*, 2017 WL 1234042, at *12 n.23 (S.D.N.Y. Mar. 31, 2017) ("Defendants' status as directors in itself, even if they 'participated'—whatever that might mean—in the drafting and negotiating of the [allegedly false document] is insufficient to establish jurisdiction.").

## V.     The Complaint Fails to Plead Section 15 Control Person Liability.

Because Plaintiffs do not allege a primary Securities Act violation, their Section 15 control person liability claim also must be dismissed. *See* 15 U.S.C. § 77o(a).

---

[6]     Indeed, the Complaint does not allege that Mr. Bogaert was a member of any Supervisory Board committee. Plaintiffs claim that Mr. Ndiaye was a member of the Corporate Governance and Nominations Committee, but that committee's purported role has no relationship whatsoever to any challenged statement or the IPO more generally. (*See* SAC ¶¶ 35, 60-61.)

The Honorable P. Kevin Castel                                                    -8-

Plaintiffs' Section 15 claim against the Supervisory Board Defendants fails for another reason as well: The Complaint does not adequately allege that the Supervisory Board Defendants had "the power to direct or cause the direction of the management and policies" of Jumia as necessary to plead control. *In re Lehman Bros. Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011). The Complaint's recently added allegations (SAC ¶¶ 50-61) merely confirm that the Supervisory Board Defendants did not have the power to *direct* management's actions; rather, their role was to *monitor* the Management Board (*see supra* Section III). To the extent Plaintiffs try to plead that the Supervisory Board Defendants provided "advice and 'strategic direction'" to the Management Board, that too "falls far short" of control. *Lehman Bros.*, 650 F.3d at 187. And Plaintiffs' cursory allegation that the Supervisory Board Defendants "were controlling persons of Jumia by virtue of their positions as directors" (SAC ¶ 153) glosses over the far more circumscribed role of the Supervisory Board in Jumia's two-tier governance structure (*see supra* Section III). In any event, such "boilerplate allegations that a party controlled another based on . . . [supposed] director status are insufficient." *Emerson* v. *Mutual Fund Series Tr.*, 393 F. Supp. 3d 220, 260 (E.D.N.Y. 2019). Because the Complaint "lacks facts sufficient to plead control under Section 15," the Court may "dismiss[] the Plaintiffs' claims with prejudice pursuant to Rule 12(b)(6)," *id.* at 261, and there is no need to wait until summary judgment, as Plaintiffs suggest (*see* Dkt. 84 at 9).

## VI.    The Complaint Comes No Closer to Alleging the Elements of a Section 10(b) Claim.

Like the prior pleadings, the Complaint fails to plead at least three elements of a Section 10(b) claim: (i) "a material misrepresentation (or omission)"; (ii) "scienter, *i.e.*, a wrongful state of mind"; and (iii) "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 182-83 (2d Cir. 2014).

*First*, the same challenged statements for which Plaintiffs have not pleaded falsity to state a Section 11 claim are for the same reasons inadequate to support their Section 10(b) claim. Nor are the few additional statements Plaintiffs rely on for their Section 10(b) claim actionable. (*See* SAC ¶¶ 226-30.) Plaintiffs fail to show how general discussions by Mr. Poignonnec on Jumia's Q1 2019 earnings call about the operation of the JForce program and the risks posed by "cancellations, failed deliveries, and returns" were materially false. (SAC ¶¶ 227, 229.) Plaintiffs also allege that a press release attached to Jumia's May 13, 2019 6-K reporting Jumia's Q1 2019 GMV and Active Consumers was false for the same reasons as their other challenged statements concerning Jumia's order-related metrics. (SAC ¶¶ 224-25.) But the press release, like the Registration Statement, contains no misstatement because it clearly states that GMV and Active Consumers are defined "irrespective of cancellations or returns." Jumia Form 6-K Exhibit 99.1, at 2.

Plaintiffs' fallback contention that Items 303 and 105 of Regulation S-K impose "affirmative, independent" disclosure duties does not save their Section 10(b) claim, the only claim

as to which Plaintiffs invoke those regulations. (SAC ¶¶ 162-63.)[7] Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income," 17 C.F.R. § 229.303(ii), and Item 105 requires disclosure of the "most significant factors that make [the] offering speculative or risky," 17 C.F.R. § 229.105. Plaintiffs allege that Jumia did not satisfy those requirements because it did not disclose the impact of "orders that were returned, not delivered or cancelled" and of "invalid orders" on its order-related metrics. (SAC ¶¶ 162-63.) But Jumia's Registration Statement specifically disclosed the risk of "failed deliveries," Jumia Form F-1 at 30-31, "excessive returns," *id.*, and "fraud perpetrated and fictitious transactions conducted on our platform" (SAC ¶¶ 118, 205). Thus, "to the extent the [P]laintiffs refer to [unfulfilled orders] as a trend that posed a risk to [Jumia]'s business," the Registration Statement "sufficiently disclosed that risk." *Etsy*, 242 F. Supp. 3d at 180 n.3.

*Second*, despite multiple opportunities to amend, the Complaint comes nowhere near "stat[ing] with particularity facts giving rise to a strong inference that [D]efendant[s] acted with the required state of mind" as mandated by the Private Securities Litigation Reform Act and Rule 9(b). *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). As a threshold matter, the Complaint does not adequately allege that the challenged statements were false or that any Defendant knew about their supposed falsity. Plaintiffs, therefore, must allege particularized facts demonstrating either (i) "motive and opportunity to commit the fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs do neither.

As to motive and opportunity, Plaintiffs allege that two of the businesses with pre-IPO investments in Jumia "wanted to exit their investments," and that one needed "to raise money" to pay down debt and a fine. (SAC ¶¶ 170-74.) Plaintiffs also allege that Jumia "need[ed] to raise cash quickly" through the IPO and that the Management Defendants had to meet "performance targets" to "exercise[]" their stock options. (SAC ¶¶ 169-70, 175, 180-84.) Those "'generalized motive[s] to ensure the success' of the company's IPO" do not allege fraudulent intent because "[a] company and its officers and directors always have" such motives. *Etsy*, 242 F. Supp. 3d at 183. "Motives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see, e.g.*, *ECA*, 553 F.3d at 201 ("'[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'"); *Wyche* v. *Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *12 (S.D.N.Y. Mar. 10, 2017) ("To the extent Defendants *were* concerned with [the company's] debt, and motivated to address it by raising as much money as possible in connection with the IPO, this motive is exactly the kind of generalized motive that courts in this Circuit have found insufficient.").

Plaintiffs also do not allege that any Defendant engaged in conscious misbehavior or acted in a manner that was "highly unreasonable, representing an extreme departure from the

---

[7] As a threshold matter, because Jumia is a foreign private issuer that filed a Form F-1, Item 303 does not apply to the Registration Statement. *See* Form F-1 General Instructions, Part I.

The Honorable P. Kevin Castel                                                          -10-

standards of ordinary care," as required to plead recklessness.  *UBS*, 752 F.3d at 187.  Plaintiffs simply assert that, "[b]y virtue of their positions," the Management Defendants "had actual knowledge or reckless disregard" of the challenged statements' falsity.  (SAC ¶¶ 164-68, 185-87.) If scienter could be pleaded merely by pointing to a defendant's position, it would be pleaded in every case naming a senior executive.  Courts thus routinely hold that alleging defendants "had access to adverse undisclosed information because of their senior positions with the company . . . [is] insufficient to establish scienter."  *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004).[8]

*Third*, the Complaint still does not adequately allege loss causation.  To plead loss causation, Plaintiffs must demonstrate that "the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity."  *In re Merrill Lynch & Co. Sec. Litig.*, 568 F. Supp. 2d 349, 359 (S.D.N.Y. 2008).  Plaintiffs fail to do so because they cannot show that any of their four purported "corrective disclosures" "reveal[ed] some then-undisclosed fact with regard to the specific [alleged] misrepresentations," as opposed to merely "characteriz[ed] [] previously disclosed facts."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010).  Plaintiffs' contention that these publicly known facts were not "pieced together, published, and widely disseminated" (Dkt. 84 at 13), although not the standard, also is flat wrong.  The relevant facts were previously disclosed in Jumia's SEC filings, including the Registration Statement itself, and/or were the subject of news coverage or other public statements for years.

*May 9, 2019*.  Plaintiffs claim that, on May 9, 2019, a short seller's "report" revealed "material discrepancies" in GMV, Active Consumers, and Active Sellers between Jumia's Registration Statement and an alleged 2018 confidential investor presentation.  (SAC ¶¶ 73-79, 234.)  But Plaintiffs concede that their comparison is between two entirely different metrics—*Gross* Merchandise Value in the Registration Statement and *Net* Merchandise Value ("NMV"), "define[d] [] as GMV minus cancellations and returns," in the presentation.  (SAC ¶ 78 & n.4.)  Not only are gross figures plainly larger than net figures, but the net figures also were not new.  The Complaint admits that the NMV numbers were available to the market in the "2017 Annual Report" of Jumia's largest pre-IPO investor posted online *more than a year* before Plaintiffs' "corrective disclosure."  (SAC ¶ 85 n.5.)

*August 21, 2019*.  Plaintiffs allege that, on August 21, 2019, Jumia "admitted" that "invalid orders" "generated by JForce" accounted for approximately 1% of GMV in 2018 and the first quarter of 2019.  (SAC ¶¶ 94, 234.)  Jumia, however, disclosed the JForce issues *more than four months* earlier when the Registration Statement warned investors that Jumia had "received information" that "members of our JForce program" "may have engaged in fraudulent activities," which Jumia was investigating.  (SAC ¶¶ 118, 205.)  Even if Plaintiffs' "corrective disclosure" included the additional specifics of the results of the investigation, Plaintiffs may not rely on the fact that Jumia's "stock price dropped when a disclosed risk . . . materialized."  *In re Tempur Sealy*

---

[8]    To the extent Plaintiffs rely on their allegations that Defendants' "decision to include" the challenged order-related metrics "shows knowing intent to present metrics that looked misleadingly positive," that theory is completely circular.  (SAC ¶¶ 176-79, 187.)

The Honorable P. Kevin Castel                                                    -11-

*Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at \*15 (S.D.N.Y. Mar. 26, 2019); *see DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 458 (S.D.N.Y. 2018) (no corrective disclosure where reported investigations "confirmed what had already been disclosed").

   *September 20, 2019.*  Plaintiffs allege that a September 20, 2019 *Bloomberg News* article discussed the infrastructure difficulties faced by "a Jumia driver" on "a typical day" and "*supported* [the short seller's] allegations" regarding "Jumia's percentage of failed deliveries." (SAC ¶¶ 100, 234 (emphasis added).)  Those obvious risks of running an e-commerce business in Africa were disclosed in the Registration Statement, *see, e.g.*, *supra* n.4, and also were covered by the media for years before Jumia's IPO, *see, e.g.*, J. Bright, "An E-Commerce Challenge in Africa," *The New Yorker* (June 30, 2016) ("Fewer than a quarter of African roads are paved . . . and many of Jumia Group's core markets . . . struggle with access to electricity and . . . the Internet service they need to order goods and services online.").  Where, as here, "subsequent reports merely confirm[] what the market already knew," there is no loss causation as a matter of law. *Odebrecht*, 323 F. Supp. at 459.  And, in any event, the Registration Statement disclosed the percentage of GMV attributable to "failed deliveries or returned [orders]."  (SAC ¶¶ 116, 203.)

   *November 12, 2019.*  Adding a new purported "corrective disclosure" date, the Complaint now claims that, on November 12, 2019, Jumia revealed that it "terminated" employees "who were previously suspended" for placing "improper orders" based on an "ongoing" "sales practices review."  (SAC ¶¶ 102, 234.)  Plaintiffs admit, as they must, that Jumia disclosed *almost three months earlier* that its sales practices review had "identified instances where improper orders were placed," and that it had "suspended the employees involved" and was "continu[ing] [] review of this matter."  (SAC ¶¶ 94, 102.)  Here too, Plaintiffs may not rely on the "materializ[ation]" of a "disclosed risk" to plead loss causation.  *Tempur Sealy*, 2019 WL 1368787, at \*15.

**VII. Plaintiffs Fail to Adequately Allege Section 20(a) Control Person Liability.**

   Because the Complaint does not plead a primary Exchange Act violation, Plaintiffs' Section 20(a) control person liability claim also cannot stand.  *See* 15 U.S.C. § 78t(a).

* * *

   For the aforementioned reasons, Defendants intend to move to dismiss the Complaint with prejudice.  The parties have conferred regarding a briefing schedule and a moderate extension of the page limits under Rules 3.C and 3.D of the Court's Individual Practices and propose as follows:  the undersigned Defendants have 35 days from the date of the Court's scheduling order to file a motion to dismiss of no more than 30 pages, Plaintiffs have 60 days thereafter to file an opposition of no more than 30 pages, and the undersigned Defendants have 30 days thereafter to file a reply of no more than 15 pages.  If the Court wishes to hold a pre-motion conference, the undersigned Defendants request that their motion to dismiss be due no earlier than 21 days after such conference so that they may address any matters raised therein.

The Honorable P. Kevin Castel                                              -12-

Respectfully submitted,

*David M.J. Rein*

David M.J. Rein

*Counsel for Defendants Jumia
Technologies AG, Jeremy Hodara,
Sacha Poignonnec, Antoine Maillet-
Mezeray, Gilles Bogaert, Andre T.
Iguodala, Blaise Judja-Sato,
Jonathan D. Klein, Angela Kaya
Mwanza, Alioune Ndiaye, Matthew
Odgers, John H. Rittenhouse, and
Donald J. Puglisi*

cc:    All counsel of record (via ECF)